# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, | Case No. |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| NEW YORK TIMES COMPANY, a New York corporation, SUSANNE CRAIG, an individual, RUSS BUETTNER, an individual, PETER BAKER, an individual, MICHAEL S. SCHMIDT, an individual, and PENGUIN RANDOM HOUSE LLC, a Delaware company, | |
| Defendants. | |

Plaintiff, PRESIDENT DONALD J. TRUMP, by and through his counsel, sues Defendants, NEW YORK TIMES COMPANY (the "New York Times" or the "Times"), SUSANNE CRAIG ("Craig"), RUSS BUETTNER ("Buettner"), PETER BAKER ("Baker"), MICHAEL S. SCHMIDT ("Schmidt"), and PENGUIN RANDOM HOUSE LLC ("Penguin") (collectively, "Defendants"), and alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      On November 5, 2024, President Trump won the 2024 Presidential Election over Vice President Kamala Harris in historic fashion, emerging victorious in both the Electoral College and the popular vote, and securing a resounding mandate from the American people. President Trump trounced Harris with 312 electoral votes and a sweep of all seven "battleground" states.  This victory was remarkable for many historic reasons, including because President Trump had to overcome persistent election interference from the legacy media, led most notoriously by the New York Times.



2.      With the overwhelming victory, President Trump secured the greatest personal and political achievement in American history. All across our country, Americans from a wide array of backgrounds saw the truth about him and voted accordingly—the same truth that the New York Times refused to recognize as it continued spreading false and defamatory content about President Trump.

3.      There was a time, long ago, when the New York Times was considered the "newspaper of record," and its editors dutifully adhered to the motto "All the News That's Fit to Print." Those halcyon days have passed. Whatever the historical merit of this self-congratulation, the Times has betrayed the journalistic ideals of honesty, objectivity, and accuracy that it once professed. Today, the Times is a full-throated mouthpiece of the Democrat Party. The newspaper's editorial routine is now one of industrial-scale defamation and libel against political opponents. As such, the Times has become a leading, and unapologetic, purveyor of falsehoods against President Trump on the legacy media landscape.

4.      It came as no surprise when, shortly before the Election, the newspaper published, on the front page, highlighted in a location never seen before, its deranged endorsement of Kamala Harris with the hyperbolic opening line "[i]t is hard to imagine a candidate more unworthy to serve as president of the United States than Donald Trump." *See* Editorial Board, *The Only Patriotic Choice for President*, THE NEW               YORK               TIMES               (Sept.               30,               2024),

https://www.nytimes.com/2024/09/30/opinion/editorials/kamala-harris-2024-endorsement.html (last visited Sept. 15, 2025) (photo excerpt below). The Board asserted hypocritically and without evidence that President Trump would "defy the norms and dismantle the institutions that have made our country strong." *Id*.



5.    The New York Times, ironically, has zero regard for "norms" or "institutions"—for example, just in the last three years, the Times printed opinion pieces that: (a) called for the Senate to retire the filibuster for the purpose of ramming through radical legislation designed to undermine election integrity, (b) characterized the Constitution as "broken" and proposed "pack[ing] the Union with new states" to guarantee its amendment, and (c) deemed the Constitution "dangerous." *See* Editorial Board, *For Democracy to Stay, the Filibuster Must Go*, THE NEW YORK TIMES (March 11, 2021), https://www.nytimes.com/2021/03/11/opinion/us-filibuster-senate.html?camp= (last visited Sept. 15, 2025); Ryan D. Doerfler and Samuel Moyn, *The Constitution*

*Is Broken and Should Not Be Reclaimed*, THE NEW YORK TIMES (Aug. 19, 2022), https://www.nytimes.com/2022/08/19/opinion/liberals-constitution.html (last visited Sept. 15, 2025); Jennifer Szalai, *The Constitution Is Sacred. Is It Also Dangerous*, THE NEW YORK TIMES (Aug. 31, 2024), https://www.nytimes.com/2024/08/31/books/review/constitution-secession-democracy-crisis.html (last visited Sept. 15, 2025).

6.     The subject matter of this action—a malicious, defamatory, and disparaging book written by two of its reporters and three false, malicious, defamatory, and disparaging articles, all carefully crafted by Defendants, with actual malice, calculated to inflict maximum damage upon President Trump, and all published during the height of a Presidential Election that became the most consequential in American history—represent a new journalistic low for the hopelessly compromised and tarnished "Gray Lady." Defendants' pre-election goal was to kill three birds with one stone: (a) damage President Trump's hard-earned and world-renowned reputation for business success, (b) in the process, sabotage his 2024 candidacy for President of the United States, and (c) prejudice judges and juries in the unlawful cases brought against President Trump, his family, and his businesses by his political opponents for purposes of election interference. With President Trump having won the Presidency, Defendants' goals remain similar and unlawful:

tarnish his legacy of achievement, destroy his reputation as a successful businessman, and subject him to humiliation and ridicule.

7.     Specifically, on September 17, 2024, Penguin published a false, malicious, and defamatory book titled "*Lucky Loser: How Donald Trump Squandered His Father's Fortune and Created the Illusion of Success*" (the "Book"), authored by Craig and Buettner. *See* Susanne Craig and Russ Buettner, *Lucky Loser: How Donald Trump Squandered His Father's Fortune and Created the Illusion of Success*,                 PENGUIN                 RANDOM HOUSE (Sept. 17, 2024), https://www.penguinrandomhouse.com/books/672076/lucky-loser-by-russ-buettner-and-susanne-craig/ (last visited Sept. 15, 2025) (photo excerpt below).



8.     In the leadup to the publication of the Book days earlier, on September 14, 2024, the New York Times published a defamatory, malicious, and false article

titled "*The Star-Making Machine That Created 'Donald Trump'* " (the "First Article"), authored by Craig and Buettner. *See* Susanne Craig and Russ Buettner, *The Star-Making Machine That Created 'Donald Trump,'* THE NEW YORK TIMES (Sept. 14, 2024), https://www.nytimes.com/2024/09/14/business/donald-trump-apprentice.html) (last visited Sept. 15, 2025) (attached hereto as **Exhibit A** with photo excerpt below).



9.      Then, on October 20, 2024, the Times published another defamatory, malicious, and false article titled "*For Trump, a Lifetime of Scandals Heads Toward a Moment of Judgment*" (the "Second Article"), authored by Baker. *See* Peter Baker, *For Trump, a Lifetime of Scandals Heads Toward a Moment of Judgment*, NEW YORK TIMES (Oct. 20, 2024), https://www.nytimes.com/2024/10/20/us/politics/trump-scandals.html (last visited Sept. 15, 2025) (attached hereto as **Exhibit B** with photo excerpt below).



10.     In another election-interfering salvo, on October 22, 2024, the Times published a third false, malicious, defamatory, and disparaging article about President Trump (the "Third Article," and together with the First Article and the Second Article, the "Articles"), authored by Schmidt. *See* Michael S. Schmidt, *As Election Nears, Kelly Warns Trump Would Rule Like a Dictator*, NEW YORK TIMES (October 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/john-kelly-trump-fitness-character.html (last visited Sept. 15, 2025) (attached hereto as **Exhibit C** with photo excerpt below).



### As Election Nears, Kelly Warns Trump Would Rule Like a Dictator

John Kelly, the Trump White House's longest-serving chief of staff, said that he believed that Donald Trump met the definition of a fascist.

11.    The Book and Articles are part of a decades-long pattern by the New York Times of intentional and malicious defamation against President Trump. Defendants maliciously published the Book and the Articles knowing that these publications were filled with repugnant distortions and fabrications about President Trump. Defendants simply ignored their breach of journalistic ethics because the Book and the Articles would further the goals of the New York Times and its backers in the Democrat Party. These publications were created with a backward methodology: the authors started with a desired narrative for the Book and the Articles, and then, to achieve that narrative, they falsified, distorted, and manipulated facts, while otherwise accurate information was, and remains, available from public and private sources. To hastily churn out the Book and the Articles right before the Presidential Election, with them appealing as crude works of paparazzi rather than as public interest reports, Defendants chose politics over truth. Defendants could not accept President Trump's win in 2016 and could not fathom his winning again by a landslide, which is what the American people chose to make reality. Hence, Defendants' desperate need to defame with a partisan spear rather than report with an authentic looking glass.

12.    To try and falsely and maliciously tear down President Trump's worldwide reputation for success, the New York Times, Craig, Buettner, and Penguin decided to try and confront, head-on, what remains to this day one of the

President's most well-known successes—in addition to his decades of magnificent real estate achievements, winning the Presidency, and then winning the Presidency *again*—his remarkable performance as the star of "The Apprentice," one of the top-rated shows of all time and a trailblazer in American television. Thanks solely to President Trump's *sui generis* charisma and unique business acumen, "The Apprentice" generated hundreds of millions of dollars in revenue, and remained on television for over thirteen years, with nearly 200 episodes. "The Apprentice" represented the cultural magnitude of President Trump's singular brilliance, which captured the *zeitgeist* of our time.



13.    However, for the Defendants, President Trump's historic performance on "The Apprentice" was *such* an appealing target that they had no qualms betraying journalistic standards to push a fake story helpful to the Democrats at any cost. In a shocking example of reckless disregard for the truth, Craig and Buettner wrote the Book and the First Article—green-lit for publication and published by Penguin and the Times, respectively—without interviewing the famed Mark Burnett ("Burnett"), who co-created "The Apprentice" with President Trump and served as the show's executive producer. As the Times, Craig, Buettner, and Penguin admitted in the Book and the First Article, "*Mr. Burnett did not respond to invitations to be interviewed*." (Emphasis added). However, Burnett spoke very clearly in 2003, when, knowing that nothing less than President Trump's celebrity and charisma would suffice to make "The Apprentice" a smash-hit, he agreed—extraordinarily— to split the show's profits 50/50 with President Trump. *See* Book at pp. 345-347.

14.    Nonetheless, unwilling to let reality stand in the way of sensational fiction, the New York Times, Craig, Buettner, and Penguin maliciously peddled the fact-free narrative that Burnett somehow "discovered" President Trump for "The Apprentice" and magically transformed him into a celebrity—even though at and prior to the time of publication Defendants knew that President Trump was already a mega-celebrity and an enormous success in business. Yet, throughout the Book and the First Article, these Defendants desperately clung to the "discovery" narrative

like a life-raft, as though Burnett's decision to work with President Trump on "The Apprentice" was on par with Christopher Columbus discovering the New World circa 1492. That was all maliciously false defamation.

15.     This false narrative about "The Apprentice" was just the tip of Defendants' melting iceberg of falsehoods. Defendants made numerous other malicious, defamatory, and disparaging claims about President Trump in the Book and the Articles, including about his family, his overwhelming success, his businesses, his acumen, his brand, his wealth, and much more. This is all consistent with the *modus operandi* of the New York Times and its so-called journalists—a pattern of falsehoods and defamation.

16.     Indeed, since 2015, when President Trump famously rode down the escalator at Trump Tower to announce his history-making candidacy for President of the United States, and continuing to the present time, in which he is once again the President, the New York Times has made it abundantly clear that it has no intention of engaging in accurate reporting about President Trump. *See* Jim Rutenberg, *Trump is Testing the Norms of Objectivity in Journalism*, THE NEW YORK               TIMES            (August            7,            2016), https://www.nytimes.com/2016/08/08/business/balance-fairness-and-a-proudly-provocative-presidential-candidate.html (last visited Sept. 15, 2025) ("If you view a Trump presidency as something that's potentially dangerous, then your reporting is

going to reflect that. You would move closer than you've ever been to being oppositional."). The Times does have every intention of defaming and disparaging the world-renowned Trump brand that consumers have long associated with excellence, luxury, and success in entertainment, hospitality, and real estate, among many other industries, as well as falsely and maliciously defaming and disparaging him as a candidate for the highest office in the United States, the 45th, and now 47th President of the United States.

17.    Given Defendants' political positions and alliances, and the timing of the publication of the Book and Articles—which were released in the two months leading up to the 2024 Presidential Election, while early voting was already underway—it is evident that the defamatory and disparaging statements in the Book and the Articles were specifically designed to try and damage President Trump's business, personal, and political reputation, and to provide maximum dissemination of the defamatory falsehoods.

