# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
### Tampa Division

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual, <br><br> Plaintiff, <br><br> v. <br><br> NEW YORK TIMES COMPANY, a New York corporation, SUSANNE CRAIG, an individual, RUSS BUETTNER, an individual, PETER BAKER, an individual, and PENGUIN RANDOM HOUSE LLC, a Delaware company, <br><br> Defendants. | Case No. 8:25-cv-02487-SDM-NHA <br><br> **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, PRESIDENT DONALD J. TRUMP ("President Trump"), by and through his counsel, brings this action against Defendants, NEW YORK TIMES COMPANY (the "New York Times" or the "Times"), SUSANNE CRAIG ("Craig"), RUSS BUETTNER ("Buettner"), PETER BAKER ("Baker"), and PENGUIN RANDOM HOUSE LLC ("Penguin") (collectively, "Defendants"), and alleges as follows:

## **INTRODUCTION**

1.    This action concerns numerous defamatory statements regarding President Trump in at least three false, defamatory, and malicious publications made by Defendants—two articles and a book:

(a) Susanne Craig and Russ Buettner, *The Star-Making Machine That Created 'Donald Trump,'* THE NEW YORK TIMES (Sept. 14, 2024), https://www.nytimes.com/2024/09/14/business/donald-trump-apprentice.html) (last visited Oct. 16, 2025) (**Exhibit A**) (the "First Article")[1];

(b) Susanne Craig and Russ Buettner, *Lucky Loser: How Donald Trump Squandered His Father's Fortune and Created the Illusion of Success*, PENGUIN RANDOM HOUSE (Sept. 17, 2024), https://www.penguinrandomhouse.com/books/672076/lucky-loser-by-russ-buettner-and-susanne-craig/ (last visited Oct. 16, 2025) (**Exhibit B**) (page from Penguin website) (the "Book")*;*

(c) Peter Baker, *For Trump, a Lifetime of Scandals Heads Toward a Moment of Judgment*, NEW YORK TIMES (Oct. 20, 2024),

---

[1] Published under the headline "He Wasn't a Billionaire: He Just Played One on TV" in the print version of the Times on September 15, 2024.

https://www.nytimes.com/2024/10/20/us/politics/trump-scandals.html

(last visited Oct. 16, 2025) (**Exhibit C**) (the "Second Article")[2];

(First and Second Articles together, the "Articles").

2.    As set forth below, Defendants originated and distributed these publications, and the defamatory statements about President Trump therein, with actual malice. The statements in question wrongly defame and disparage President Trump's hard-earned professional reputation, which he painstakingly built for decades as a private citizen before becoming President of the United States, including as a successful businessman and as star of the most successful reality television show of all-time— *The Apprentice*.

## PARTIES

3.    Plaintiff, President Trump, is a citizen of the United States and a citizen of the State of Florida. He served as the 45th President of the United States, and currently serves as the 47th President of the United States.

4.    Defendant New York Times is a New York corporation and global media organization with its principal place of business in New York, New York.

5.    Defendant Craig is a natural person over the age of eighteen, a citizen of the State of New York, and believed to be an employee of the Times, and an independent contractor to Penguin.

---

[2] Published under the headline "A Scandal-Plagued Career Nears a Decisive Moment" in the print version of the Times on October 23, 2024.

6.    Defendant Buettner is a natural person over the age of eighteen, a citizen of the State of New York, and believed to be an employee of the Times, and an independent contractor to Penguin.

7.    Defendant Baker is a natural person over the age of eighteen and, a citizen of the District of Columbia, and believed to be an employee of the Times.

8.    Defendant Penguin is a Delaware limited liability company with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a). The parties are completely diverse, as President Trump is a citizen of Florida, while all Defendants are citizens of New York, Delaware, and the District of Columbia, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

10.    The Court possesses personal jurisdiction over Defendants pursuant to Florida Statute §48.193(2) on the grounds that Defendants, during the operative period alleged in this Complaint, engaged in substantial and not isolated business activities in Florida, and more specifically in this District. Defendant Times sells printed, regularly read newspapers in Florida, which contain news reports, editorials, and other media content, including the Articles.  Defendant Times publishes online news reports, editorials, and other media content at https://www.nytimes.com, which

are regularly read by individuals in Florida, including the Articles. Penguin publishes online books/e-books at https://www.penguinrandomhouse.com/books/ and sells printed books, all of which are regularly read by individuals in Florida, including the Book.

11.    In addition, this Court possesses personal jurisdiction over Defendants pursuant to: (a) Florida Statute §48.193(1)(a)(1) on the grounds that Defendants Times and Penguin operate, conduct, engage in, or carry on a business in Florida or have an office or agency in Florida, (b) Florida Statute §48.193(1)(a)(2) on the grounds that Defendants committed a tortious act in Florida (as alleged herein), and (c) Florida Statute §48.193(1)(a)(6) on the grounds that Defendants caused injury to President Trump within Florida arising out of an act or omission by Defendants outside of Florida, while at or about the time of the injury, products and services provided by Defendants were used or consumed within Florida in the ordinary course of commerce, trade, or use.

12.    The Book and Articles were published in Florida and remain accessible to the public in Florida. The Times' newspapers, online content, and subscriptions are available for public consumption in Florida, and Penguin's publications are available for public consumption in Florida. Injury to President Trump's reputation in his home state of Florida and among Florida citizens is particularly damaging to him.

13.    The Times and its reporters produce a distinct newspaper for daily distribution and sale in Florida. The Times distributes and sells thousands, or even millions, of copies of its paper each day in Florida, and to thousands of subscribers through its interactive digital content who reside in Florida. In the aggregate, the Times and its reporters generate many millions of individual copies of the Times per year which are distributed in Florida.