18.    Contrary to the Times' and its reporters' apparent impression, the First Amendment has never furnished the Times—or Penguin, or anyone else—with an unqualified privilege to make false, malicious, and defamatory statements about its opponents in order to try and ruin their lives and livelihoods. President Trump brings this suit to highlight that principle and to clearly state to all Americans exhausted

by, and furious at, the decades of journalistic corruption, that the era of unchecked, deliberate defamation by the Times and other legacy media outlets is over.

## THE PARTIES

19.     President Trump is a citizen of the United States, a resident of the State of Florida, the 45th President of the United States of America, and, having handily won the 2024 Presidential Election despite Defendants' best efforts to the contrary, is the 47th President of the United States. In addition to his unprecedented political success, President Trump is universally known for his decades of remarkable business achievements, particularly at the helm of the world-renowned Trump Organization, with its worldwide portfolio of luxury real estate holdings. Having long established himself as a global celebrity, he then revolutionized television as the star of "The Apprentice." President Trump continues to redefine what is possible in business and media, including with his founding, and powerful use, of the immensely successful social media platform, *Truth Social*.

20.     Recently, President Trump's transcendent ability to defy wrongful conventions has been vividly reflected in his successful undertaking to restore integrity to journalism, and repair the immense damage caused by legacy media outlets such as the Times for the better part of a decade. These legal victories were so significant that even the Times had no choice but to, at last, reverse their position, and reluctantly recognize the importance of the President's highly meritorious and

successful cases. *See* Michael M. Grynbaum and Alan Feuer, *ABC to Pay $15 Million to Settle a Defamation Suit Brought by Trump*, THE NEW YORK TIMES (Dec. 14, 2024), https://www.nytimes.com/2024/12/14/business/media/trump-abc-settlement.html (last visited Sept. 15, 2025); Benjamin Mullin, Michael M. Grynbaum, Lauren Hirsch and David Enrich, *Paramount to Pay Trump $16 Million to Settle '60 Minutes' Lawsuit*, THE NEW YORK TIMES (July 2, 2025), https://www.nytimes.com/2025/07/02/business/media/paramount-trump-60-minutes-lawsuit.html (last visited Sept. 15, 2025).

21.    Indeed, ABC News not only made a $15 million settlement payment but also paid an additional $1 million in legal fees and published a statement of regret for the abhorrent defamation of President Trump by George Stephanopoulos during a March 2024 segment of ABC's *This Week*. "Under the terms of [the] settlement . . . ABC News will donate the $15 million to [President] Trump's future presidential foundation and museum. The network and its star anchor, George Stephanopoulos, also published a statement saying they 'regret' remarks made about Mr. Trump during a televised interview in March." *See* Grynbaum and Feuer, *ABC to Pay $15 Million to Settle a Defamation Suit Brought by Trump*, *supra*.

22.    Paramount and CBS News, for their part, made a $16 million settlement for their deceptive tampering with the infamous *60 Minutes* interview of failed presidential candidate Kamala Harris and subsequent concealment of the unedited

interview transcript. Additionally, consistent with President Trump's steadfast commitment to ensure accurate and fair reporting that serves the public good, he secured as part of the settlement a landmark new transparency Rule requiring CBS News to promptly release unedited transcripts of its future presidential interviews. "Paramount said late Tuesday that it had agreed to pay President Trump $16 million to settle his lawsuit over the editing of an interview on the CBS News program '60 Minutes,' an extraordinary concession to a sitting president by a major media organization . . . . As part of the settlement, Paramount said, it agreed to release written transcripts of future '60 Minutes' interviews with presidential candidates." *See* Mullin, Grynbaum, Hirsch and Enrich, *Paramount to Pay Trump $16 Million to Settle '60 Minutes' Lawsuit*, *supra*.

23.     In addition, Paramount will be furnishing an additional $20 million in advertising and programming in the form of advertising, PSAs, and programming, bringing the total settlement to over $36 million. *See* Joey Garrison, *Trump says he expects $20 million worth of ads, programs from '60 Minutes settlement*, USA TODAY                         (July                         23,                         2025), https://www.usatoday.com/story/news/politics/2025/07/23/trump-20-million-side-pot-60-minutes-paramount-settlement/85345680007/ (last visited Sept. 15, 2025).

24.    President Trump's victories over ABC and CBS were monumental. As

he emphatically stated of the  results of the transformative legal actions:

> BREAKING NEWS! We have just achieved a BIG AND IMPORTANT WIN in our Historic Lawsuit against 60 Minutes, CBS, and Paramount. Just like ABC and George Slopadopoulos, CBS and its Corporate Owners knew that they defrauded the American People, and were desperate to settle. Paramount/CBS/60 Minutes have today paid $16 Million Dollars in settlement, and we also anticipate receiving $20 Million Dollars more from the new Owners, in Advertising, PSAs, or similar Programming, for a total of over $36 Million Dollars. This is another in a long line of VICTORIES over the Fake News Media, who we are holding to account for their widespread fraud and deceit. The Wall Street Journal, The Failing New York Times, The Washington Post, MSDNC, CNN, and all other Mainstream Media Liars, are ON NOTICE that the days of them being allowed to deceive the American People are OVER. MAKE AMERICA GREAT AGAIN!

> *See*            @REALDONALDTRUMP,            X.COM, (https://truthsocial.com/@realDonaldTrump/posts/114898229237459086) (last visited Sept. 15, 2025).

25.    Further, President Trump has also brought a powerhouse defamation

suit against the *The Wall Street Journal*, arising out of a July 17, 2025 article falsely

claiming that he authored, drew, and signed a card to wish the late—and utterly

disgraced—Epstein a happy fiftieth birthday. *See President Donald J. Trump v. Dow*

*Jones & Company, Inc. d/b/a The Wall Street Journal, News Corporation, Keith*

*Rupert Murdoch*, *Robert Thomson*, *Khadeeja Safdar*, *and Joseph Palazzolo*, Case

1:25-cv-23232 (S.D. Fl. July 18, 2025) (*arising out of:* Khadeeja Safdar and Joseph

Palazzolo, *Jeffrey Epstein's Friends Sent Him Bawdy Letters for a 50th Birthday*

*Album. One Was From Donald Trump*, WALL STREET JOURNAL (July 17, 2025),

https://www.wsj.com/politics/trump-jeffrey-epstein-birthday-letter-we-have-certain-things-in-common-f918d796?mod=hp_lead_pos7 (last visited Sept. 15, 2025)).

26.    Notwithstanding President Trump's undeniable legal successes against the biased legacy media, the Times has predictably and bitterly criticized the lawsuits. *See* David Enrich, *Trump's New Line of Attack Against the Media Gains Momentum*, THE NEW YORK TIMES (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/business/media/trump-media-lawsuits.html (last visited Sept. 15, 2025) ("First Amendment experts say Mr. Trump's lawsuits, based on unproven legal theory, lack merit. But more could be on the way.").

27.    Despite wrong and partisan criticism from the Times and other major outlets, President Trump has also been extraordinarily successful and prolific in defeating the numerous "lawfare" cases brought against him by Democrats and frequently "reported" about, but actually just cheered on, by the Times in a grossly biased manner. Vitally, on August 21, 2025, the New York Appellate Division vacated an unconstitutional civil fraud penalty of over $520,000,000 against President Trump, members of his family, and his businesses handed down by a biased judge as a result of a sham lawsuit brought by Democrat New York Attorney General Letitia James, which involved no financial losses, no victims, and only gross mistakes by James and Democrat-backed Justice Arthur Engoron, such as valuing

magnificent Mar-a-Lago in Palm Beach, Florida, at a ludicrous $18 million when it is worth at least 100 times that amount. *See* Jonah E. Bromwich and Ben Protess, *Divided Court Eliminates Trump's Half-Billion-Dollar Fine in Fraud Case*, THE NEW YORK TIMES (Aug. 21, 2025), https://www.nytimes.com/2025/08/21/nyregion/trump-fraud-james.html (last visited Sept. 15, 2025). Throughout the pendency of this grotesque and unprecedented sham, the Times and its reporters acted as unabashed cheerleaders for James, even perversely portraying her as the victim. *See* Jeffrey Toobin, *Adam Schiff, Letitia James and Trump's Payback Plan*, THE NEW YORK TIMES (Aug. 14, 2025), https://www.nytimes.com/2025/08/14/opinion/schiff-james-trump-investigation.html (last visited Sept. 15, 2025); Jonah E. Bromwich, *She Relishes Being Trump's Nemesis. Now He Is Out for Revenge*, THE NEW YORK TIMES (June 11, 2025), https://www.nytimes.com/2025/06/11/nyregion/trump-james-ny-attorney-general-investigation.html (last visited Sept. 15, 2025); Jonah E. Bromwich and Ben Protess, *What the Civil Fraud Ruling Means for Trump's Finances and His Empire*, THE NEW YORK TIMES (Feb. 16, 2024),

https://www.nytimes.com/2024/02/16/nyregion/trump-fraud-trial-finances.html

(last visited Sept. 15, 2025).

28.    Defendant Times is a New York corporation and global media organization with its principal place of business in New York, New York.

29.    Defendant Craig is a natural person over the age of eighteen, a citizen of the State of New York, and an employee of the Times. Craig has "[i]n recent years [has] been focused on shedding light on Mr. Trump's finances." *See Susanne Craig*, THE NEW YORK TIMES, https://www.nytimes.com/by/susanne-craig (last visited Sept. 15, 2025).

30.    Defendant Buettner is a natural person over the age of eighteen, a citizen of the State of New York, and an employee of the Times. *See Russ Buettner,* THE NEW YORK TIMES, https://www.nytimes.com/by/russ-buettner (last visited Sept. 15, 2025).

31.    As detailed in the Book and related reporting, Craig and Buettner received stolen tax returns from convicted felon Charles Littlejohn. *Plaintiff's Notice of Filing Redacted Version of ECF 111-2 in Compliance with Court Order (ECF 114)*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. FL Apr. 25, 2024), ECF No. 119 Exhibit 1 (Deposition of Charles Littlejohn).

32.    Defendant Baker is a natural person over the age of eighteen and, a citizen of the District of Columbia, and an employee of the Times. Baker was the "chief White House correspondent . . . covering President Biden and his administration," who "sometimes" writes about President Trump. *See Peter Baker,* THE NEW YORK TIMES, https://www.nytimes.com/by/peter-baker (last visited Sept. 15, 2025).  Baker also wrote a biography on former President Obama, "The Call of History" (*see* Book Review, *available at* https://perma.cc/4RX8-MQZW (last visited Sept. 15, 2025)), and his wife, Susan Glasser, is active in her social media attacks on President Trump. *See* X Profile, Susan Glasser, *available at* https://x.com/sbg1 (last visited Sept. 15, 2025)*.*

33.    Defendant Schmidt is a natural person over the age of eighteen, is a citizen of the District of Columbia, and is an employe of the Times. *See Michael S. Schmidt,* THE NEW YORK TIMES, https://www.nytimes.com/by/michael-s-schmidt (last visited Sept. 15, 2025). Schmidt, also a contributor to MSNBC and NBC News, wrote a book attacking President Trump, published by Penguin. *See* Michael S. Schmidt, *Donald Trump v. The United States: Inside the Struggle to Stop a President*, PENGUIN RANDOM HOUSE (Sept. 1, 2020),

https://www.penguinrandomhouse.com/books/604656/donald-trump-v-the-united-states-by-michael-s-schmidt/ (last visited Sept. 15, 2025).

34.    Defendant Penguin is a Delaware limited liability company with its principal place of business in New York, New York, and is the U.S. arm of Penguin Random House, the world's largest trade publisher.