14.    When writing for the Times, Craig, Buettner and Baker were all aware of the Times' regular distribution and sale in Florida. Each was aware that their writings would be published and distributed in Florida.

15.    Penguin, which maintains an office in Florida, similarly regularly publishes, markets, distributes, and sells thousands of titles, including thousands of copies of the Book, in Florida under various brands, including but not limited to *Penguin Random House* and *Penguin Books.*

16.    Defendants Penguin, Craig, and Buettner knew that the Book would be published, distributed, and sold in Florida.

17.    Penguin's extensive business contacts with, and interest in, Florida are further evidenced by litigation to protect its business. *See, e.g.,* Complaint, *Penguin Random House LLC et al. v. Ben Gibson, in his official capacity as Chair of the Florida State Board of Education et al.,* No. 6:24-cv-01573 (M.D. Fl. Aug. 29, 2024), https://www.publishersweekly.com/binary-

data/ARTICLE_ATTACHMENT/file/000/006/6535-1.pdf (last visited Oct. 16, 2025).

18.   Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (b)(3). A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District: both the Times and Penguin distributed and sold at least tens of thousands of copies of the publications at issue within this District.

19.   Additionally, Trump Media & Technology Group ("TMTG"), the media and technology company that owns and operates the social media platform *Truth Social*, which President Trump founded, is headquartered in Sarasota, within this District. President Trump was TMTG's majority shareholder at the time his claims accrued.

## FACTUAL ALLEGATIONS

### *Defendants' Defamatory Statements*

20.   Penguin, Craig, and Buettner published many false, malicious, and defamatory statements in the Book, including, without limitation, the following:

> (a) "Donald Trump had received the equivalent of more than $400 million from his father, much of it through fraudulent tax evasion schemes."
> *See* Book at p. 5.

(b) "Mark Burnett,[3] the television producer who made Trump a star, did not just hand him a fortune. In the editing bay, skilled hands created a version of Donald Trump—diligent, measured, polite but authoritative—that might have been nonexistent but was highly marketable." *Id.* at pp. 7-8.

(c) "Sometimes, despite himself, Donald Trump received his fortune from those sources mostly outside of his ability to run a business. The secret of his life, one that emerges in hundreds of moments big and small, is that the less he has been involved in decision-making, the better his chances of financial success." *Id.* at p. 8.

(d) "It was the first of many such relationships in Trump's life. He would be drawn to men who displayed a penchant for violence, and wax sentimentally about the days when, in his perception, society accepted resolving disputes with physical violence." *Id.* at p. 69.

(e) "With no real estate or financial staff at his disposal, Donald's assessment of a potential opportunity started and stopped at the end of his nose. There would be no deliberative planning and very little in the way of an analysis of risks or potential return on investment." *Id.* at p. 159.

---

[3] Hereinafter "Burnett".

(f) "In the language of the tax code, Fred had given his son taxable gifts masquerading as loans, a likely tax fraud that went unnoticed." *Id.* at p. 166.

(g) "Even as his father's chosen successor and the child who benefited the most from his father's wealth, Donald accelerated his long efforts to erase his father's accomplishments from the public consciousness in service of artificially inflating his own." *Id.* at p. 184.

(h) "He increasingly saw no value in working with partners, or in heeding the advice of others, whether prominent business consultants, experienced sports team owners, or executives with one of the best-run hotel and casino companies on the world." *Id.* at p. 219.

(i) "As the national economy slowed, Trump took on costs and debts with breathtaking speed, each time without seriously running the numbers to spec out potential profits." *Id.* at p. 270.

(j) "During a fifteen-year rise, he had paid close attention to aesthetic details, from the waterfall and ficus trees in the lobby of Trump Tower to the angle of the telephone handsets on his yacht for high rollers. He had not paid similar attention to financial details, especially whether his individual businesses could support their payments on the money he borrowed to buy or build them." *Id.* at p. 290.

(k) "A plan was soon devised to funnel some of Fred's cash to Donald and his three siblings. They would accomplish that goal by adding a sham layer to Fred's business, one designed to evade the gift and estate taxes. They would call that extra layer All County Building Supply and Maintenance. It would serve no purpose beyond creating an off-ramp to send cash to his children." *Id.* at p. 300.

(l) "So the Trumps began submitting the padded bills to request rent increases from state officials. Part of the cost of Donald Trump's off-the-books inheritance would be passed along to his father's middle-income tenants." *Id.* at p. 301.

(m)     "Between the trust funds, the invoice-padding operation, and other devices created to siphon off his father's wealth outside the gift and estate tax system, Donald was already collecting almost $2 million a year from his father's companies. His own business failures meant he kept that money tax-free." *Id.* at p. 314.

(n) "After experiencing years of sensory overload in jungles around the world, the first thing Burnett's producers noticed when they arrived on the twenty-sixth floor of Trump Tower was the stink, a musty and moldy carpet smell that seemed to emanate from every corner. As they

walked through, with eyes trained to notice small details, they saw the chipped wood on seemingly every piece of furniture." *Id*. at p. 352.

(o) "Trump's desk showed no signs of real work—no computer, contracts, or files. It was just smothered by newspaper and magazine articles focused on one subject: himself." *Id*. at p. 353.

(p) "Donald Trump, the self-described world's greatest dealmaker, had sold the bulk of his father's empire for almost $250 million less than it was worth." *Id*. at p. 360.

(q) "The business model that Burnett had spent the prior decade perfecting—selling corporations on the value of letting him weave their products into his show—was about to make Trump the equivalent of a second inheritance. And as when he was born, other people would do all the work." *Id*. at p. 366.

(r) "Trump typically lied or fuzzed the fact that he did not own the [construction] projects and was not the developer, creating the illusion that he was everywhere, buying properties, taking on risk, and pouring concrete." *Id*. at p. 398.