**JURISDICTION AND VENUE**

35.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a). The parties are completely diverse, as President Trump is a citizen of Florida, while all Defendants are citizens of New York, Delaware, and the District of Columbia, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

36.    The Court possesses personal jurisdiction over Defendants pursuant to Florida Statute §48.193(2) on the grounds that Defendants, during the operative period alleged in this Complaint, engaged in substantial and not isolated business activities in Florida, and more specifically in this District. By way of illustration, Defendant Times publishes online news reports, editorials, and other media content at https://www.nytimes.com, which are regularly read by individuals in Florida, including the content at issue in this action; Defendant Times sells printed, regularly read newspapers in Florida, which contain news reports, editorials, and other media content, including the content at issue in this action;  Defendant Penguin publishes

online books/e-books at https://www.penguinrandomhouse.com/books/, which are regularly read by individuals in Florida, including the book at issue in this action; and Defendant Penguin sells printed, regularly read books in Florida, including the book at issue in this action.

37.    In addition, this Court possesses personal jurisdiction over Defendants pursuant to: (a) Florida Statute §48.193(1)(a)(1) on the grounds that Defendants Times and Penguin operate, conduct, engage in, or carry on a business in this state or have an office or agency in this state, (b) Florida Statute §48.193(1)(a)(2) on the grounds that Defendants committed a tortious act in this state (as alleged in this Complaint), and (c) Florida Statute §48.193(1)(a)(6) on the grounds that Defendants caused injury to President Trump within this state arising out of an act or omission by Defendants outside this state, while at or about the time of the injury, products, materials, or things processed, serviced, or manufactured by Defendants were used or consumed within this state in the ordinary course of commerce, trade, or use.

38.    The Book and Articles were published in Florida, remain accessible by the public in Florida, and have been accessed and read by individuals in Florida. The New York Times's newspapers, online content, and subscriptions are available for public consumption in Florida, and Penguin's publications are available for public consumption in Florida. Injury to President Trump's reputation in Florida and among

Florida citizens is particularly damaging and injurious to President Trump, and to his business and political efforts.

39.    The Times and its reporters produce a distinct newspaper for distribution and sale in Florida each day. Depending on current events and whether the particular issue of the Times is a weekday or weekend edition, the Times distributes and sells between thousands and tens of thousands of copies of its paper each day in Florida, to Floridians—not to mention the thousands of subscribers to its interactive digital content who reside in Florida. In the aggregate, the Times and its reporters generate millions of individual copies of the Times per year fully intending those copies to be distributed and sold in Florida, to Floridians.

40.    When writing for the Times, Craig, Buettner, Baker, and Schmidt were all aware of the Times' nationwide circulation, including its regular distribution and sale in Florida. Each write for the Times in part because of its national presence. Each was aware that their writings would be published and distributed in Florida, to Floridians, and each approved of the Times' distribution and sale of their writings in Florida as a part of selling the Times.

41.    Penguin similarly regularly publishes, distributes, and sells books in Florida. It publishes titles under numerous brands, including *Penguin Random House*, *Penguin Books*, *Viking*, *Dutton Children's Books*, *The Princeton Review*, *Ballantine Books*, *Image Catholic Books*, *Alfred A. Knopf*, *Doubleday*, and *Vintage*

*Books*. Across its various brands, Penguin publishes approximately 85,000 unique titles in the United States annually, with approximately 15,000 printed, distributed, and sold as physical media and the remaining 70,000 as digital books; some titles are published, distributed, and sold via both print and digital channels.

42.     Penguin markets, distributes, and sells substantially all these titles, including *Lucky Loser*, the title at the center of this litigation, in Florida for sale to Floridians. Penguin has sold thousands or tens of thousands of copies of *Lucky Loser* in Florida through both its print and digital channels. Defendants Craig and Buettner were, once again, aware that *Lucky Loser* would be published, distributed, and sold in Florida, and each approved of Penguin's marketing, distributing, and selling their book in Florida. Penguin continues to distribute and sell *Lucky Loser* in Florida as of the filing of this Complaint. Penguin also maintains an office in Florida, located at 8950 SW 74 Court, Suite 2010, Miami, FL 33156.

43.     Penguin's extensive business contacts with, and interest in, Florida, are further evidenced by its litigation to protect what it perceives to be threats to its business. In August 2024, for example, Penguin joined five other publishers in filing a lawsuit in this District against the Florida State Board of Education and State officials in connection with HB 1069, an education law protecting youth against inappropriate content in school libraries. *See* Complaint, Penguin *Random House LLC et al*. *v. Ben Gibson, in his official capacity as Chair of the Florida State Board*

*of Education et al.,* No. 6:24-cv-01573 (M.D. Fl. Aug. 29, 2024),

https://www.publishersweekly.com/binary-

data/ARTICLE_ATTACHMENT/file/000/006/6535-1.pdf (last visited Sept. 15,

2025).

44.    Defendants Craig and Buettner aggressively marketed *Lucky Loser* to a

nationwide audience and repeatedly republished its central claims in a series of

interviews through nationwide channels. These interviews included appearances on

*CNN*, *Mediaite*, *National Public Radio*, and other programs; they were predictably

republished in a series of other sources which further called attention to Craig and

Buettner's defamatory, malicious, false, and harmful claims about President Trump.

Both Craig and Buettner appeared on these programs to promote their book knowing

that these promotions would be rebroadcast in Florida and intending for their

appearances to increase the nationwide sales of their books, including in Florida.

45.    As of the filing of this Complaint, the several New York Times articles

in dispute remain in circulation in Florida and available online in Florida via the

Times' website. Each has had several hundred comments, including comments by

Florida readers, as the Times encourages its readers to discuss the contents of its

articles to promote engagement with the Times's articles.

46.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (b)(3).

A substantial part of the events or omissions giving rise to Plaintiff's claims occurred

in this District: both the Times and Penguin distributed and sold between thousands and tens of thousands of copies of their respective publications within this District. Defendants have published their false and harmful statements to the millions of residents of this District, if not more. Because many of the statements that Defendants have made within this District are of the sort for which harm is presumed, this Court can and should presume that the reputation of President Trump and his businesses, the Trump Organization, and President Trump's other business holdings during the relevant period, including the *Truth Social* platform and the $TRUMP crypto project, were harmed with the millions of residents of this District.

47.    Additionally, Trump Media & Technology Group ("TMTG"), the media and technology company that owns and operates *Truth Social*, which President Trump is founder of, is headquartered in Sarasota, within this District. The President founded TMTG, and was TMTG's majority shareholder at the time his claims accrued.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### *President Trump's Sterling Business & Real Estate Background*

48.    President Trump's family has long been one of the most influential and successful real estate families in New York City, New York State, and around the world.

49.    President Trump's late father, Fred C. Trump, was a legendary businessman and a patriot, who built over 27,000 apartments in New York City. He likewise was responsible for building one of New York City's first modern supermarkets, called Trump Market, in Woodhaven, Queens; building Shore Haven in Bensonhurst, which included thirty-two six-story buildings and a shopping center covering some thirty acres; constructing the twenty-three building Beach Haven Apartments over 40 acres near Coney Island; building barracks and garden apartments for the U.S. Navy along the East Coast during World War II; and building middle-income housing for the returning veterans and their families after the war had ended. For his efforts and accomplishments, in 1985, Fred Trump received the Horatio Alger Award for distinguished Americans.

50.    Fred Trump's success was a major source of inspiration for President Trump and a catalyst for the Trump family's overwhelming success going forward.

51.    President Trump initially learned about the real estate business from his father and leveraged the skills he gained under his father's tutelage for his own historic accomplishments, starting in New York City's real estate market—the toughest in the world.

52.    President Trump's early success and business acumen were nationally recognized in 1982 as he was listed in *The Forbes 400* List of the wealthiest people in America. *See* Antoine Gara, *Donald Trump Through the Years*, FORBES (Dec. 2,

2016), https://www.forbes.com/pictures/ghmf45edldg/1982-the-forbes-400 (last visited Sept. 15, 2025).

53.    Thereafter, President Trump's stewardship of the Trump Organization has made it and the Trump name synonymous not only with New York City real estate but also with worldwide excellence, luxury, and opulence. Under President Trump's leadership, the Trump brand has come to symbolize the highest standards of class, quality, and consumer satisfaction.

54.    President Trump built much of New York City's famed skyline, owning and operating many of the key New York landmarks.

55.    Currently, President Trump and the Trump Organization own and operate the magnificent Trump Tower, Trump International Hotel and Tower, The Trump Building, 1290 Avenue of the Americas, Trump Park Avenue, Trump Parc, Trump Parc East, Trump World Tower, 610 Park Avenue, Trump Tower City Center, Trump Palace, Trump Park Residences Yorktown, Trump Plaza, 200 Riverside Boulevard, 220 Riverside Boulevard, 240 Riverside Boulevard, 1 Central Park West, the Grand Hyatt Hotel, and 40 Wall Street, in addition to numerous other iconic properties.



56.    President Trump has built, transformed, established, and revitalized businesses, projects and brands, including "The Apprentice;" *Truth Social*; Trump Tower, New York City; Trump International Hotel and Tower, New York City; The Trump Building, New York City; the GM Building, New York City; 1290 Avenue of the Americas, New York City; Trump Park Avenue, New York City; Trump Parc, New York City; Trump Parc East, New York City; Trump World Tower, New York City; 610 Park Avenue, New York City; Trump Tower City Center, New York City; Trump Palace, New York City; Trump Plaza, New York City; Plaza Hotel, New York City; 200 Riverside Boulevard, New York City; 240 Riverside Boulevard, New York City; 1 Central Park West, New York City; the Grand Hyatt Hotel, New

York City; Wollman Rink, New York City; West Side Railyards, New York City; Trump Park Residences, Yorktown; Mar-a-Lago, Palm Beach, Florida; Trump Plaza and Casino, Atlantic City; Trump Castle, Atlantic City; Trump Taj Mahal, Atlantic City; Trump International Hotel, D.C.; Trump International Hotel, Las Vegas; Trump International Hotel and Tower, Chicago; Trump National, Westchester; Trump International Golf Club, West Palm Beach; Trump International Golf Club, Puerto Rico; Trump National Golf Club, Ranchos Palos Verdes; Trump National Golf Club, Bedminster; Trump National Golf Club, Charlotte; Trump National Golf Club, Philadelphia; Trump National Golf Club, Jupiter; Trump National Golf Club, D.C.; Trump National Golf Club, Doral; Trump International Golf Links, Scotland; Trump Turnberry, Scotland; Trump International Golf Links, Doonbeg, Ireland; Trump Links at Ferry Point, Bronx; Trump International Golf Dubai; USFL Football League (Team Owner); Miss Universe Organization; Miss USA; and Miss Teen USA.



57.    President Trump has authored many best-selling books, including: *Trump: The Art of the Deal* (1987); *Trump: Surviving at the Top* (1990); *Trump: The Art of the Comeback* (1997); *The America We Deserve* (2000); *Trump: How to Get Rich* (2004); *Trump: Think Like a Billionaire* (2004); *Why We Want You to Be Rich* (2006); *Trump 101: The Way to Success* (2006); *Trump: The Best Real Estate Advice I Ever Received* (2006); *Think Big and Kick Ass: In Business and Life* (2007); *Never Give Up: How I Turned My Biggest Challenges into Success* (2008); *Think Like a Champion: An Informal Education In Business and Life* (2008); *Time to Get Tough: Making America #1 Again!* (2011); *Midas Touch: Why Some Entrepreneurs Get Rich - and Why Most Don't* (2012); *Why We Want You to Be Rich: Two Men, One Message* (2014); *Crippled America: How to Make America Great Again* (2015); *Great Again: How to Fix Our Crippled America* (2015); *Our Journey Together* (2021); *The Greatest Speeches of Donald J. Trump* (2022); *Letters to Trump* (2023); *Trumped: The Wit and Wisdom of Donald J. Trump* (2024); *Time to Get Tough: Make America Great Again* (2024); and *Save America* (2024).