(s) "Donald Trump had faced these moments before, periods when it seemed his failures could not be saved only by aggressive tax maneuvers or not paying his debts. But there always came a new

windfall from plain old luck. The luck of his birth. The luck of being made into a television celebrity." *Id*. at p. 444.

(t) "Here's the part that may sting the most in a country that sees itself as history's greatest meritocracy: Good things happened to Donald Trump. He did not earn most of those good things. He was born. He was discovered by a revolutionary television producer. And he was pushed into an investment against his will. And from those three bits of good luck came the equivalent today of more than $1.5 billion. That sort of tailwind could paper over a litany of failure and still fund a lavish life. And there is no evidence that in fifty years of labor Donald Trump added to his lucky fortunes. He would have been better off betting on the stock market than himself." *Id*. at p. 445.

(u) "Then Mark Burnett's *The Apprentice* fortified Trump's fact-free bubble, while also making it national and bankable in ways that Trump never did on his own." *Id*. at p. 448.

(v) "As much as the illusion of success was the ultimate creation of Trump's first seventy years, the illusion of persecution may be his final masterpiece." *Id*. at p. 449.

21.     The Times, Craig, and Buettner published many false, malicious, and defamatory statements in the First Article, including, without limitation, the following:

(a) "Late in the summer of 2003, a team of television producers stepped off the elevator on the 26th floor of Trump Tower eager to survey the set of their next reality show. After years filming 'Survivor' in jungles around the world, training cameras on exotic spiders and deadly snakes to evoke danger, they came looking for a different set of sensory clues, the tiny details that would convey wealth and power. Right away, they knew they had a problem. The first thing they noticed was the stench, a musty carpet odor that followed them like an invisible cloud. Then they spotted scores of chips in the finish of the wooden desks and credenzas. The décor felt long out of date, making the space seem like a time capsule from when Donald J. Trump opened the building early in his first rise to fame." *See* First Article at p. 1.

(b) "At the office's spiritual center, Mr. Trump's own desk bore no evidence of work, no computer screens or piles of contracts and blueprints, just a blanket of news articles focused on one subject: himself." *Id*. at pp. 1-2.

(c) "As he began playing a wealthy tycoon on television, Mr. Trump secretly put a plan in motion to tap into his father's fortune again." *Id*. at p. 3.

(d) "Mr. Trump had mostly luck to credit for being discovered, at age 57, by Mark Burnett . . . ." *Id*.

(e) "Mr. Trump would need only to play a re-crafted version of himself." *Id*. at p. 4.

(f) "The producers would also need to invent a version of Donald Trump that did not actually exist—measured, thoughtful and endlessly wealthy . . . ." *Id*.

(g) "Mr. Trump did not mention that he had just directed his siblings to sell the dozens of buildings their late father had left them in trust funds, a betrayal of Fred C. Trump's wishes to keep his empire in the family." *Id*. at p. 8.

(h) "Donald Trump, four years after his father's death, orchestrated the private sale for $738 million. It was a huge number. But the buyers' banks valued the buildings at about $975 million, raising a question about Mr. Trump's claim to have mastered the art of the deal." *Id*.

(i) "Mr. Trump was on his way to collect more than $200 million from '*The Apprentice*' and an even quirkier offshoot, '*Celebrity Apprentice*,'

14

as host for over more than a decade. Thanks to his rehabilitated image, he would earn another $200 million from licensing and endorsement deals. That lucky windfall, similar in size to his inheritance and also requiring no business expertise, funded a new wave of Trump-run businesses ...." *Id*. at p. 21.

22.    The Times and Baker published many false, malicious, and defamatory statements in the Second Article, including, without limitation, the following:

(a) "Mr. Trump got an early start learning how to cut corners. As a high school student at New York Military Academy, he knowingly borrowed a friend's dress jacket with a dozen medals attached to wear for his yearbook photo, in effect appropriating medals that he did not win himself, according to [the Book]."

(b) "He likewise cheated to get into college, according to his estranged niece, Mary L. Trump. The future president paid a friend to take the SAT for him, Ms. Trump asserted in her own book, earning a score that later helped him transfer to Wharton business school at the University of Pennsylvania, a credential he has boasted about ever since."

(c) "Federal, state and local authorities looked into his ties with the Mafia, found violations of money laundering rules and penalized him for skirting stock trade rules."

### *President Trump's Well-Deserved Reputation*
### *as a Successful Businessman at Issue*

23.    President Trump's early success and business acumen were nationally recognized as early as 1982 when he was listed in *The Forbes 400* List of the wealthiest people in America. *See* Antoine Gara, *Donald Trump Through the Years*, FORBES (Dec. 2, 2016), https://www.forbes.com/pictures/ghmf45edldg/1982-the-forbes-400 (last visited Oct. 16, 2025).

24.    Thereafter, President Trump's stewardship of the Trump Organization rendered it and the Trump name synonymous not only with best-in-class New York City real estate but also with worldwide excellence, luxury, and opulence. Under President Trump's leadership, the Trump brand has come to symbolize the highest standards of class, quality, and consumer satisfaction.

25.    In addition to real estate, President Trump has spearheaded a long list of projects and brands that succeeded because of *his* unique brand, including, among many others, *The Apprentice*, *Truth Social*, and *Miss Universe*.

26.     In addition, President Trump has authored over a dozen best-selling books, including, as Defendants should know all too well, New York Times Best Seller *Trump: The Art of the Deal* (1987) (#1 on the Times Best Seller list for 13 weeks with an overall position on the list for 48 weeks).

27.    His success in the media realm has also extended to dozens of television and movie appearances, even before he became the star of *The Apprentice*.

28.    While not serving in the Oval Office, between 2021 and January of 2025, President Trump began new business ventures, ranging from social media enterprises (*Truth Social*) to crypto projects ($TRUMP).