58.     President Trump's hundreds of history-making media appearances and roles include: *WrestleMania V* (1989); *Ghosts Can't Do It* (1989); *All My Children* (1992); *Lady Boss* (1992); *Home Alone 2* (1992); *Fallen Champ*: *The Untold Story of Mike Tyson* (1993); *Fresh Prince of Bel Air* (1994); *The Little Rascals* (1994); *Across the Sea of Time* (1995); *Eddie* (1996); *The Nanny* (1996); *The Associate* (1996); *The Drew Carey Show* (1997); *NightMan* (1997); *Spin City* (1998); *54* (1998); *Celebrity* (1998)*; Sex In The City* (1998); *Miss Universe 2001* (2001); *The Job* (2001-2002); *Zoolander* (2001); *Donald Trump Real Estate Tycoon!* (2002) (video game); *Two Weeks Notice* (2002); *Miss USA 2002* (2002); *Ali G Show* (2003); *Marmalade* (2004); *Days of Our Lives* (2005); *Miss Universe Pageant*; *The Apprentice* (2004-2015) *and Celebrity Apprentice* (2008-2015); Hosted *Saturday Night Live* (2015); Hosted *WWE*; and much more.

59.    President Trump has utilized his business and real estate acumen to grow his business and holdings across America and internationally, including Ireland, Oman, Scotland, Vietnam, and Dubai. Trump properties include majestic buildings, bespoke resorts, world-class golf courses, and elite restaurants.

60.    After leaving office in 2021, President Trump began new business ventures, ranging from social media enterprises (*Truth Social*) to crypto projects ($TRUMP).

61.    As evidenced by the meteoric rise of *Truth Social*, President Trump's business success resonates in the American collective consciousness, his winning appeal to the electorate is based, in significant part, on his getting unmatched results across various and multiple industries. Without being involved in day to day operations, President Trump with his brand and social media prowess alone propelled the company to great success—even after several of the company's early directors had already inflicted incalculable harm on the nascent business. *See Trump Media & Tech. Grp. Corp., et al. v. ARC Glob. Investments II LLC, et al.*, No. 2024 CA 001061 (Fla. 12th Cir. Ct.).

62.    These diverse businesses depend on public patronage and public participation for their revenue; in turn, the demand to visit Trump Organization properties depends in large part on President Trump's well-earned reputation as a shrewd businessman—and his name's association with excellence, luxury, and

elegance—which have proven vital to the values of many of these businesses and properties. President Trump prides himself on having a reputation for high standards, excellence, and consumer satisfaction; statements falsely casting aspersions on President Trump's reputation as a businessman or the Trump Organization's legitimacy therefore cause direct and easily foreseeable harm to these businesses' value, revenue, and profitability.

### *President Trump's Celebrity and Achievements Pave the Way for "The Apprentice"*

63.    President Trump masterfully applied his eminence in real estate and business to worldwide publicity, which fueled the growth of the Trump Organization and continued to bolster his sterling reputation through the 1980s, 1990s, and into the 21st century, as evidenced by his appearances and speaking parts in numerous well-known movies, television shows, and beauty pageants.

64.    By the early 2000s, President Trump was a well-known household name to the American people and internationally. The public associated President Trump's persona with someone who was highly successful, had built an enterprise worth over a billion dollars, and was tough and principled, yet courageous enough to speak his mind without fear of rebuke.

65.    President Trump's hard-earned reputation for excellence led Burnett to seek him out when the idea for the television show "The Apprentice" began to formulate. President Trump and Burnett created "The Apprentice," which first aired

in 2004 and gave the public an inside look into President Trump's brilliant business acumen and unique real estate abilities.

66.    Because of President Trump's *sui generis* charisma and personality, "The Apprentice" instantly became a top-rated television show. The program generated hundreds of millions of dollars in revenue and was on television for over thirteen years, with nearly 200 episodes.

67.    Vitally, on "The Apprentice," President Trump coined the iconic catchphrase "You're Fired!" This led to numerous derivative works and merchandise that utilized the phrase and embodied President Trump's name, image, and likeness.



68.    "The Apprentice" was a monumental success *directly because of* President Trump.



| Season | Show | 18-49 Rating | Total Viewers (Millions) |
|--------|------|--------------|--------------------------|
| 2014-2015 | Celebrity Apprentice | 2.4 | 7.609 |
| 2012-2013 | All-Star Celebrity Apprentice | 1.9 | 5.807 |
| 2011-2012 | Celebrity Apprentice | 2.5 | 7.283 |
| 2010-2011 | Celebrity Apprentice (Spring) | 3.3 | 9.046 |
| 2010-2011 | The Apprentice (Fall) | 1.7 | 4.675 |
| 2009-2010 | Celebrity Apprentice | 3.2 | 8.210 |
| 2008-2009 | Celebrity Apprentice | 3.5 | 8.981 |
| 2007-2008 | Celebrity Apprentice | 4.0 | 9.784 |
| 2006-2007 | The Apprentice | 3.1 | 7.486 |
| 2005-2006 | The Apprentice (Spring) | 4.1 | 9.944 |
| 2005-2006 | The Apprentice (Fall) | 5.0 | 11.010 |
| 2004-2005 | The Apprentice (Spring) | 6.4 | 13.963 |
| 2004-2005 | The Apprentice (Fall) | 7.8 | 16.143 |
| 2003-2004 | The Apprentice | 10.1 | 20.704 |

'THE (CELEBRITY) APPRENTICE' RATINGS: HOW 'YUGE' WAS TRUMP'S RUN?

SOURCE: NIELSEN

THE**WRAP**

### *The Illogical, Tortured, and Twisted Falsity of the Book and the Articles*

69.    Clearly indicating Defendants' actual malice, the Book and the First Article center on the absurd, fanciful, and false story that President Trump somehow owes his public persona and celebrity status to Burnett and other NBC executives. *See* First Article ("Mr. Trump had mostly luck to credit for being discovered, at age 57, by Mark Burnett, then the hottest name in the hottest new television genre.").

Nothing could be further from the truth. NBC and all of the producers are indebted to President Trump for making "The Apprentice" a smash hit in a way that no other celebrity could have accomplished. As conceded in the Book, "Trump was the star." *See* Book at p. 371. One producer even observed that "he couldn't have been a better reality star." *Id*. at p. 373.

70.    Indeed, the false thrust of the Book and the First Article—the twisted inversion of President Trump's importance to "The Apprentice"—is belied by Burnett's and NBC's choice of President Trump in the first place. They recognized that not just anybody could turn "The Apprentice" into a success. Only President Trump had the necessary combination of actual business achievement, charisma, fame, personality, intellect, and instinctual comfort in front of a television audience that could drive the show to television heights.

71.    The Book and the First Article revolve around this false, malicious, and defamatory premise that Burnett and NBC "discovered" and made President Trump, despite the authors' admission that before "The Apprentice," President Trump was already charismatic and famous. *See* Book at p. 7 ("No telling of Donald Trump's life could be complete without occasionally marveling at the power of his innate and unique charisma. Across the decades, Donald Trump drew eyeballs, viewers, and everyday people who just wanted to touch his suit . . . ."); *Id*. at p. 225 ("'I think people were mesmerized by him,' [Norman] Levin later recalled. 'He had this

extraordinary charisma that anything he said was like gospel.' "); First Article ("Donald J. Trump opened [Trump Tower] early *in his first rise to fame.*"); ("For better or worse, *Mr. Trump, long a staple of the New York City tabloids, drew eyeballs* and would never shy away from a camera."); (In the most recent Gallup survey measuring Mr. Trump's reputation before the show, *98 percent of those polled knew his name*") (emphasis added).

72.    Further underscoring the defamatory nature of the false premise that the producers of "The Apprentice" somehow made an undiscovered President Trump into a successful celebrity, and the actual malice of Craig, Buettner, and Penguin, they concede that in 1985:

> The *revered* CBS news program *60 Minutes* had been working on a profile of Donald. A producer on the show later recalled that segment came about organically from the simple observation that Donald Trump seemed to be everywhere . . . . Known for his tough scrutiny of subjects, correspondent Mike Wallace opened the segment by lending his voice to Donald Trump's favorite version of himself. "In a world where mere millionaires have become a dime a dozen," Wallace said, "there's a new billionaire in town. Trump's the name. Donald Trump." The most serious news program on national television had just crowned Donald Trump a billionaire . . . .

> *See* Book at p. 227 (emphasis added).

73.    With this paragraph, the untenable, tortured logic of Craig, Buettner, and Penguin is laid bare: they claim on the one hand that "The Apprentice" magically transformed President Trump from unknown businessman to successful celebrity thanks to Burnett's "discovery," while conceding on the other hand that as early as

1985, the then-most famous news program in America, and its equally famous lead

correspondent, christened President Trump as a national mega-celebrity.

74.    The alarming level of intellectual dishonesty and lack of narrative logic

within the Book is not limited to the paragraph about the Wallace segment. Several

pages later, Craig, Buettner, and Penguin report about the legendary Robin Leach's

visit to President Trump at Mar-a-Lago:

> For those first few months [in 1985 after purchasing Mar-a-Lago], the Trumps
> flew back and forth between Florida and New York most weekends. Donald
> and Ivana . . . . allowed Mar-a-Lago to be the site of a fundraiser for the local
> landmark preservation charity . . . . They broke the staid local norms by letting
> *Lifestyles of the Rich and Famous* film the event as part of another profile of
> Donald Trump's wealth. "Trump heads a two-billion-dollar-plus real estate
> empire," host Robin Leach said . . . . Leach promised viewers that learning
> what Trump had been up to would "shock, surprise, and delight you." "He's
> bought a winter house! But not any winter house. This Trump castle is the
> number-one home in America," Leach said as a helicopter camera shot
> zoomed across the beach toward the estate's red-tile roofs. "It's the nation's
> largest and most expensive private residence. You're about to tour this
> incredible estate—all one hundred twenty-eight rooms!"

*Id*. at p. 232.

75.    The Defendants themselves prove that their other false claims are

malicious defamation against President Trump. Craig, Buettner, and Penguin

concede that by 1986, "Trump had been transformed from a real estate developer

into a national celebrity. People stopped him on the streets of Manhattan for an

autograph. Some asked to touch him for good luck, as if he were a Blarney Stone in

pinstripes." *Id*. at p. 236. They continue: "His name appeared in newspapers every

day, sometimes in multiple places in the same paper. He had become so well-known that 'Donald Trump' was now its own simile and metaphor, shorthand for success and prominence." *Id*.

76.    In truth, this transformation had occurred even earlier. President Trump had been the subject of the cover article in *GQ* in May 1984 "that had sold very well." *Id*. at 237.

77.    Ironically, in 1986, even the New York Times—which now seeks to tear President Trump's reputation down—wrote of "big time real estate entrepreneurs such as Donald Trump," while another newspaper included the phrase "the nation's firmament of big developers—the Donald Trumps." *Id*. at 236. The Times even listed him as a name that stood shoulder-to-shoulder with "the heads of American Express, General Electric, and Citicorp." *Id*.

78.    As if all this were not enough, just as President Trump "benefited from pop culture and people's growing interest in the lives of the rich and famous, he also benefitted from an explosive trend in book publishing." *Id*. After President Trump signed a book contract for his famed book *The Art of the Deal*, "[t]he book-in-progress was announced by Liz Smith, then one of the most prominent gossip columnists in the country, as the lead item in her nationally syndicated column, which ended with this line: 'This book could very well out-Iacocca Lee Iacocca's smashing best-seller!'" (referring to the long-running smash-hit Iacocca: An

Autobiography, which "chronicled Lee Iacocca's rise from child of Italian immigrants in Pennsylvania to leading the Chrysler Corporation back from the brink of collapse in the early 1980s," which became "the bestselling nonfiction book of 1984 and 1985 . . . ."). *Id*. at 237.