29.    These diverse businesses depend on public patronage and public participation for their revenue; in turn, the demand to visit Trump Organization properties depends in large part on President Trump's well-earned positive reputation—and his name's long-established association with excellence, luxury, and elegance—which have proven vital to the values of many of these businesses and properties. President Trump prides himself on having a reputation for high standards, excellence, and consumer satisfaction; statements falsely casting aspersions on President Trump's reputation as a businessman or the Trump Organization's legitimacy therefore cause direct and easily foreseeable harm to these businesses' value, revenue, and profitability.

### *President Trump's Celebrity and Achievements Pave the Way for "The Apprentice"*

30.    President Trump's hard-earned, sterling reputation led Burnett—who co-created *The Apprentice* with President Trump and served as the show's executive producer—to seek him out. President Trump and Burnett created *The Apprentice*, which gave the public an inside look into President Trump's unique business acumen and real estate abilities.

31.     There were many reasons—ignored by the New York Times, Penguin, Craig, and Buettner—why Burnett sought out President Trump, two of which were that: he is a globally celebrated businessman, and he possesses a unique charisma. President Trump's global profile and charisma brought inherent value to *The Apprentice*.

32.     "He always played himself and so that was how powerful his brand was . . . Anytime you have a sitcom that needs that stock character, Trump was not only somebody that comes to mind but somebody that's super willing to do it."  Rebecca Sun, Hollywood Reporter, cited in Inside Edition (May 12, 2016), https://www.youtube.com/watch?v=cbdrr9w4e80 (last visited Oct. 16, 2025).

33.     Wrote another commentator: "But politics aside, Trump was famous for decades prior to entering the political fray, beginning in the 1980s, when he first became a prominent figure as a New York City real estate tycoon." Michael Kennedy, ScreenRant, *Ghosts Can't Do It: Donald Trump Once Starred in a Supernatural Sex Comedy* (April 23, 2020), https://screenrant.com/ghosts-cant-do-it-movie-donald-trump-appearance/ (last visited Oct. 16, 2025).

34.     Because of President Trump, *The Apprentice* instantly became a top-rated television show. The program generated hundreds of millions of dollars in revenue and was on television for over thirteen years, with nearly 200 episodes. Not

coincidentally, after President Trump left the show in June 2015, the value of *The Apprentice* brand declined sharply.

35.    Vitally, on *The Apprentice*, President Trump coined the iconic catchphrase "You're Fired!" This led to numerous derivative works and merchandise that utilized the phrase and embodied President Trump's name, image, and likeness.

36.    *The Apprentice* was a monumental success *because of* President Trump, producing unprecedented ratings and viewership. For example, in the first season alone, 2003-2004, the show became an instant hit, earning an 18-49 rating of 10.1 and 20,704,000 total viewers.

37.    As the New York Times itself reported, the final episode of the first season of the groundbreaking new show was seen in whole or in part by 40,000,000 viewers and pulled in an average total of 28,000,000 viewers. The Times called the finale "an overpowering ratings force," which NBC Entertainment president Jeff Zucker said was the result of the show becoming "the cultural phenomenon of the television season." *The Apprentice* "dwarfed" the results of other major shows, including *American Idol*. *See* Bill Carter, *'The Apprentice' Scores Ratings Near Top for the Season*, THE NEW YORK TIMES (April 17, 2004),

https://www.nytimes.com/2004/04/17/us/the-apprentice-scores-ratings-near-top-for-the-season.html (last visited Oct. 16, 2025).

### ***Defendants Double Down and Refuse to Retract Their Falsehoods***

38.    Defendants rejected President Trump's reasonable demands for retraction, and instead doubled down and expanded on their malicious and defamatory falsehoods.

39.    By letter dated September 15, 2024, President Trump's counsel notified the Times of the defamatory content at issue in the First Article (**Exhibit D**).

40.    By letter dated September 19, 2024, David E. McCraw, Senior Vice President & Deputy General Counsel for the Times, wrote, erroneously, *inter alia*: "We know of nothing in the piece that is factually wrong . . . . " (**Exhibit E**).

41.    By letter dated October 1, 2024, President Trump's counsel again notified the Times of the defamatory content at issue in the First Article (**Exhibit F**).

42.    By letter dated October 29, 2024, President Trump's counsel notified Defendants of the defamatory content in the Book, and First and Second Articles (**Exhibit G**).

43.    By letter dated October 31, 2024, Mr. McCraw, wrote, wrongly, *inter alia*: "I have reviewed the letter and the stories with our editors and reporters, and we see no basis for a correction of any of the articles." (**Exhibit H**).

44.    By letter also dated October 31, 2024, Carolyn K. Foley, Senior Vice President & Associate General Counsel for Penguin, wrote, in error, *inter alia*: "Your letter falls short, however, of identifying an actionable claim for defamation against Penguin Random House Press." (**Exhibit I**).

### *Defendants' Actual Malice*

45.    Defendants individually and collectively published numerous false, malicious, and defamatory statements while realizing that these statements were false or, at a minimum, with reckless disregard for the truth.

46.    As an initial matter, Defendants knowingly relied on hopelessly biased or discredited sources. Most notably detailed in the Book and related reporting, Craig and Buettner received stolen tax returns from convicted felon Charles Littlejohn.[4] *Plaintiff's Notice of Filing Redacted Version of ECF 111-2 in Compliance with Court Order (ECF 114)*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. FL Apr. 25, 2024), ECF No. 119 Exhibit 1 (Deposition of Charles Littlejohn).

47.    Moreover, the Times and its authors admit that they view President Trump as a threat who does not deserve fair treatment. *See* Jim Rutenberg, *Trump is*

---

[4] Penguin, Craig, and Buettner admit their reliance on the disgraced felon Littlejohn, shockingly thanking and praising him for his crimes in the "Acknowledgments" section of the Book: "Chaz Littlejohn, an earnest and brilliant young man, came to us willing to risk his liberty to help us inform the public about the truth behind Donald Trump as a businessman." *See* Book at 451.