79.    Another highly inconvenient but material fact—buried by Craig, Buettner, and Penguin deep in the middle pages of the Book just before the Robin Leach visit to Mar-a-Lago—puts the lie to their attacks on President Trump's business acumen. President Trump acquired Mar-a-Lago for a total of "$8 million for the estate and its contents, plus another $2 million for a four-hundred-foot strip of beach across Ocean Boulevard from the mansion" with a "down payment of $2,812." *Id*. at 232. Today, Mar-a-Lago, situated in the exclusive Palm Beach, Florida, is likely worth well over $1,000,000,000. Indeed, "Mar-a-Lago has more than 10 times the acreage of the property that holds the record for Palm Beach's most expensive home. That property, a nearly 1.6-acre estate on North Country Road . . . sold for $170 million in 2023 . . . ." *See* Katherine Clark and E.B. Solomont, *How Much Is Mar-a-Lago Actually Worth? It's a Billion-Dollar Question*, THE WALL STREET JOURNAL, (June 7, 2024), https://www.wsj.com/real-estate/luxury-homes/donald-trump-mar-a-lago-worth-71c278a1 (last visited Sept. 15, 2025). "Mar-a-Lago could be worth north of $1 billion, said Todd Michael Glaser, the

developer behind the Tarpon Island Project, calling the club 'the Mona Lisa' of Palm Beach real estate." *Id.*

80.    And, last year, even the antagonistic Baker conceded in the pages of the New York Times that President Trump had been a "celebrity builder" before running for office. Peter Baker, *Trump's Wild Claims, Conspiracies, and Falsehoods Redefine Presidential Bounds*, THE NEW YORK TIMES (Nov. 3, 2024), https://www.nytimes.com/2024/11/03/us/politics/trump-falsehoods-claims-election.html (last visited Sept. 15, 2025)

81.    All this begs the question: how could Burnett have "discovered" President Trump after newspapers and television programs of national prominence, including but not limited to *60 Minutes*, *Lifestyles of the Rich and Famous*, and the New York Times itself, had decades earlier confirmed the President's business acumen and mega-celebrity status? The answer, of course, is that Burnett could not possibly have "discovered" President Trump, thus laying waste to the central, nonsensical, false, malicious, and defamatory premise of the Book.

82.    In truth, President Trump was the *only* man who could have delivered the results that Burnett and NBC sought. Craig, Buettner, and Penguin, again contradicting their own false narrative, conceded as much:

> Just like that, without consulting anyone or taking time to reflect, Trump had said yes. Burnett believed he needed Trump. [Conrad] Riggs had contacted several moguls—Jack Welch, Warren Buffett, and Richard Branson—but Burnett and Riggs felt those other moguls would either not be open to the

demands of a weekly show or lacked the necessary charisma and good looks. For better or worse, Trump drew eyeballs. He would make for good television and never shy away from a camera. Burnett thought the normal talent fees paid by the network would not be enough to lock in someone of Trump's stature. He knew the deal it would take. "Fifty-fifty," Burnett said. "Okay," Trump said, and the two men shook hands.

*See* Book at pp. 345-346; *see also* First Article at p. 4.

83.    Regarding President Trump's singular importance, Rob LaPlante, one of Burnett's producers, agreed: "People look at Donald Trump as a beacon of opportunity. He has a reputation of whatever he touches turns to gold, and people want to find out how he does it." *See* Book at p. 351.

84.    In 2003, Burnett even told the New York Times that he considered President Trump to be a "soul mate." *Id*. at p. 348. Burnett also joined the team that helped organize President Trump's first inauguration and they were pictured together in January 2017 at a pre-inauguration dinner at Union Station in Washington, D.C. *See* Book at commentary under 19th photograph in hardcover edition. Burnett currently serves as United States Special Envoy for the United Kingdom.

85.    But, adding insult to injury, the Book and the First Article falsely painted President Trump's affable personality, which Burnett had found so appealing, in a negative light. Defendants were surely aware of prior efforts to involve President Trump in reality-themed programming, such as HBO's *Ali G Show* (2003), just before "The Apprentice," and even in that unscripted circumstance,

President Trump was thoughtful and courteous, and the filming of his offices belied Defendants' claims of degraded conditions or a non-working environment.

86.    Overall, Defendants used the Book and the Articles to make numerous malicious, defamatory, and disparaging claims about President Trump based on distortion and fabrication. The Book and the Articles recklessly disregard the truth that the President's fortune was developed through business genius, creativity, perseverance, talent, authenticity, and other unique traits. Not, as the Book and the Articles falsely claim, by luck, any semblance of wrongdoing, "twisting the rules," or reliance on government programs. *See* Book at p. 6. The utter falsity of the Book and the Articles, abundantly evident on the face of this Complaint, will be even further developed with a reasonable opportunity for further discovery and investigation.

### *Defendants' False Statements*

87.    Defendants individually and collectively published numerous false statements while subjectively realizing that these statements were false or, at a minimum, subjectively harboring serious misgivings that they would turn out to be false given sufficient investigation or additional information from objective sources not hostile to President Trump. (For brevity, in the following section, the statement that Defendants "knew" that something was false should be understood to mean that

either Defendants knew that the statement was false or recklessly disregarded the truth but published it nonetheless).

88.    Penguin, Craig, and Buettner published the following false statements in the Book, among others, and without limitation:

(a) "Donald Trump had received the equivalent of more than $400 million from his father, much of it through fraudulent tax evasion schemes." At the time of publication, Craig, Buettner, and Penguin knew that President Trump had not received money from his father through fraudulent tax evasion schemes. *See* Book at p. 5.

(b) "The family fortune that launched Donald Trump was built on government programs designed to ease the pain caused by the Great Depression and World War II, and to assist the veterans returning from that war"; "His father wrung millions of additional dollars from those programs by twisting the rules." A reasonable reader would have understood these statements as asserting as a matter of fact that Fred Trump violated federal law to wrongfully benefit from these government programs. At the time of publication, Craig, Buettner, and Penguin knew that President Trump's fortune had not been built on violated federal law regarding these or any other government programs. *Id.* at p. 6.

46

(c) "Mark Burnett, the television producer who made Trump a star, did not just hand him a fortune . . . . [S]killed hands created a version of Donald Trump—diligent, measured, polite but authoritative—that might have been nonexistent but was highly marketable." *Id.* at pp. 7-8. At the time of publication, Craig, Buettner, and Penguin knew that President Trump's presence on "The Apprentice" fairly depicted how he conducted himself in his personal and business dealings outside the show.

(d) "Sometimes, despite himself, Donald Trump received his fortune from those sources mostly outside of his ability to run a business. The secret of his life, one that emerges in hundreds of moments big and small, is that the less he has been involved in decision-making, the better his chances of financial success." *Id.* at p. 8. A reasonable reader would have understood this statement as asserting as a matter of fact that President Trump reduced the value of the enterprises that he owned and directed. At the time of publication, Craig, Buettner, and Penguin knew that President Trump's association with a business or product increased its value, including due to the premium that consumers and investors placed on President Trump's business judgment.

(e) "It was the first of many such relationships in Trump's life. He would be drawn to men who displayed a penchant for violence, and wax sentimentally about the days when, in his perception, society accepted resolving disputes with physical violence." *Id.* at p. 69. A reasonable reader would have understood this statement as asserting as a matter of fact that President Trump approved of the illegal use of violence to solve disputes; further, a reasonable reader would have understood this statement as asserting as a matter of fact that President Trump himself had a penchant for physical violence. At the time of publication, Craig, Buettner, and Penguin knew that President Trump neither condoned illegal violence nor was he a violent man.

(f) "Tenants at the Pembroke and Hague Towers blamed the Trumps for infestations of cockroaches and mice, a broken air-conditioning system, elevators that did not work, a lack of hot water, and an unusable swimming pool." *Id.* at p. 148. A reasonable reader would have understood this statement both as a statement of fact regarding the conditions at the Pembroke and Hague Towers as well as a statement of fact that the Trump family maintained low-quality real estate not suitable for habitation. At the time of publication, Craig, Buettner, and Penguin knew that the Pembroke and Hague Towers did not suffer from

these conditions specifically and that President Trump and his family maintained high-quality housing for their tenants.

(g) "With no real estate or financial staff at his disposal, Donald's assessment of a potential opportunity started and stopped at the end of his nose. There would be no deliberative planning and very little in the way of an analysis of risks or potential return on investment." *Id.* at p. 159. A reasonable reader would have understood this statement as an assertion that President Trump neither conducted nor participated in reasonable diligence before making real-estate investments. At the time of publication, Craig, Buettner, and Penguin knew that President Trump conducted proper due diligence for his real estate projects, including relevant planning and evaluating estimated returns on investments.

(h) "In the language of the tax code, Fred had given his son taxable gifts masquerading as loans, a likely tax fraud that went unnoticed." *Id.* at p. 166. A reasonable reader would have understood this statement as an assertion that Fred Trump and President Trump participated in criminal tax fraud. At the time of publication, Craig, Buettner, and Penguin knew that neither Fred Trump nor President Trump committed tax fraud, either alone or in concert with one another.

(i) "Even as his father's chosen successor and the child who benefitted the most from his father's wealth, Donald accelerated his long efforts to erase his father's accomplishments from the public consciousness in service of artificially inflating his own." *Id.* at p. 184. At the time of publication, Craig, Buettner, and Penguin knew that President Trump cherished and protected his father's legacy, and continues to do so to this day.

(j) "He increasingly saw no value in working with partners, or in heeding the advice of others, whether prominent business consultants, experienced sports team owners, or executives with one of the best-run hotel and casino companies on the world." *Id.* at p. 219. A reasonable reader would have understood this statement as an assertion that President Trump was not a willing business partner. At the time of publication, Craig, Buettner, and Penguin knew that President Trump frequently worked successfully with partners and considered the advice of others as appropriate.

(k) "As the national economy slowed, Trump took on costs and debts with breathtaking speed, each time without seriously running the numbers to spec out potential profits." *Id.* at p. 270. A reasonable reader would have understood this statement as an assertion that President Trump

neither conducted nor participated in reasonable diligence before making real-estate investments. At the time of publication, Craig, Buettner, and Penguin knew that President Trump conducted, or directed other qualified entities to conduct, reasonable due diligence on his projects prior to making them.

(l) "During a fifteen-year rise, he had paid close attention to aesthetic details, from the waterfall and ficus trees in the lobby of Trump Tower to the angle of the telephone handsets on his yacht for high rollers. He had not paid similar attention to financial details, especially whether his individual businesses could support their payments on the money he borrowed to buy or build them." *Id.* at p. 290. At the time of publication, Craig, Buettner, and Penguin knew that President Trump paid appropriate attention to the finances of his businesses, including their expected cash flow and expected returns on his investments.

(m)     "A plan was soon devised to funnel some of Fred's cash to Donald and his three siblings. They would accomplish that goal by adding a sham layer to Fred's business, one designed to evade the gift and estate taxes. They would call that extra layer All County Building Supply and Maintenance. It would serve no purpose beyond creating an off-ramp to send cash to his children." *Id.* at p. 300. A reasonable reader

would have understood this statement as an assertion that Fred Trump, President Trump, and the Trump family criminally violated relevant federal tax laws through use of a shell corporation. At the time of publication, Craig, Buettner, and Penguin knew that neither Fred Trump, President Trump, nor the family committed criminal tax evasion.

(n) "So the Trumps began submitting the padded bills to request rent increases from state officials. Part of the cost of Donald Trump's off-the-books inheritance would be passed along to his father's middle-income tenants." *Id.* at p. 301. A reasonable reader would have understood this statement as an explanation as to how the Trump family committed criminal tax evasion and defrauded state officials, their tenants, or both. At the time of publication, Craig, Buettner, and Penguin knew that President Trump and his family did not defraud anyone or commit criminal tax evasion through an invoice or bill-padding scheme.

(o) "Between the trust funds, the invoice-padding operation, and other devices created to siphon off his father's wealth outside the gift and estate tax system, Donald was already collecting almost $2 million a year from his father's companies. His own business failures meant he

kept that money tax-free." *Id.* at p. 314. Again, a reasonable reader would have understood this statement in context as an explanation as to how President Trump personally profited from alleged criminal tax evasion and that President Trump's businesses were somehow not successful. At the time of publication, Craig, Buettner, and Penguin knew that Fred Trump did not commit criminal tax evasion. Craig, Buettner, and Penguin further understood that President Trump was not a party to a criminal tax-evasion scheme. They further understood that because no such criminal scheme occurred, by definition, President Trump was not the beneficiary of any such scheme. They also understood, and state in other portions of the Book, that President Trump was hugely successful in his own right.