*Testing the Norms of Objectivity in Journalism*, THE NEW YORK TIMES (August 7, 2016), https://www.nytimes.com/2016/08/08/business/balance-fairness-and-a-proudly-provocative-presidential-candidate.html (last visited Oct. 16, 2025) ("If you view a Trump presidency as something that's potentially dangerous, then your reporting is going to reflect that. You would move closer than you've ever been to being oppositional."); The New York Times Trust Team, *You Asked, We Answered: How The Times Is Reporting on the Trump Administration*, THE NEW YORK TIMES (Mar. 24, 2025), https://www.nytimes.com/2025/03/06/insider/how-the-new-york-times-reports-on-trump.html  (last visited Oct. 16, 2025) ("The newsroom of the Times has been reporting for years on Donald Trump's tenuous relationship with facts. We routinely point out falsehoods, exaggerations and misstatements, making sure that we also then let readers know what's accurate."); Angelo Fichera, *The Method Behind Trump's Mistruths*, THE NEW YORK TIMES (Apr. 8, 2024), https://www.nytimes.com/interactive/2024/04/08/us/politics/trump-speech-mistruths.html (last visited Oct. 16, 2025) ("Since the beginning of his political career, Donald J. Trump has misled, mischaracterized, dissembled, exaggerated and, at times, flatly lied.").

48.     Further, Defendant Baker makes no secret of the fact that he considered President Trump's first administration to be a "factory of falsehoods . . . ." Peter Baker, *Dishonesty Has Defined the Trump Presidency. The Consequences Could Be*

*Lasting*. THE NEW YORK TIMES (Nov. 1, 2020),

https://www.nytimes.com/2020/11/01/us/politics/trump-presidency-

dishonesty.html (last visited Oct. 16, 2025) ("the Trump presidency has been a

factory of falsehood from the start");

49.    Penguin even published a book written by a Times reporter, the very

title of which wrongly and maliciously positions President Trump as an enemy of

the United States, and which was marketed as the "high-stakes story of those who

felt compelled to confront and try to contain the most powerful man in the world as

he shredded norms and sought to expand his power." Michael S. Schmidt, *Donald*

*Trump v. The United States: Inside the Struggle to Stop a*

*President*, PENGUIN RANDOM HOUSE (Sept. 1, 2020),

https://www.penguinrandomhouse.com/books/604656/donald-trump-v-the-united-

states-by-michael-s-schmidt/ (last visited Oct. 16, 2025).

50.    Moreover, Defendants have adopted numerous patterns and practices

regarding President Trump that greatly deviate from their typical journalistic

patterns and practices.

51.    For example, the Times reporters follow an internal practice that stories

covering President Trump are to be written in an antagonistic and negative manner.

To that end, Times reporters routinely resolve any factual ambiguities or

uncertainties in their reporting in the way that will harm President Trump, his family, his businesses, and his associates.

52.    These policies—broadly understood and followed by the Times' reporters, including Craig, Buettner, and Baker, and enforced by its editors—include practices that go against widely accepted journalistic standards, such as deliberately ignoring potentially positive and exculpatory sources of information, incorrectly deeming statements by witnesses or insiders that tend to support President Trump, his family, or his businesses to be "not reliable" or "not credible," and publishing negative, false claims about President Trump based on exclusively anonymous sources, which often do not exist, and without verification of sources' claims.

53.    Likewise, the Times and its reporters, including Craig, Buettner, and Baker, have a pattern and practice of contacting President Trump and his team regarding negative stories on a ludicrously short timeline so as to be able to claim that they sought comment—in order to preserve a scintilla of the pretense of neutrality—while making it functionally impossible for President Trump to comment on the stories.

54.    Another improper pattern and practice shared by all Defendants is to attempt to couch statements in ways that they subjectively know will be taken by a reasonable reader as assertions of fact in language that allows them to claim they are making mere opinion statements. Defendants employ this technique with the

unlawful intent of communicating false or likely false factual assertions to their readers while attempting to skirt potential legal liability. Indeed, Defendants use this technique with the specific intent of convincing readers of false and harmful statements of fact about President Trump while attempting to minimize their potential defamation liability.

55.    Defendants similarly pursue a pattern and practice of turning a deliberate blind eye towards research or investigatory methods that would disprove their anti-Trump thesis. For non-exhaustive examples, and as detailed *supra*, Defendants published numerous statements regarding President Trump's role in *The Apprentice* without first securing an interview with primary, senior sources involved in the production of *The Apprentice*, such as Burnett. Defendants knew that Burnett would likely have contradicted numerous specific false, malicious, and defamatory purported statements of fact that they made regarding President Trump's role in *The Apprentice* as well as their general narrative regarding President Trump's role in the show's success. Defendants therefore did not sufficiently pursue speaking with Burnett, did not sufficiently seek to obtain his original notes or records, and otherwise failed to engage with Burnett and other potential insiders within *The Apprentice* because they subjectively believed that these sources would have tended to contradict Defendants' preferred and defamatory anti-Trump narrative.

56.     Inconveniently for Defendants, Burnett *did* speak clearly in 2003, when he agreed—extraordinarily—to split the show's profits 50/50 with President Trump. *See* Book at 345-347.

57.     Nor did Defendants attempt to interview any of the directors, producers, or writers of the television programs, movies, or specials aired or released *before The Apprentice*, in which President Trump was selected to play himself or a fictional version of himself in cameo or supporting roles alongside some of the most recognized celebrities in the world who were then at the height of their careers and reach.