(p) "After experiencing years of sensory overload in jungles around the world, the first thing Burnett's producers noticed when they arrived on the twenty-sixth floor of Trump Tower was the stink, a musty and moldy carpet smell that seemed to emanate from every corner. As they walked through, with eyes trained to notice small details, they saw the chipped wood on seemingly every piece of furniture." *Id.* at p. 352. A reasonable reader would have understood this statement as both communicating specific flaws with Trump Tower and its twenty-sixth

floor as well as asserting as a statement of fact that Trump Tower and its twenty-sixth floor were in a state of serious disrepair. At the time of publication, Craig, Buettner, and Penguin knew that Trump Tower in general, and in particular the office on the twenty-sixth floor, were in excellent condition and had no such defects.

(q) "Trump's desk showed no signs of real work—no computer, contracts, or files. It was just smothered by newspaper and magazine articles focused on one subject: himself." *Id*. at p. 353. A reasonable reader would also have understood this statement as an assertion that President Trump did not actively participate in his businesses. At the time of publication, Craig, Buettner, and Penguin knew that President Trump did actively participate in his businesses.

(r) "Beyond the studio space, the harder work of reinventing Trump had only just begun." *Id*. at p. 354. A reasonable reader would have understood this as a statement of fact that President Trump's typical demeanor would have made him unfit for serving as the host of "The Apprentice." At the time of publication, Craig, Buettner, and Penguin knew that President Trump's demeanor on "The Apprentice" was a reasonably accurate approximation of how he conducted himself in his off-air business dealings.

(s) "Donald Trump, the self-described world's greatest dealmaker, had sold the bulk of his father's empire for almost $250 million less than it was worth." *Id*. at p. 360. At the time of publication, Craig, Buettner, and Penguin knew that no such unsuccessful sale occurred.

(t) "The business model that Burnett had spent the prior decade perfecting—selling corporations on the value of letting him weave their products into his show—was about to make Trump the equivalent of a second inheritance. And as when he was born, other people would do all the work." *Id*. at p. 366. At the time of publication, Craig, Buettner, and Penguin knew that President Trump, collaborating with Burnett, expended substantial effort to make "The Apprentice" successful.

(u) "Trump typically lied or fuzzed the fact that he did not own the [construction] projects and was not the developer, creating the illusion that he was everywhere, buying properties, taking on risk, and pouring concrete." *Id*. at p. 398. At the time of publication, Craig, Buettner, and Penguin knew that President Trump did not lie in connection with construction projects and in fact did own and develop them.

(v) "Donald Trump had faced these moments before, periods when it seemed his failures could not be saved only by aggressive tax maneuvers or not paying his debts. But there always came a new

windfall from plain old luck. The luck of his birth. The luck of being made into a television celebrity." *Id*. at p. 444. At the time of publication, Craig, Buettner, and Penguin knew that President Trump did not use repeated, undeserved windfalls to escape failures and that he was not "made into a television celebrity" but rather made "The Apprentice" the successful show that it was. President Trump has always worked for his success and Defendants knew that.

(w)      "Here's the part that may sting the most in a country that sees itself as history's greatest meritocracy: Good things happened to Donald Trump. He did not earn most of those good things. He was born. He was discovered by a revolutionary television producer. And he was pushed into an investment against his will. And from those three bits of good luck came the equivalent today of more than $1.5 billion. That sort of tailwind could paper over a litany of failure and still fund a lavish life. And there is no evidence that in fifty years of labor Donald Trump added to his lucky fortunes. He would have been better off betting on the stock market than himself." *Id*. at p. 445. At the time of publication, Craig, Buettner, and Penguin knew that President Trump did earn what he has, was not "discovered" to become a television star but was already a star in business who was singularly essential to "The Apprentice."

Defendants knew that President Trump tirelessly worked to achieve the grand scale of accomplishments he has garnered.

(x) "Then Mark Burnett's *The Apprentice* fortified Trump's fact-free bubble, while also making it national and bankable in ways that Trump never did on his own." *Id*. at p. 448. At the time of publication, Craig, Buettner, and Penguin knew that President Trump had built a national brand on his own prior to "The Apprentice."

(y) "As much as the illusion of success was the ultimate creation of Trump's first seventy years, the illusion of persecution may be his final masterpiece." *Id*. at p. 449. At the time of publication, Craig, Buettner, and Penguin knew that President Trump's success that led to being elected President multiple times was no illusion.

89.    The New York Times, Craig, and Buettner published the following false statements in the First Article, without limitation and among others:

(a) "Late in the summer of 2003, a team of television producers stepped off the elevator on the 26th floor of Trump Tower eager to survey the set of their next reality show. After years filming "Survivor" in jungles around the world, training cameras on exotic spiders and deadly snakes to evoke danger, they came looking for a different set of sensory clues, the tiny details that would convey wealth and power. Right away, they

knew they had a problem. The first thing they noticed was the stench, a musty carpet odor that followed them like an invisible cloud. Then they spotted scores of chips in the finish of the wooden desks and credenzas. The décor felt long out of date, making the space seem like a time capsule from when Donald J. Trump opened the building early in his first rise to fame." *See* First Article at p. 1. A reasonable reader would have understood this statement as both communicating specific flaws with Trump Tower and its twenty-sixth floor as well as asserting as a statement of fact that Trump Tower and its twenty-sixth floor were in a state of serious disrepair. At the time of publication, New York Times, Craig, and Buettner knew that Trump Tower in general, and in particular the office on the twenty-sixth floor, were in excellent condition and had no such defects.

(b) "At the office's spiritual center, Mr. Trump's own desk bore no evidence of work, no computer screens or piles of contracts and blueprints, just a blanket of news articles focused on one subject: himself." *Id.* at pp. 1-2. At the time of publication, New York Times, Craig, and Buettner knew that President Trump's desk was in no such condition. A reasonable reader would also have understood this statement as an assertion that President Trump did not actively

participate in his businesses. At the time of publication, New York Times, Craig, and Buettner know that President Trump did actively participate in his businesses and their historic success.

(c) "As he began playing a wealthy tycoon on television, Mr. Trump secretly put a plan in motion to tap into his father's fortune again." *Id*. at p. 3. At the time of publication, the New York Times, Craig, and Buettner knew that President Trump was in fact a wealthy businessman and was not "playing" a role.

(d) "Mr. Trump had mostly luck to credit for being discovered, at age 57, by Mark Burnett, then the hottest name in the hottest new television genre." *Id*. At the time of publication, the New York Times, Craig, and Buettner knew that President Trump had built a national brand on his own prior to "The Apprentice," and was not "discovered" by Burnett.

(e) "Mr. Trump would need only to play a re-crafted version of himself." *Id*. at p. 4. A reasonable reader would have understood this as a statement of fact that President Trump's typical demeanor would have made him unfit for serving as the host of The Apprentice. At the time of publication, New York Times, Craig, and Buettner knew that President Trump's demeanor on "The Apprentice" was a reasonably accurate approximation of how he conducted himself in his off-air

business dealings, and was the overwhelming reason for the show's success.

(f) "The producers would also need to invent a version of Donald Trump that did not actually exist—measured, thoughtful and endlessly wealthy—a complete rehabilitation of his public image." *Id*. A reasonable reader would have understood this as a statement of fact that President Trump's typical demeanor and business success would have made him unfit for serving as the host of "The Apprentice." At the time of publication, New York Times, Craig, and Buettner knew that President Trump's demeanor on "The Apprentice" was a reasonably accurate approximation of how he conducted himself in his off-air business dealings, and that his businesses were amazingly successful.

(g) "[H]e had just directed his siblings to sell the dozens of buildings their late father had left them in trust funds, a betrayal of Fred C. Trump's wishes to keep his empire in the family. Donald Trump, four years after his father's death, orchestrated the private sale for $738 million. It was a huge number. But the buyers' banks valued the buildings at about $975 million, raising a question about Mr. Trump's claim to have mastered the art of the deal." *Id*. at p. 8. At the time of publication, Craig, Buettner, and Penguin knew that President Trump and his

siblings did not participate in below - market transactions that were against Fred C. Trump's wishes.

(h) "Mr. Trump was on his way to collect more than $200 million from "The Apprentice" and an even quirkier offshoot, 'Celebrity Apprentice,' as host for over more than a decade. Thanks to his rehabilitated image, he would earn another $200 million from licensing and endorsement deals. That lucky windfall, similar in size to his inheritance and also requiring no business expertise, funded a new wave of Trump-run businesses …." *Id*. at p. 21.  At the time of publication, the New York Times, Craig, and Buettner knew that President Trump, collaborating with Burnett, expended substantial effort to make "The Apprentice" successful, and that these amounts were no lucky windfall, but were the result of his self-made star power.

90.    The New York Times and Baker published the following false statements in the Second Article:

(a) "Mr. Trump got an early start learning how to cut corners. As a high school student at New York Military Academy, he knowingly borrowed a friend's dress jacket with a dozen medals attached to wear for his yearbook photo, in effect appropriating medals that he did not win himself, according to [the Book]."  At the time of publication, the New

York Times and Baker knew that President Trump did not appropriate medals to claim credit for his friend's accomplishments.

(b) "He likewise cheated to get into college, according to his estranged niece, Mary L. Trump. The future president paid a friend to take the SAT for him, Ms. Trump asserted in her own book, earning a score that later helped him transfer to Wharton business school at the University of Pennsylvania, a credential he has boasted about ever since." At the time of publication, the New York Times and Baker knew that President Trump did not cheat to get into college and that Mary Trump has been spreading vicious lies about the President that are subject to a lawsuit by him against her.

(c) "Federal, state and local authorities looked into his ties with the Mafia, found violations of money laundering rules and penalized him for skirting stock trade rules." At the time of publication, the New York Times and Baker knew that President Trump did not have ties to the Mafia and did not violate money laundering rules.

91.    The New York Times and Schmidt published the following false statement in the Third Article: they reported on the discredited former chief-of-staff John Kelly, who was fired by President Trump and whose other false statements have been thoroughly debunked, repeating the false allegation that President Trump

"had made admiring statements about Hitler, had expressed contempt for disabled veterans and had characterized those who died on the battlefield for the United States as 'losers' and 'suckers' . . . . " At the time of publication, the New York Times and Schmidt knew that Kelly's false claims had been debunked and were not credible, and that President Trump did not make the statements attributed to him.

92.    The New York Times knew better than to publish Kelly's obvious "Hitler" lie; after all, in 2017, the Times reported extensively on President Trump's historic decision to recognize Jerusalem as the capital of Israel. *See, e.g.*, Mark Landler, *Trump Recognizes Jerusalem as Israel's Capital and Orders U.S. Embassy to Move*, THE NEW YORK TIMES (Dec. 6, 2017), https://www.nytimes.com/2017/12/06/world/middleeast/trump-jerusalem-israel-capital.html (last visited Sept. 15, 2025). Moreover, after President Trump's commanding victory in the 2024 presidential election, even the Times grudgingly acknowledged his history of strong support for Israel. *See, e.g.*, Liam Stack, *Trump Has History of Strong Support for Israel*, THE NEW YORK TIMES (Nov. 6, 2024), https://www.nytimes.com/2024/11/06/world/middleeast/trump-israel-support.html (last visited Sept. 15, 2025). In light of this prior reporting and actual knowledge, the Times knew that Kelley's statements were false, discredited, and should not be repeated uncritically.

### *Defendants Double Down and Refuse to Retract Their Falsehoods*

93.    Since its publication, the First Article has gained substantial traction and republication across various mediums.

94.    For example, the First Article received 585 comments from readers of the New York Times just within the first 24 hours of publication; upon information and belief, some of whom reside in Florida. *See* Craig and Buettner, *The Star-Making Machine That Created 'Donald Trump,' supra.* Notably, the Times, apparently unwilling to stand by its reporting, disabled comments the day after the First Article was published; the Article would have drawn tens of thousands of comments otherwise.

95.    The First Article is also accompanied by a thirty-seven-minute commentary that adds additional color to the defamatory statements therein, which has been heard many times by readers of the New York Times. *Id*.

96.    On X.com, Craig, who has 88,000 followers, has pinned a tweet that shows that the Book, which contains all of these and other defamatory statements, had been atop the New York Times's best seller list for two weeks. *See* @SUSANNECRAIG,                                                    X.COM, (https://x.com/susannecraig/status/1841851317981000151) (last visited Sept. 15, 2025).

97.    Buettner, who has 15,900 followers on X.com, has also published several tweets about the Book. *See* @RUSSBUETTNER, X.com, (https://x.com/russbuettner) (last visited Sept. 15, 2025).