58.     Illustrative, non-exhaustive, and publicly available examples of the consistent demand for President Trump in popular culture—before *The Apprentice*— include: *Ghosts Can't Do It* (1989)[5] (playing himself in scenes with Bo Derek); *Home Alone 2* (1992)[6] (playing himself in a cameo with Macaulay Culkin); *The Fresh Prince of Bel Air* (1994)[7] (playing himself in a scene with Will Smith and other cast members); *The Little Rascals* (1994)[8] (playing the father of one of the characters); *The Nanny* (1996)[9] (playing himself in a scene with Fran Drescher); *The Drew Carey Show* (1997)[10] (playing himself in a sketch with Drew

---

[5] https://www.youtube.com/watch?v=Z9SFY2tumWA (last visited Oct. 16, 2025).
[6] https://www.youtube.com/watch?v=QnTuFaM_E9I (last visited Oct. 16, 2025).
[7] https://www.youtube.com/watch?v=aR_97NojyRI (last visited Oct. 16, 2025).
[8] https://www.youtube.com/watch?v=BUlEr8ec8Ao (last visited Oct. 16, 2025).
[9] https://www.youtube.com/watch?v=Njrwasa5YFo (last visited Oct. 16, 2025).
[10] https://www.youtube.com/watch?v=DRXPcHESrV8 (last visited Oct. 16, 2025).

Carey); *NightMan* (1997)[11] (playing a Marvel comics superhero version of himself); *Spin City* (1998)[12] (playing himself in a scene with famed actor Michael J. Fox); *Celebrity* (1998)[13] (playing himself in Woody Allen's comedy); *Sex In The City* (1998)[14] (playing himself in a scene with Kim Cattrall); *Zoolander* (2001)[15] (playing himself in opening scene cameo of Ben Stiller's comedy); *Two Weeks Notice* (2002)[16] (playing himself in a scene with Hugh Grant); and *The Ali G Show* (2003)[17] (interviewed by Sasha Baron Cohen).

59.    All these appearances confirm President Trump's unique place in the national cultural consciousness well before *The Apprentice*.

60.    As demonstrated by these memorable appearances in movies and television—and by President Trump's #1 position on the New York Times Best Seller list, *supra*—there was nothing created or fictional about President Trump's image as a successful businessman or his actual success in business—the opposite, his success and well-deserved image are all a matter of public record, intentionally ignored by Defendants.

---

[11] https://www.youtube.com/watch?v=6qtb6z80-I8 (last visited Oct. 16, 2025).
[12] https://www.youtube.com/watch?v=t_zBCEIr2Lo (last visited Oct. 16, 2025).
[13] https://www.youtube.com/watch?v=uMEig9gON6s (last visited Oct. 16, 2025).
[14] https://www.youtube.com/watch?v=brQADPmbapo (last visited Oct. 16, 2025).
[15] https://www.youtube.com/watch?v=HFjCEhCggEk (last visited Oct. 16, 2025).
[16] https://www.youtube.com/watch?v=FeYHMtenAJM (last visited Oct. 16, 2025).
[17] https://www.youtube.com/watch?v=sP5ElraFHHE (last visited Oct. 16, 2025).

61.    Defendants also made false, malicious, and defamatory statements regarding President Trump's business decisions and compliance with federal tax laws based on incomplete, minimal information—having only partial information, illegally obtained, regarding several years of tax returns—and realized that a responsible assessment of the Trump family's compliance with tax laws would have required forensic auditing, expert tax legal advice, and other expensive investigatory tools that would have confirmed that both President Trump and his father Fred Trump were in compliance with all applicable rules, laws, and regulations. The fact that neither President Trump nor Fred Trump was investigated for, charged with, or convicted of tax fraud was irrelevant to Defendants; facts were not to get in the way of the Defendants' pre-determined, false, malicious, and defamatory narrative.

62.    These breaches of journalistic ethics are further proven by the Times' enthusiastic aiding and abetting of the partisan effort to falsely link Russian interference to President Trump's victory in the 2016 Presidential Election, which is well on its way to becoming one of the most profoundly disturbing criminal political scandals in American history. *See, e.g.,* David E. Sanger and Scott Shane, *Russian Hackers Acted to Aid Trump in Election, U.S. Says*, THE NEW YORK TIMES (Dec. 19, 2016), https://www.nytimes.com/2016/12/09/us/obama-russia-election-hack.html (last visited Oct. 16, 2025); Michael D. Shear and David E. Sanger, *Putin Led a Complex Cyberattack Scheme to Aid Trump, Report Finds,* THE NEW YORK TIMES

(Jan. 6, 2017), https://www.nytimes.com/2017/01/06/us/politics/donald-trump-wall-hack-russia.html?searchResultPosition=36 (last visited Oct. 16, 2025); Michael S. Schmidt, Mark Mazzetti, and Matt Apuzzo, *Trump Campaign Aides Had Repeated Contacts With Russian Intelligence*, THE NEW YORK TIMES (Feb. 14, 2017), https://www.nytimes.com/2017/02/14/us/politics/russia-intelligence-communications-trump.html (last visited Oct. 16, 2025); Scott Shane and Mark Mazzetti, *The Plot to Subvert an Election*, THE NEW YORK TIMES (Sept. 20, 2018), https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html (last visited Oct. 16, 2025); Karen Yourish and Larry Buchanan, *Mueller Report Shows Depth of Connections Between Trump Campaign and Russians*, THE NEW YORK TIMES (April 19, 2019), https://www.nytimes.com/interactive/2019/01/26/us/politics/trump-contacts-russians-wikileaks.html (last visited Oct. 16, 2025); Editorial Board, *The Trump Campaign Accepted Russian Help*, THE NEW YORK TIMES (Aug. 19, 2020), https://www.nytimes.com/2020/08/19/opinion/trump-russia-2016-report.html?smid=tw-nytopinion&smtyp=cur (last visited Oct. 16, 2025).