98.    The Book, which is also available in audiobook format, is currently listed as the number 20 most-read book on Amazon, with 893 reviews. *See* Craig and Buettner, *Lucky Loser: How Donald Trump Squandered His Father's Fortune and Created the Illusion of Success*, AMAZON (https://www.amazon.com/Lucky-Loser-Squandered-Fathers-Illusion/dp/0593298640) (last visited Sept. 15, 2025). The Book's readers, on information and belief, include many readers in Florida and in this District.

99.    Even as Defendants continued to expand on their falsehoods, they also rejected President Trump's reasonable demands for retraction of the defamatory statements.

100.    By letter dated October 29, 2024, President Trump notified Defendants of the defamatory publications at issue, demanded that the Defendants cease and desist from their publication of the defamatory statements, issue a full and fair retraction of the statements made in the Book and the Articles, and immediately issue an apology for the defamatory statements. (October 29, 2024 Letter attached hereto as **Exhibit D**).

101.   By letter dated October 31, 2024, David E. McCraw, Senior Vice President & Deputy General Counsel for the New York Times, wrote, *inter alia*: "I have reviewed the letter and the stories with our editors and reporters, and we see no basis for a correction of any of the articles." (October 31, 2024 Letter attached hereto as **Exhibit E**).

102.   By letter also dated October 31, 2024, Carolyn K. Foley, Senior Vice President & Associate General Counsel for Penguin, wrote, *inter alia*: "Your letter falls short, however, of identifying an actionable claim for defamation against Penguin Random House Press." (October 31, 2024 Letter attached hereto as **Exhibit F**).

103.   Clearly, these Defendants have no interest whatsoever in correcting or retracting their damaging falsehoods, and instead appear content to double down.

104.   All the above-referenced articles, posts, and statements have damaged President Trump due to the malicious, false, defamatory, and misleading statements made in the Book, the Articles, and in subsequent publications of them all.

105.   All conditions precedent to the bringing of this action have occurred, been satisfied, or have otherwise been waived.

106.   As a result of Defendants' tortious conduct described herein and President Trump's need to protect and enforce his legal rights, President Trump has

retained the undersigned attorneys and is required to incur the burden of attorneys' fees to prosecute this action.

### *Defendants' Actual Malice Towards President Trump*

107.    Defendants each desire for President Trump fail politically and financially. Each feels actual malice towards President Trump in the colloquial sense: that is, each—Craig, Buettner, Baker, and Schmidt, as individuals, and the Times and Penguin's relevant executives as corporations—subjectively wishes to harm President Trump, and each wish to manipulate public opinion to President Trump's disadvantage to worsen his current and future political and economic prospects. Put bluntly, Defendants baselessly hate President Trump in a deranged way.

108.    One need not speculate as to the existence of this hatred—the Times admits that it views President Trump as a threat, and as a result, the far-left newspaper has worked tirelessly to maliciously and falsely portray him as dishonest, erode public trust in him, and tear down his achievements. *See* The New York Times Trust Team, *You Asked, We Answered: How The Times Is Reporting on the Trump Administration*, THE NEW YORK TIMES (Mar. 24, 2025), https://www.nytimes.com/2025/03/06/insider/how-the-new-york-times-reports-on-trump.html (last visited Sept. 15, 2025) ("The newsroom of the Times has been reporting for years on Donald Trump's tenuous relationship with facts. We routinely

67

point out falsehoods, exaggerations and misstatements, making sure that we also then let readers know what's accurate."); Peter Baker, *Dishonesty Has Defined the Trump Presidency. The Consequences Could Be Lasting*. THE NEW YORK TIMES (Nov. 1, 2020), https://www.nytimes.com/2020/11/01/us/politics/trump-presidency-dishonesty.html (last visited Sept. 15, 2025) ("the Trump presidency has been a factory of falsehood from the start"); Angelo Fichera, *The Method Behind Trump's Mistruths*, THE NEW YORK TIMES (Apr. 8, 2024), https://www.nytimes.com/interactive/2024/04/08/us/politics/trump-speech-mistruths.html (last visited Sept. 15, 2025) ("Since the beginning of his political career, Donald J. Trump has misled, mischaracterized, dissembled, exaggerated and, at times, flatly lied.").

109.   In furtherance of their ill will towards President Trump, Defendants have adopted numerous patterns and practices regarding their treatment of President Trump that both deviate from their typical journalistic patterns and practices—including those that the Times, its reporters, and Penguin used when dealing with President Biden and his administration—as well as broadly regarded best practices for journalism and nonfiction publishing.

110.   For example, the Times has a series of patterns and practices that its reporters understand and follow when addressing President Trump: stories covering President Trump are to be written in the most antagonistic and negative way

possible. To that end, Times reporters routinely resolve any factual ambiguities or uncertainties in their reporting in the way that will most harm President Trump, his family, his businesses, and his associates.

111. These policies— broadly understood and followed by the Times' reporters, including Craig, Buettner, Baker, and Schmidt, and enforced by its editors—include practices that go against widely accepted journalistic standards, such as deliberately ignoring potentially exculpatory sources of information, deeming statements by witnesses or insiders that tend to support President Trump, his family, or his businesses to be "not reliable" or "not credible" because of their support for President Trump, and publishing negative claims about President Trump based on exclusively anonymous sources, which often do not exist, and without verification of sources' claims.

112. Likewise, the Times and its reporters, including Craig, Buettner, Baker, and Schmidt, have a pattern and practice of contacting President Trump and his team regarding negative stories on a short timeline so as to be able to state that they sought comment—in order to preserve a scintilla of the pretense of neutrality—while making it functionally impossible for President Trump to comment on stories with factual errors, correct those errors, or provide a responsive quote before publication. This policy further enables the Times and its reporters to publish negative assertions about President Trump about which they subjectively harbor doubts as to their

truthfulness by permitting them to claim that they sought factual confirmation or denial regarding their stories, even when they subjectively realize that they did not do so in good faith.

113.    Another pattern and practice shared by all Defendants is to attempt to couch statements in ways that they subjectively know will be taken by a reasonable reader as assertions of fact in language that allows them to claim they are making mere opinion statements. Defendants each employ this technique with the subjective intent of communicating false or likely false factual assertions to their readers while avoiding potential legal liability. Indeed, Defendants use this technique with the specific intent of convincing readers of false and harmful statements of fact about President Trump while attempting to minimize their potential defamation liability.

114.    All Defendants similarly pursue a pattern and practice of turning a deliberate blind eye towards research or investigatory methods that would disprove their anti-Trump thesis. For non-exhaustive examples, and as detailed *supra*, Defendants published numerous statements regarding President Trump's role in "The Apprentice" without first securing an interview from primary sources senior to the production of The Apprentice, such as Burnett. Defendants knew that Burnett would likely have contradicted numerous specific false, malicious, and defamatory purported statements of fact that they made regarding President Trump's role in "The Apprentice" as well as their general narrative regarding President Trump's role in

70

the show's success. Defendants therefore did not sufficiently pursue speaking with Burnett even after he did not grant an interview, did not sufficiently seek to obtain his original notes or records, and otherwise failed to engage with Burnett and other potential insiders with "The Apprentice" because they subjectively believed that these sources would have tended to contradict the defamatory lies that they wished to publish about President Trump.

115. Likewise, Defendants made numerous false statements regarding Fred Trump and President Trump's business decisions and compliance with federal tax laws based on incomplete, minimal information—having only several years of tax returns, and even those only obtained illegally—and realized that a responsible assessment of the Trump family's compliance with tax laws would have required forensic auditing, expert tax legal advice, and other expensive investigatory tools that would have confirmed that neither Fred Trump nor President Trump violated federal tax laws. Defendants refused to do so specifically because they subjectively wished to publish false assertions about the Trump family's compliance with tax laws to cause President Trump personal, political, and professional harm. That neither Fred Trump nor President Trump was investigated for, charged with, or convicted of tax fraud was irrelevant; facts were not to get in the way of the Defendants' pre-determined narrative.

116.    These long-running defamatory patterns and practices have a common thread: they work together toward publication of false, negative assertions about President Trump, his family, and his businesses that Defendants either knew were false or, at a minimum, had grave concerns as to their veracity. Defendants nonetheless published these statements out of a common subjective desire to cause reputational and economic harm to President Trump, his family, his businesses, and those in his orbit. Indeed, even though Defendants received notice from President Trump that their work contained numerous false statements, *supra*, they have failed to retract or correct any of them.

117.    Defendants' actual malice manifested in numerous ways. Defendants launched investigations into President Trump, his family, and his businesses for the express purpose of harming all three. Defendants deliberately refused to engage with individuals expected to speak well of President Trump and his businesses. Defendants resolved any apparent ambiguities in statements or evidence regarding President Trump or his businesses in favor of the most negative statements that the Times, its reporters, and Penguin could publish. In short, Defendants maintained and abided by a clear pattern and practice of avoiding truthful and positive claims about President Trump, exhaustively investigating negative claims about President Trump, and relying near-exclusively on materials chosen to highlight false, negative claims about President Trump. Consequently, Defendants published numerous false and

defamatory statements about President Trump even though they knew that a reader with access to the information and sources that Defendants had would not believe what Defendants published.

118.   It is also a matter of public record that the New York Times and its reporters do not believe that they need to cover President Trump fairly, as confirmed by Times reporter Jim Rutenberg. *See, e.g.,* Rutenberg, *Trump is Testing the Norms of Objectivity in Journalism*, *supra*. While the simple fact of the Times's self-proclaimed bias is already public record, discovery in this action will reveal an even more disturbing picture.

119.   These breaches of journalistic ethics are further proven by the Times's enthusiastic aiding and abetting of the Russia Collusion Hoax, which is well on its way to becoming one of the most profoundly chilling and disturbing criminal political scandal in American history.

120.   On July 18, 2025, Director of National Intelligence Tulsi Gabbard posted on *X*: "Americans will finally learn the truth about how in 2016, intelligence was politicized and weaponized by the most powerful people in the Obama Administration to lay the groundwork for what was essentially a years-long coup against President @realDonaldTrump, subverting the will of the American people and undermining our democratic republic." *See* @DNIGABBARD, X.COM, (https://x.com/DNIGabbard/status/1946271402971312514?ref_src=twsrc%5Etfw

%7Ctwcamp%5Etweetembed%7Ctwterm%5E1946271402971312514%7Ctwgr%5

Ef90cd24e0b9fa192404cfd94a5bcd35dd56c88d3%7Ctwcon%5Es1_&ref_url=http

s%3A%2F%2Fwww.breitbart.com%2Fpolitics%2F2025%2F07%2F18%2Fdeclass

ified-obama-admin-manufactured-intelligence-to-push-fake-trump-russia-

collusion-narrative%2F (last visited Sept. 15, 2025); *see also* Brooke Singman,

*Obama admin manufactured intelligence to create 2016 Russian election*

*interference narrative, documents show,* FOX NEWS (July 18, 2025),

https://www.foxnews.com/politics/obama-admin-manufactured-intelligence-

create-2016-russian-election-interference-narrative-documents-show    (last visited

Sept. 15, 2025); Joel B. Pollak, *Tulsi Gabbard's Revelations Vindicate Mark Levin,*

*Breitbart News, Trump*, BREITBART (July 21, 2025), https://www.breitbart.com/the-

media/2025/07/21/tulsi-gabbards-revelations-vindicate-mark-levin-breitbart-news-

trump/ (last visited Sept. 15, 2025).

121. Two days later, Director Gabbard posted on *X*: "In the months leading

up to the November 2016 election, the Intelligence Community agreed that there

was no intelligence that reflected that Russia was trying to hack the election…So it

was very striking when we look back at the documents that I declassified and

released that show there was a shift in early December." *See* @RAPIDRESPONSE47,

X.COM,    (https://x.com/RapidResponse47/status/1946939059928011247).    She

further observed: "The effect of what Pres. Obama and his senior national security

team did was subvert the will of the American people, undermining our democratic republic, and enacting what would be essentially a years-long coup against President Trump." *See* @RapidResponse47, x.com, (https://x.com/RapidResponse47/status/1946936900377329917) (last visited Sept. 15, 2025).