63.    On July 20, 2025, Director of National Intelligence Tulsi Gabbard confirmed that the Russia collusion narrative, also known as the "Russia Hoax," had been false: "The effect of what Pres. Obama and his senior national security team did was subvert the will of the American people, undermining our democratic

republic, and enacting what would be essentially a years-long coup against President Trump." *See* @RAPIDRESPONSE47, X.COM, (https://x.com/RapidResponse47/status/1946936900377329917) (last visited Oct. 16, 2025).

64.    In this case, Defendants, just as they did with respect to the Russia Hoax, possessed public and non-public information and had access to information which they knew to be accurate and proved their reporting wrong. However, consistent with their long-term pattern and *modus operandi*—lie about President Trump when the truth does not fit their far-left agenda—they deliberately ignored this information and instead published the malicious, false and defamatory Book and the Articles as "hit pieces" calculated to severely harm President Trump and his reputation, as they have done for at least a decade.

### *Damages*

65.    Since its publication, the First Article has gained substantial traction and republication across various media.

66.    For example, the First Article received 585 comments from readers of the New York Times just within the first 24 hours of publication; upon information and belief, some of whom reside in Florida. *See* Craig and Buettner, *The Star-Making Machine That Created 'Donald Trump,' supra.* Notably, the Times, apparently unwilling to stand by its reporting, disabled comments the day after the

First Article was published; otherwise the Article would have drawn tens of thousands of comments.

67. Similarly, the Second Article received 1467 comments before the Times quickly closed the comment function.

68. The First Article is accompanied by a thirty-seven-minute commentary that adds more false color to the defamatory statements therein, which has been heard many times by readers of the New York Times. *Id*.

69. On X.com (formerly Twitter), Craig, who has 88,000 followers, has pinned a tweet that shows that the Book, which contains these and other defamatory statements regarding President Trump, had been atop the New York Times Best Seller list for two weeks. *See* @SUSANNECRAIG, X.COM, ([https://x.com/susannecraig/status/1841851317981000151](https://x.com/susannecraig/status/1841851317981000151)) (last visited Oct. 16, 2025).

70. Buettner, who has 15,900 followers on X.com, has also published several tweets about the Book. *See* @RUSSBUETTNER, X.com, ([https://x.com/russbuettner](https://x.com/russbuettner)) (last visited Oct. 16, 2025).

71. The Book, which is also available in audiobook format, is currently listed as the #1 Best Seller in "Biographies of Business & Industrial Professionals," and has 920 ratings. *See* [https://www.amazon.com/Lucky-Loser-Squandered-Fathers-Illusion/dp/0593298640](https://www.amazon.com/Lucky-Loser-Squandered-Fathers-Illusion/dp/0593298640) (last visited Oct. 16, 2025).

72.    Defendants used their false and defamatory publications to disparage President Trump and impugn his reputation.

73.    Discrete economic harms resulted from these defamatory statements. Defendants timed the release of the Book and the First Article to be close in time with the release of the disparaging and failed movie *The Apprentice* (2024),[18] which debuted at the Cannes Film Festival.  Defendants' false publications about President Trump also led directly to a precipitous decline in the stock price of TMTG, significantly injuring the President given his ownership stake.  Moreover, the repeated, false attacks on President Trump's business acumen and public image have directly affected the profitability of his businesses, which have always relied in part on their placement in the market as luxury brands and the need for active customer engagement with President Trump across his offerings.

74.    The value of President Trump's personal brand alone is reasonably estimated to be worth in the many billions of dollars. Business ventures bearing his name generate hundreds of millions of dollars of annual revenue for the Trump Organization.  Moreover, the injury to President Trump's business and personal reputation inflicted by these Defendants threatens to continue, thereby causing

---

[18] *The Apprentice* (2024) has no relationship to or affiliation with *The Apprentice* reality television show that is the subject of this Complaint.

massive economic damage to his brand value and significant damage and injury to his future financial prospects.

75.    President Trump's damages take the form of direct harm to his professional and occupational interests, including, without limitation, the value of his brand, properties, and businesses, and severe diminishment and tarnishing of his reputation as a businessman in the eyes of the American public and around the world.

76.    Exacerbating the damages, Defendants made all their false, malicious, and defamatory statements in bad faith, motivated by hatred and ill-will against President Trump without any regard for the truth, and made contrary to information Defendants possessed that showed their statements to be false, or at minimum should have raised and did raise serious doubts that the statements could possibly be true. which they were not.

77.    All conditions precedent to the bringing of this action have occurred, been satisfied, or have otherwise been waived.

## **CLAIMS FOR RELIEF**

### **COUNT I – DEFAMATION *PER SE***
***(Plaintiff President Trump v. Defendants Penguin, Craig, and Buettner)***
***Specific Publication: The Book***

78.    Plaintiff realleges his allegations contained in paragraphs 1 through 77 as if set forth fully below.

79.    The following false, malicious, and defamatory statements about President Trump, among many other statements, were, intentionally, with actual malice, and without privilege, published in the Book to millions of people in the State of Florida and in this District, and elsewhere, by Defendants Penguin, Craig, and Buettner, and were defamatory and false, and injured President Trump in his profession, occupation, and trade, thus constituting defamation *per se*: the statements contained in paragraphs 20(a), 20(b), 20(c), 20(e), 20(f), 20(i), 20(j), 20(k), 20(l), 20(m), 20(o), 20(p), 20(r), 20(t), 20(u), and 20(v) of this Complaint.

80.    Defendants possessed information and had access to information that showed their statements were false.

81.    Defendants also made statements for which they had no factual basis.

82.    As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendants, Plaintiff has been damaged.

83.    Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiff, he seeks an award of punitive damages.