122.   As a willing accomplice in the Russia Collusion Hoax, the Times knowingly spread falsehoods calculated to undermine President Trump's historic victory in the 2016 presidential election and to delegitimize his presidency. *See, e.g.,* David E. Sanger and Scott Shane, *Russian Hackers Acted to Aid Trump in Election, U.S. Says*, The New York Times (Dec. 19, 2016), https://www.nytimes.com/2016/12/09/us/obama-russia-election-hack.html (last visited Sept. 15, 2025); Michael D. Shear and David E. Sanger, *Putin Led a Complex Cyberattack Scheme to Aid Trump*, *Report Finds,* The New York Times (Jan. 6, 2017), https://www.nytimes.com/2017/01/06/us/politics/donald-trump-wall-hack-russia.html?searchResultPosition=36 (last visited Sept. 15, 2025); Scott Shane, *What Intelligence Agencies Concluded About the Russian Attack on the U.S. Election,* The New York Times (Jan. 6, 2017), https://www.nytimes.com/2017/01/06/us/politics/russian-hack-report.html?searchResultPosition=46 (last visited Sept. 15, 2025); Scott Shane, *What We Know and Don't Know About the Trump-Russia Dossier*, The New York

TIMES (Jan. 11, 2017), https://www.nytimes.com/2017/01/11/us/politics/trump-intelligence-report-explainer.html?searchResultPosition=94 (last visited Sept. 15, 2025); Michael S. Schmidt, Mark Mazzetti, and Matt Apuzzo, *Trump Campaign Aides Had Repeated Contacts With Russian Intelligence*, THE NEW YORK TIMES (Feb. 14, 2017), https://www.nytimes.com/2017/02/14/us/politics/russia-intelligence-communications-trump.html (last visited Sept. 15, 2025); Scott Shane and Mark Mazzetti, *The Plot to Subvert an Election*, THE NEW YORK TIMES (Sept. 20, 2018), https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html (last visited Sept. 15, 2025); Karen Yourish and Larry Buchanan, *Mueller Report Shows Depth of Connections Between Trump Campaign and Russians*, THE NEW YORK TIMES (April 19, 2019), https://www.nytimes.com/interactive/2019/01/26/us/politics/trump-contacts-russians-wikileaks.html (last visited Sept. 15, 2025); Editorial Board, *The Trump Campaign Accepted Russian Help*, THE NEW YORK TIMES (Aug. 19, 2020), https://www.nytimes.com/2020/08/19/opinion/trump-russia-2016-report.html?smid=tw-nytopinion&smtyp=cur (last visited Sept. 15, 2025); Julian E. Barnes, *The Intelligence on Russia Was Clear. It Was Not Always Presented That Way.*, THE NEW YORK TIMES (March 17, 2021), https://www.nytimes.com/2021/03/17/us/politics/russia-elections-trump-intelligence.html (last visited Sept. 15, 2025).

123.   The Times's reaction to this revelation of criminal conduct by the Obama Administration and its deep state lawfare targeting President Trump was predictably grotesque. First, the Times cynically asserted that Gabbard's report about the politically motivated Russia Collusion Hoax was itself "politically motivated." Julian E. Barnes and David E. Sanger, *Gabbard Claims Obama Administration Tried to Undermine Trump in 2016*, THE NEW YORK TIMES (July 18, 2025), https://www.nytimes.com/2025/07/18/us/politics/gabbard-obama-trump-russia.html (last visited Sept. 15, 2025). Second, the Times, oblivious to the irony of its own propaganda, declared that "Donald Trump has become the deep state." Maureen Dowd, *MAGA's New Target: Trump*, THE NEW YORK TIMES (July 18, 2025), https://www.nytimes.com/2025/07/19/opinion/trump-maga-epstein-deep-state.html (last visited Sept. 15, 2025). Indeed, Dowd's description would have been accurate had she been referring to former President Obama rather than her intended target, President Trump: "He is the keeper of secrets. He is the one stealing away people's liberties. He is the one weaponizing government and protecting the ruling class." *Id*.

124.   In this case, Defendants, just as they did with respect to the Russia Collusion Hoax, possessed public and non-public information and had access to information which they knew to be accurate. However, consistent with their long-term pattern and *modus operandi*—lie about President Trump when the truth does

not fit their far-left agenda—they deliberately ignored this information and instead published the malicious, false and defamatory Book and the Articles as "hit pieces" calculated to severely harm President Trump and his reputation, as they've done for a decade.

### *Damages*

125.   Defendants' defamatory and disparaging statements have caused numerous harms to President Trump and his businesses.

126.   Americans voted in historic numbers for President Trump, including, determinatively, in swing states, in large part because of President Trump's record of success as a businessman and President, particularly given the Biden-Harris Administration's abysmal economic record and extreme inflation. Sensing the weakness of their preferred candidate in the election, Defendants timed their publications at the height of election season to inflict maximum electoral damage against President Trump. Defendants also used their false and defamatory publications to disparage the American Dream lived out by Fred Trump and President Trump, impugn his lifelong support for America's men and women in uniform, and attempt to set up as many roadblocks and obstacles as possible in President Trump's second term.

127.   The reputational and economic harm that Defendants have inflicted on President Trump and his businesses can be redressed by this Court. Indeed, courts

for centuries have recognized that some of the defamatory statements directed at President Trump are so loathsome in their character—such as the false claim that President Trump has engaged in illegal activity, including but not limited to tax fraud and wire fraud—that these statements constitute defamation *per se*, where damages are presumed.

128.   Discrete economic harms resulted from these defamatory statements. Defendants timed the release of the Book and the First Article to be close in time with the release of the trailer for the forthcoming movie "The Apprentice." Defendants' false publications about President Trump also led directly to a precipitous decline in the stock price of TMTG, significantly injuring the President given his ownership stake. More generally, the repeated attacks on President Trump's business acumen and public image directly affect the profitability of his businesses, which rely in part on their placement in the market as luxury brands and the need for active customer engagement with President Trump across his offerings.

129.   The value of President Trump's one-of-a-kind, unprecedented personal brand alone is reasonably estimated to be worth at over $100,000,000,000. His business ventures are successful and generate hundreds of millions of dollars of annual revenue for the Trump Organization. Moreover, the injury to President Trump's business and personal reputation inflicted by these Defendants threatens to

continue, thereby causing massive economic damage to his brand value and significant damage and injury to his future financial prospects. The harm to the value of TMTG stock is one example of how the Defendants' defamation has injured President Trump. Because President Trump's net worth is extremely high and includes his unique brand, which he has carefully cultivated over decades, the reputational injury inflicted in this case reaches billions of dollars.

130.   Defendants' smears served only one purpose: to disgrace and humiliate President Trump with false, malicious, and defamatory "reporting" premised on disregarding the truth and actual biographical facts, the televised and recorded record, and relevant business data. The economic harms that President Trump suffered because of Defendants' conduct can and should be redressed by the Court.

## CLAIMS FOR RELIEF

## COUNT I – DEFAMATION *PER SE*
### *(All Defendants)*

131.   Plaintiff, President Trump, realleges his allegations contained in paragraphs 1 through 130 of this Complaint, *supra*, as if set fully forth herein.

132.   Selected unprivileged statements set forth in this Complaint, made by Defendants to tens of millions of individuals about President Trump—including to many individuals in Florida and in this District—are deceptive, malicious, intentional, defamatory, disparaging, distorted, fabricated, false, and misleading, and

injured President Trump in his profession and occupation, thus constituting defamation *per se*.

133.   The statements in this Complaint constituting defamation *per se* are, among others, those set forth in paragraphs 88(a), 88(h), 88(m), 88(n), 88(o), 90(c), and 91.

134.   The unprivileged statements made by Defendants to others about President Trump are false and defamatory.

135.   At the time such statements were made by Defendants, they knew or should have known that they were false and defamatory.

136.   Defendants published such statements negligently, with knowledge of the falsity of the statements, and/or with reckless disregard of their truth or falsity.

137.   Numerous people read and/or heard the false and defamatory statements.

138.   The statements were not privileged.

139.   The statements were published by Defendants with actual malice, as part of a long term pattern, with oppression, and fraud in that they were aware at the time of the falsity of the publication and thus, made said publications in bad faith, out of hatred and ill-will directed towards President Trump without any regard for the truth.

140.   Defendants possessed information and had access to information that showed their statements were false.

141.   Defendants also made statements for which they had no factual basis.

142.   Moreover, the statements tend to so harm the reputation of President Trump as to lower his professional reputation in the community or deter third persons from associating or dealing with him and, as such, constitute defamation *per se*.

143.   As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendants, President Trump has been damaged, and is entitled to compensatory damages.

144.   Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards President Trump, he also seeks an award of punitive damages.

145.   Moreover, President Trump's economic losses because of Defendants' defamatory statements are enormous and take the form of direct harm to his professional and occupational interests, including the value of his brand, properties, and businesses.

146.   President Trump's non-economic damages include attempted severe diminishment and tarnishing of his reputation as President and as a businessman in the eyes of the American public and around the world.

## COUNT II – DEFAMATION *PER QUOD*
### *(All Defendants)*

147.   Plaintiff, President Trump, realleges his allegations contained in paragraphs 1 through 130 of this Complaint, *supra*, as if fully set forth herein.

148.   The unprivileged statements made by Defendants to others about President Trump are false and defamatory *per quod*.

149.   The statements in this Complaint constituting defamation *per quod* are, among others,  those set forth in paragraphs 88(b), 88(c), 88(d), 88(e), 88(f), 88(g), 88(i), 88(j), 88(k), 88(l), 88(p), 88(q), 88(r), 88(s), 88(t), 88(u), 88(v), 88(w), 88(x), 88(y), 89(a), 89(b), 89(c), 89(d), 89(e), 89(f), 89(g), 89(h), 90(a), and 90(b).

150.   At the time such statements were made by Defendants, they knew or should have known that they were false and defamatory.

151.   Defendants published such statements negligently, with knowledge of the falsity of the statements, and/or with reckless disregard of their truth or falsity.

152.   The statements were not privileged.

153.   The statements were published by Defendants with actual malice, as part of a long term pattern, with oppression and fraud in that they were aware at the time of the falsity of the publication and thus, made said publications in bad faith, out of hatred and ill-will directed towards President Trump without any regard for the truth.

154.   Moreover, the statements tend to so harm the reputation of President

Trump as to lower his professional reputation in the community or deter third persons from associating or dealing with him.

155.    As a proximate result of the false and defamatory publication of statements to third parties by Defendants, President Trump has been damaged, and is entitled to compensatory damages.

156.    Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards President Trump, he also seeks an award of punitive damages.

**WHEREFORE**, Plaintiff, PRESIDENT DONALD J. TRUMP demands judgment against Defendants NEW YORK TIMES COMPANY, SUSANNE CRAIG, RUSS BUETTNER, PETER BAKER, MICHAEL S. SCHMIDT, and PENGUIN RANDOM HOUSE LLC, as follows:

(a) On Counts I and II, compensatory damages in an amount not less than $15,000,000,000;

(b) On Counts I and II, punitive damages in an amount to be determined upon trial of this action;

(c) The costs associated with this action; and

(d) Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to all issues so triable.

Dated:  September 15, 2025                    Respectfully submitted,

*/s/Alejandro Brito*
Alejandro Brito
Florida Bar No. 098442
BRITO, PLLC
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Tel:  305-614-4071
Fax:  305-440-4385
abrito@britopllc.com
apiriou@britopllc.com

*/s/Edward Andrew Paltzik*
Edward Andrew Paltzik
Taylor Dykema PLLC
914 E. 25th Street
Houston, TX 77009
Tel: 516-526-0341
edward@taylordykema.com
(*pro hac vice* admission forthcoming)

*/s/Daniel Zachary Epstein*
Daniel Zachary Epstein
Epstein & Co. LLC
8903 Glades Rd
Ste A8 #2090
Boca Raton, FL 33434
Tel: 202-240-2398
dan@epsteinco.co
(*pro hac vice* admission forthcoming)

*Counsel to Plaintiff*
*President Donald J. Trump*