## COUNT II – DEFAMATION *PER QUOD*
### *(Plaintiff President Trump v. Defendants Penguin, Craig, and Buettner)*
### *Specific Publication: The Book*

84.    Plaintiff realleges his allegations contained in paragraphs 1 through 77 as if set forth fully below.

85.     The following false, malicious, and defamatory statements about President Trump, among many other statements, were, intentionally, with actual malice, and without privilege, published in the Book to millions of people in the State of Florida and in this District, and elsewhere, by Defendants Penguin, Craig, and Buettner, were defamatory and false, and injured President Trump's reputation: the statements contained in paragraphs 20(d), 20(g), 20(h), 20 (n), 20(q), and 20(s) of this Complaint.

86.     Defendants possessed information and had access to information that showed their statements were false.

87.     Defendants also made statements for which they had no factual basis.

88.     As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendants, Plaintiff has been damaged.

89.     Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiff, he seeks an award of punitive damages.

## COUNT III – DEFAMATION *PER SE*
### *(Plaintiff President Trump v. Defendants Times, Craig, and Buettner)*
### *Specific Publication: The First Article*

90.     Plaintiff realleges his allegations contained in paragraphs 1 through 77 as if set forth fully below.

91.    The following false, malicious, and defamatory statements about President Trump, among many other statements, were intentionally, with actual malice, and without privilege, published in the First Article to millions of people in the State of Florida and in this District, and elsewhere, by Defendants Penguin, Craig, and Buettner, were defamatory and false, and injured President Trump in his profession, occupation, and trade, thus constituting defamation *per se*: the statements contained in paragraphs 21(b), 21(c), 21(d), 21(f), 21(h), and 21(i) of this Complaint.

92.    Defendants possessed information and had access to information that showed their statements were false.

93.    Defendants also made statements for which they had no factual basis.

94.    As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendants, Plaintiff has been damaged.

95.    Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiff, he seeks an award of punitive damages.

## COUNT IV – DEFAMATION *PER QUOD*
### (Plaintiff President Trump v. Defendants Times, Craig, and Buettner)
### Specific Publication: The First Article

96.    Plaintiff realleges his allegations contained in paragraphs 1 through 77 as if set forth fully below.

97.    The following false, malicious, and defamatory statements about President Trump, among many other statements, were, intentionally, with actual malice, and without privilege, published in the First Article to millions of people in the State of Florida and in this District, and elsewhere, by Defendants Times, Craig, and Buettner, were defamatory and false, and injured President Trump's reputation: the statements contained in paragraphs 21(a), 21(e), and 21(g) of this Complaint.

98.    Defendants possessed information and had access to information that showed their statements were false.

99.    Defendants also made statements for which they had no factual basis.

100.    As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendants, Plaintiff has been damaged.

101.    Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiff, he seeks an award of punitive damages.

### COUNT V – DEFAMATION *PER SE*
*(Plaintiff President Trump v. Defendants Times and Baker)*
*Specific Publication: The Second Article*

102.    Plaintiff realleges his allegations contained in paragraphs 1 through 77 as if set forth fully below.

103.    The following false, malicious, and defamatory statement about President Trump, among many other statements, was, intentionally, with actual

malice, and without privilege, published in the Second Article to millions of people in the State of Florida and in this District, and elsewhere, by Defendants Times and Baker, was defamatory and false, and injured President Trump in his profession, occupation, and trade, thus constituting defamation *per se*: the statement contained in paragraph 22(c) of this Complaint.

104.   Defendants possessed information and had access to information that showed their statements were false.

105.   Defendants also made statements for which they had no factual basis.

106.   As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendants, Plaintiff has been damaged.

107.   Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiff, he seeks an award of punitive damages.

### COUNT VI – DEFAMATION *PER QUOD*
*(Plaintiff President Trump v. Defendants Times and Baker)*
*Specific Publication: The Second Article*

108.   Plaintiff realleges his allegations contained in paragraphs 1 through 77 as if set forth fully below.

109.   The following false, malicious, and defamatory statements about President Trump, among many other statements, were, intentionally, with actual malice, and without privilege, published in the Second Article to millions of people

38

in the State of Florida and in this District, and elsewhere, by Defendants Times and Baker, were defamatory and false, and injured President Trump's reputation: the statements contained in paragraphs 22(a) and 22(b) of this Complaint.

110.   Defendants possessed information and had access to information that showed their statements were false.

111.   Defendants also made statements for which they had no factual basis.

112.   As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendants, Plaintiff has been damaged.

113.   Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiff, he seeks an award of punitive damages.

**WHEREFORE**, Plaintiff, PRESIDENT DONALD J. TRUMP demands judgment against all Defendants as follows:

(a) On all Counts, an award of compensatory damages in an amount not less than $15,000,000,000, and punitive damages in an amount to be determined upon trial of this action;

(b) On all Counts, retraction of the defamatory publications and statements;

(c) The costs associated with this action; and

(d) Such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial as to all issues so triable.

Dated:  October 16, 2025

Respectfully submitted,

*/s/Alejandro Brito*
Alejandro Brito
Florida Bar No. 098442
BRITO, PLLC
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Tel:  305-614-4071
Fax:  305-440-4385
abrito@britopllc.com
apiriou@britopllc.com

*/s/Edward Andrew Paltzik*
Edward Andrew Paltzik
Taylor Dykema PLLC
914 E. 25th Street
Houston, TX 77009
Tel: 516-526-0341
edward@taylordykema.com

(*pro hac vice*)

*/s/Daniel Zachary Epstein*
Daniel Zachary Epstein
Epstein & Co. LLC
8903 Glades Rd
Ste A8 #2090
Boca Raton, FL 33434
Tel: 510-239-7430
chair_00_trek@icloud.com

(*pro hac vice*)

*Counsel to Plaintiff*
*President Donald J. Trump*