## UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION

PRESIDENT DONALD J. TRUMP,
an individual,

                Plaintiff,

v.

NEW YORK TIMES COMPANY, a New
York corporation, SUSANNE CRAIG, an
individual, RUSS BUETTNER, an
individual, PETER BAKER, an individual,
and PENGUIN RANDOM HOUSE LLC,
a Delaware company,

                Defendants.

Case No.
8:25-cv-02487-SDM-NHA

**DEFENDANTS' MOTION TO DISMISS OR, IN THE
ALTERNATIVE, TO TRANSFER FOR IMPROPER VENUE AND
SUPPORTING MEMORANDUM OF LAW**

Defendants The New York Times Company ("The Times"), Susanne Craig,
Russ Buettner, Peter Baker, and Penguin Random House LLC ("PRH") respectfully
move to dismiss Plaintiff President Donald J. Trump's amended complaint
("Complaint" or "FAC"), Doc. 9, for improper venue under Federal Rule of Civil
Procedure 12(b)(3), or, in the alternative, to transfer this action to the Southern District
of New York pursuant to 14 U.S.C. § 1404.

## INTRODUCTION

This lawsuit should be dismissed or transferred to the Southern District of New
York. *None* of the material events giving rise to President Trump's defamation claims
transpired in this District, and virtually all of the relevant transfer factors point to New
York instead. President Trump has challenged dozens of statements from a book
(published by PRH) and two articles published in *The New York Times* by three of its
award-winning journalists. But none of those statements mentions or even materially
references anything in this District. To the contrary, the statements are about various
aspects of President Trump's storied New York life—including his time at the New
York Military Academy; his relationship with his father, "legendary New York City
builder" Fred Trump; his business career in New York; his inheritance of a New York
real estate empire and avoidance of New York tax; and his starring role on the reality
television show *The Apprentice*, which was famously filmed at Trump Tower in New
York. FAC ¶¶ 20–23. Almost all the relevant reporting on these topics occurred,

1

unsurprisingly, in the New York area, and none happened in this District.

This case should be dismissed or transferred based on either of two grounds. *First*, this District is not a proper venue. None of the material events relevant to the claims took place in the District, much less the necessary "*substantial part* of the events . . . giving rise to the claim[s]." 28 U.S.C. §1391(b)(2) (emphasis added). And, because proper venue lies in the Southern District of New York, President Trump cannot establish venue under 28 U.S.C. §1391(b)(3). *Second*, alternatively, transfer to the Southern District of New York is warranted on forum non conveniens grounds: this suit could have been filed there, and the private and public interest factors (including convenience of key witnesses) strongly favor transfer.

President Trump's decision to file suit in a District that has nothing to do with his defamation claims and where neither he nor any Defendant resides is the type of forum shopping that courts regularly reject. This action should be dismissed or transferred to the Southern District of New York.

## FACTUAL BACKGROUND

### I.   The Parties

President Trump is "a citizen of the State of Florida," a resident of the Southern District of Florida and, as President of the United States, also a resident of Washington, D.C. FAC ¶ 3. Before becoming a Florida resident in 2019, he was a citizen of New York, where, "beginning in the 1980s . . . he . . . became a prominent New York City real estate tycoon." *Id.* ¶ 33. President Trump still maintains property in New York, including his Trump Tower residence, which served as the location for

2

the *Apprentice* television show between 2003 and 2015. *Id*. ¶¶ 21(a), 34.

Defendant PRH is the publisher of *Lucky Loser: How Donald Trump Squandered His Father's Fortune and Created the Illusion of Success* (the "Book"). Decl. of Scott Moyers ("PRH Decl.") ¶ 4. PRH is a limited liability company with its principal place of business in New York. *Id*. ¶ 3.

Defendants Susanne Craig and Russ Buettner are Pulitzer Prize-winning reporters for The Times. Decl. of Susanne Craig ("Craig Decl.") ¶¶ 3, 9; Decl. of Russ Buettner ("Buettner Decl.") ¶ 3. They co-authored the Book and an article adapted from the Book titled *The Star-Making Machine That Created 'Donald Trump,'* which ran in *The New York Times* on September 14, 2024 (the "Adaptation Article"). Craig Decl. ¶ 17; Buettner Decl. ¶ 6. Craig resides in New York, and Buettner resides in New Jersey and primarily works in New York. Craig Decl. ¶ 2; Buettner Decl. ¶¶ 2, 3.

Defendant Peter Baker is the chief White House correspondent for The Times and a resident of Washington, D.C. Decl. of Peter Baker ("Baker Decl.") ¶¶ 2, 3. Baker is the author of the second article at issue, which was published in *The New York Times* on October 20, 2024. Titled *For Trump a Lifetime of Scandals Heads Toward a Moment of Judgment*, it surveyed decades of controversies involving President Trump (the "Survey Article"). *Id*. ¶ 5.

Defendant The Times is the publisher of *The New York Times* and a New York corporation with its principal place of business in New York. Decl. of Todd Socia ("Times Decl."). The Times published the Adaptation and Survey Articles. *Id*. ¶ 4.

3

## II.    Foundational Reporting for *Lucky Loser* Conducted in New York

*Lucky Loser*, the work at the heart of this action, tells the New York-centric story of how President Trump acquired his wealth before becoming President. Craig Decl. Ex. 2 at 10–14. Much of the Book reports on President Trump's upbringing by prominent New York City builder Fred Trump, President Trump's own career in New York City real estate, his inheritance of his father's New York property empire, and his role in *The Apprentice*, set in Manhattan. *Id.*

The foundation for the Book's reporting on many of these subjects—including multiple Statements in suit—was Buettner and Craig's award-winning investigative reporting into President Trump's finances for *The New York Times*. When they began that reporting in 2016, Craig and Buettner were reporters for the Metro Section, which covers New York City. Buettner Decl. ¶ 4; Craig Decl. ¶¶ 4, 5. At the time, President Trump was known as a quintessential New York figure, whose "name [was] synonymous . . . with best-in-class New York City real estate" and was famous for hosting *The Apprentice* from Trump Tower. FAC ¶ 24; Craig Decl. ¶ 5.

The initial focus of Buettner and Craig's reporting was how President Trump "received at least $413 million in today's dollars from his father's [New York] real estate empire, much of it through tax dodges in the 1990's." Craig Decl. ¶ 7; *id.* Ex. 1 at 1. To this end, Buettner and Craig obtained "a vast trove of confidential tax returns and financial records" relating to Trump family businesses in New York. Craig Decl. ¶ 8; *id.* Ex. 1. The source for these materials was later revealed to be Mary Trump, Plaintiff's niece, who was a New York resident at all relevant times. Craig Decl. ¶ 8.

On October 2, 2018, after an almost two-year investigation, The Times published a 14,500-word feature article by Buettner, Craig and their co-author, David Barstow, titled *Trump Engaged in Suspect Tax Schemes as He Reaped Riches from His Father* (the "2018 Article"). Craig Decl. Ex. 1. In the 2018 Article, Craig and Buettner reported that President Trump funded his business ventures in New York with income he received from the real estate empire of his father, "legendary New York City builder" Fred Trump. *Id.* Ex. 1 at 2, 11–14. The 2018 Article also reported that Fred Trump structured transfers of his wealth to President Trump and his other children to avoid paying millions of dollars in taxes, including by routing money through various New York entities. *Id.* Ex. 1 at 2, 22–26. In 2019, Craig and Buettner received the Pulitzer Prize and George Polk Award for their groundbreaking work. *Id.* ¶ 9.

Craig and Buettner conducted their reporting for the 2018 Article mainly from New York, relying primarily on New York-based sources. Buettner Decl. ¶ 11; Craig Decl. ¶ 8. They also relied heavily on business records and documents that originated in New York—including New York state tax filings, corporate filings by New York corporations, state records, invoices for transactions done in New York, and documents from New York court proceedings. Buettner Decl. ¶ 8; Craig Decl. ¶ 8.

On September 22, 2021, President Trump sued The Times, Craig and Buettner in New York state court over the reporting that would become the basis for *Lucky Loser*. Notably, President Trump "d[id] not specifically dispute the truth of any statements made in the article" and did not assert a libel claim, instead claiming tortious interference with contract based on The Times's publication of New York tax records

5

obtained from Mary Trump. *See Trump v. Trump*, 79 Misc. 3d 866, 868 (Sup. Ct. N.Y. Cty. 2023). The claims against The Times, Craig and Buettner were dismissed; the court recognized that "reporters are entitled to engage in legal and ordinary newsgathering activities." *Id*.[1]

### III.    *Lucky Loser* and the Adaptation Article

On October 8, 2020, Buettner and Craig executed a publishing agreement with PRH in New York, governed by New York law, to expand their earlier work on President Trump's finances into a book, which was ultimately published as *Lucky Loser* in September 2024. Buettner Decl. ¶ 10; Craig Decl. ¶ 10. Craig and Buettner "spent three years building upon [their] prior reporting by conducting hundreds of new interviews and acquiring additional documents, including confidential correspondence, internal business records from *The Apprentice*, and unpublished memoirs." Craig Decl. ¶ 11; *id.* Ex. 2 at 5. The Book relied upon and heavily cited Buettner and Craig's previous investigations into President Trump's finances for The Times. Craig Decl. ¶ 6; *id.* Ex. 2 at 5, 470, 477, 488, 492.

The research and writing for the Book took place primarily in New York. Buettner Decl. ¶ 11; Craig Decl. ¶ 15. Craig and Buettner conducted significant additional research into President Trump's upbringing in New York, his reliance on

---

[1] The Times, Craig and Buettner were subsequently awarded nearly $400,000 in attorneys' fees and other expenses pursuant to the New York anti-SLAPP law. *Trump v. Trump*, 2024 WL 133904, at *2 (Sup. Ct. N.Y. Cty. Jan 12, 2024). President Trump has continued to litigate this New York action against Mary Trump, a co-defendant who was not dismissed, with discovery set to close in 2026. *See Trump v. Trump, et al.*, Index No. 453299/2021, Dkt. 170 (Sup. Ct. N.Y. Cty. May 1, 2025).

his father's New York real estate empire and his own business dealings in New York. Buettner Decl. ¶ 8; Craig Decl. ¶¶ 12, 13. As with their previous reporting for The Times on these subjects, they relied heavily on sources based in or around New York. Craig Decl. ¶ 12,13. Neither Craig nor Buettner visited the Middle District of Florida to research or write the Book. Nor did they interview any sources residing there as part of the reporting challenged in this action. Buettner Decl. ¶ 8; Craig Decl. ¶ 21.

The Book also focused on President Trump's starring role in *The Apprentice* reality television show, which (in the wake of several high-profile bankruptcies) brought him renewed fame and more than $425 million. Craig Decl. ¶ 14; FAC ¶¶ 20(b), (q), (i). *The Apprentice* is a distinctly New York phenomenon. The show opens with vistas of Manhattan shot from a helicopter and President Trump's boast that he was "the largest real estate developer" in "New York City, my city," and it is largely set in a boardroom in Trump Tower. Craig Decl. Ex. 2 at 356–57.

The Book (and Adaptation Article) reported how President Trump came to be cast in *The Apprentice*, how producers shaped his on-screen persona as a "measured, thoughtful and endlessly wealthy" businessman and how he exploited product placement opportunities to make "the equivalent of a second inheritance." FAC ¶ 20(q), 21(f). The Book's reporting on this subject was based on dozens of interviews with individuals involved in making *The Apprentice*, including key sources based in New York. Craig Decl. ¶ 14. Craig and Buettner did not interview any sources in Middle District of Florida as part of their reporting on *The Apprentice* and they never traveled to Florida to obtain information relating to this subject. Craig Decl. ¶ 21.

7

Before the Book was published (and then again before the Adaptation Article), Craig repeatedly sought comment from President Trump through his senior advisor, Jason Miller, a resident of Virginia, and by emailing the Trump Campaign's general press email account. Craig Decl. ¶ 20. Craig reached out to Miller directly by email and phone on multiple occasions while she was in New York, but President Trump ultimately never provided any comment. *Id.* Craig and Buettner's voluminous notes, records, and drafts relating to their investigations into President Trump are located in New York and New Jersey, respectively. *Id.* ¶ 11; Buettner Decl. ¶ 11.

Craig and Buettner worked with PRH employees in New York to edit and revise the manuscript of the Book. Buettner Decl. ¶ 9; Craig Decl. ¶ 15. The Book was printed in Virginia and delivered to PRH's warehouses in Maryland, from where it shipped nationwide. PRH Decl. ¶ 8. The Book went on sale around the country and was available for purchase before September 14, 2024. *Id.* Neither Craig nor Buettner went to Florida to promote the Book. Buettner Decl. ¶ 9; Craig Decl. ¶ 24.

On September 14, 2024, The Times published the Adaptation Article, which is an adaptation of the Book's reporting about President Trump's role on *The Apprentice*. Buettner Decl. ¶ 6; Craig Decl. ¶ 17. The Adaptation Article was edited in New York. *Id.* It was published online and in print from The Times's headquarters in New York City and distributed nationally and internationally. Times Decl. ¶ 5–7. It was based on the same reporting as the Book, including multiple sources who reside or regularly conduct business in New York. Craig Decl. ¶¶ 14, 17. The Adaptation Article did not mention Florida and did not include information from sources in Florida, much less

8

this District. Craig Decl. Ex. 3; *id.* ¶ 21.

## IV.    The Survey Article

On October 20, 2024, The Times published the Survey Article. Baker researched and wrote it over a roughly two-week period while living and working in Washington, D.C. Baker Decl. ¶ 6. He worked with Times editors located in New York and Washington. *Id.* ¶ 7. The Times published the article online and in print from its headquarters in New York. Baker Decl. ¶ 5; Times Decl. ¶ 6–8.

The Survey Article was a survey of prior news coverage of President Trump; it summarized a "lifetime of scandals" that headed toward "a moment of judgment"— the upcoming 2024 presidential election. Baker Decl. Ex. 1. The article discussed prior news coverage about President Trump over the course of decades; the online version provided hyperlinks to that prior coverage. Baker did not do original reporting when preparing the article, relying instead on prior news coverage. *Id.* ¶ 6. All three challenged statements in the article appeared in a section under the subheading "Making and Losing Money," which described Trump's upbringing and early career in New York. *Id.* Ex. 1. None of these statements mentioned people or places in Florida. Florida was mentioned only in a different part of the article not at issue here— a later section entitled "The Real Verdict," concerning events related to criminal charges Trump faced in the Southern District of Florida, not in this District. *Id.*

## V.    The Complaint

President Trump alleges three counts of defamation *per se* and three counts of defamation *per quod* based on 33 statements—22 from *Lucky Loser*, 9 from the

Adaptation Article, and 3 from the Survey Article. FAC. ¶¶ 20–22 (collectively, the "Statements"). The Statements concern New York and can be grouped as follows:

(1) The "**Apprentice Statements**," which relate to the crafting of President Trump's image on his New York-based reality television show, *The Apprentice*, and the value he derived from the show, *see id* ¶¶ 20, 20, 20, 20, 20; 21(a), (b), (d), (e), (f), (i);

(2) The "**Inheritance Statements**," which relate to President Trump's receipt of money from his father's New York real estate empire, *see id.* ¶¶ 20(a), (c), (f),  (g), (k), (l), (m), (q), (s), (t); 21(c), (g), (i);

(3) The "**Business Statements**," which relate to President Trump's approach to business during his time as a self-identified "New York City real estate tycoon," *id.* ¶ 24, including his appetite for risk, lack of attention to detail and business failures, *see id.* ¶¶ 20(c), (e), (h), (i), (j), (m), (p), (r), (s), (t), (v); 21(h); and

(4) The **"Penchant Statement**," which relates to President Trump's hiring of people with a "penchant for violence," *see id.* ¶ 20(d); and

(5) The "**Survey Statements**," which relate to past news coverage of controversies involving President Trump's upbringing and New York area real estate dealings, *see id* ¶ 22(a), (b), (c).

The Complaint alleges that venue "is proper in this district under 28 U.S.C. § 1391(b)(2) and (b)(3)." *Id.* ¶ 18. To support this legal conclusion, President Trump alleges that (a) "the Times and Penguin distributed and sold at least tens of thousands of copies of the publications at issue within this District," *id.*, and (b) he was the "majority shareholder of [Sarasota-based Trump Media & Technology Group] at the time his claims accrued," *id.* ¶ 19.

## ARGUMENT

### I.    The FAC Should Be Dismissed, or Transferred, For Improper Venue

Courts dismiss or transfer an action when venue is "wrong" or "improper." Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1406(a). "Whether venue is 'wrong' or 'improper'

depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013). Under 28 U.S.C. § 1391, which governs this action, there are three potential paths to proper venue. President Trump invokes Section 1391(b)(2), which requires a plaintiff to show that a "substantial part of the events" giving rise to his claims occurred within the relevant district. FAC ¶ 18. Alternatively, he identifies Section 1391(b)(3), which applies when "there is no district in which an action may otherwise be brought as provided in [the venue statute]," and, in those rare cases, this fallback provision permits venue to be established in "any judicial district in which any defendant is subject to the court's personal jurisdiction." *Id.* [2]

On a motion to dismiss for improper venue, "the plaintiff has the burden of showing that venue . . . is proper." *Clean Fuels of Ind. Inc. v. Riverport Ins. Co.*, 2016 WL 6650714, at *1 (M.D. Fla. Nov. 10, 2016) (citing *Pinson v. Rumsfeld*, 192 F. App'x. 881, 817 (11th Cir. 2006)). Courts "accept all allegations of the complaint as true, unless contradicted by the defendants' affidavits, and when an allegation is so challenged the court may examine facts outside of the complaint to determine whether venue is proper." *Asbury v. Stout*, 2025 WL 1906707, at *2 (M.D. Fla. July 10, 2025). "The decision to transfer a case to another district is left to the sound discretion of the trial court." *Brown v. Conn. Gen. Life Ins. Co.*, 934 F.2d 1193, 1197 (11th Cir. 1991).

---

[2] Section 1391(b)(1) is inapplicable because it applies only if "all defendants are residents of" Florida and at least one defendant "resides" in this District. Here, Baker, Buettner, and Craig are not residents of the state of Florida within the meaning of the venue statute. *See* 28 U.S.C. § 1391(c)(1); *see also* Baker Decl. ¶ 2; Buettner Decl. ¶ 2; Craig Decl. ¶ 2.

### A. The Middle District of Florida Is Not a Proper Venue Under Section 1391(b)(2)

President Trump cannot satisfy Section 1391(b)(2) because the material events that gave rise to this defamation suit did not occur in the Middle District of Florida.

Under the applicable test, courts "focus on relevant activities of the defendant, not of the plaintiff," *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371–72 (11th Cir. 2003), and consider only those "events that *directly* gave rise to a claim . . . ." *Trump v. Simon & Schuster, Inc.*, 2023 WL 5000572, at *4 (N.D. Fla. Aug. 4, 2023) (emphasis added). Tangential or "insubstantial connection[s]" between the parties and this District do not suffice to establish venue. *Jenkins*, 321 F.3d at 1372. When "events have taken place" in multiple places, "only those locations hosting a substantial part' of the events are to be considered." *Id*. at 1371. And "it is only those acts which were, in and of themselves, 'wrongful' or had a 'close nexus' to the wrong that c[an] form the basis of a proper venue." *Nunes v. Cable News Network, Inc.*, 2023 WL 2468646, at *5 (M.D. Fla. Mar. 1, 2023); *see also Kapordelis v. Danzig*, 387 F. App'x 905, 906 (11th Cir. 2010) ("Events that lack a close nexus with the cause of action are irrelevant."). Thus, venue analysis is far more demanding than the "minimum contacts" standard for personal jurisdiction. *See, e.g.*, *Mt. Hawley Ins. Co. v. Adams Homes, LLC*, 2014 WL 12538169, at *2 (N.D. Fla. Jan. 10, 2014) ("[T]here must be a substantial connection to the kind of events giving rise to the claim—that is, 'a close nexus to the wrong' alleged—not merely insubstantial 'minimum contacts' . . . .") (citing *Jenkins*, 321 F.3d at 1372).

For claims arising out of the nationwide publication of books or news, like those

12

brought here, courts consider what the article "pertained to" and "'where defendant's newsgathering related to challenged statements occurred.'" *Nunes*, 2023 WL 2468646, at *5–6 (quoting *Montgomery v. Risen*, 2016 WL 4119865, at *2 (S.D. Fla. Jan. 26, 2016)); *see Simon & Schuster*, 2023 WL 5000572, at *4 (holding venue was improper because "none of the relevant events—let alone 'a substantial part' of them—occurred in this district," in part because "neither the Interviews nor the alleged manipulation of the recordings took place here").

Here, *none* of the material events giving rise to this action have a "close nexus" to the Middle District of Florida. The Complaint challenges 33 Statements focused primarily on aspects of President Trump's life in New York. Specifically, the Statements cover his experience as "a high school student at New York Military Academy," including taking the SATs; his financial dependence on his father's New York real estate empire; his career as a New York real estate tycoon, the sale of his father's New York real estate empire, and ties to the New York "Mafia" that were investigated by New York authorities; and his role on *The Apprentice*, a Manhattan-based reality television series set in Trump Tower. *See* FAC ¶¶ 20–22. None of the Statements mention this District or even Florida more generally. *Id.*[3]

---

[3] President Trump challenges the Statement that he "typically lied or fuzzed the fact" that he did not own certain construction projects but instead simply licensed his name to the projects. FAC ¶ 20(r). By way of example, the Book identifies projects in "Atlanta, Dallas, Delaware, two in Florida, Hawaii, Philadelphia, New York City, and White Plains, along with Panama, Mexico, and Israel." Craig Decl. Ex. 2 at 398. One of the projects "in Florida" was a development in Tampa. This fleeting reference was based on local news reports. Neither Craig nor Buettner interviewed any sources in Tampa and did not travel to Tampa in connection with this reporting. Craig Decl. ¶ 22. Accordingly, even with respect to that Statement, Defendants never engaged in relevant reporting activities in this District, and the incidental reference to Florida does not support a "substantial connection" with this District.

None of Defendants' newsgathering activities relating to the Statements took place in the Middle District of Florida. Virtually all of the relevant newsgathering for the Book and Adaptation Article took place in or around New York. Craig Decl. ¶¶ 11–14. Craig and Buettner relied upon documents from New York, including court filings, tax returns, corporate records, and records received from New York resident Mary Trump. *Id.* ¶¶ 8, 11. They conducted interviews with New York-based sources, including a prior executive director of the New York/New Jersey Port Authority and Trump Organization executives. *Id.* ¶ 13. None of this reporting involved trips to this District or interviews with anyone located here. *Id.* ¶ 21. Similarly, no newsgathering for the Survey Article took place in this District. Baker Decl. ¶ 8.

Finally, none of the Defendants wrote, edited, or published the Statements in this District, or even Florida more generally. Craig Decl. ¶¶ 15, 19, 21, 23; Buettner Decl. ¶ 11; Baker Decl. ¶ 8. Craig and Buettner published their Book with PRH, a major New York publisher, under a publishing agreement governed by New York law. Craig Decl. ¶ 10; Buettner Decl. ¶ 10; PRH Decl. ¶ 5. And their Book was written primarily in the New York area and edited by PRH employees based in and around New York. Craig Decl. ¶ 15; Buettner Decl. ¶ 10; PRH Decl. ¶ 6. Craig, Buettner and Baker wrote their respective Articles for *The New York Times*, a New York-based newspaper, and the Articles were edited in New York. Craig Decl. ¶ 19; Buettner Decl. ¶ 10; Baker ¶¶ 5, 10. Baker wrote the Survey Article in Washington D.C. Baker Decl. ¶¶ 6, 7, 10.

On these facts, where *none* of the relevant reporting took place in or was aimed

at the Middle District of Florida, President Trump cannot establish this District as a proper venue. *See, e.g.*, *Nunes*, 2023 WL 2468646, at \*5 (holding that venue was improper because "none of the events giving rise to the alleged defamation actually took place in Florida," even though plaintiff worked in Sarasota County).[4]

### 1. Nationwide Distribution of the Works, Including in the District, Does Not Establish Venue

The Complaint alleges venue is proper here because "both the Times and Penguin distributed and sold at least tens of thousands of copies of the publications at issue within this District." FAC ¶ 18. Even if true, that would not be sufficient. The plaintiff in *Nunes* made the same argument that a "substantial part" of his defamation claim arose here because the news broadcast was published "in the Middle District of Florida *in addition to all over the world*." 2023 WL 2468646, at \*5. The court held venue to be improper because none of the statements in suit pertained to Florida and "none of the events giving rise to the alleged defamation actually took place in Florida." *Id*. In a similar vein, President Trump tried and failed to establish proper venue based on "marketing, selling, and distribution" of books in the district in a copyright action he filed in the Northern District of Florida. *Simon & Schuster*, 2023 WL 5000572, at \*3. There, the court held that "was not enough to satisfy Section 1391(b)(2)" and transferred to the Southern District of New York. *Id*. at \*4.

---

[4] *See also Simon & Schuster*, 2023 WL 5000572, at \*4–5 (holding that venue was improper because none of the relevant interviews took place in the district); *Montgomery*, 2016 WL 4119865, at \*2 (venue improper where defendant's newsgathering occurred in D.C., not Florida); *Gerow v. U.S. DOJ*, 2023 WL 7385603, at \*1 (M.D. Fla. June 6, 2023) (Merryday, J.) (holding that venue was improper where "defendants (and the witnesses and the evidence)" were outside the District).

15

There is no evidence that Defendants engaged in any relevant journalistic activities in this District. President Trump cannot bring an action here merely because the Statements happened to circulate here as part of a broader nationwide distribution.

### 2. Plaintiff Is Not a Resident of the District and Any Alleged Harm in the District Is Incidental

President Trump cannot draw support from decisions holding that venue may be appropriate "in the district where the injured party resides and the defamatory statements were published." *Cap. Corp. Merch. Banking Inc. v. Corp. Colocation, Inc.*, 2008 WL 4058014, at *3 (M.D. Fla. Aug. 27, 2008); *see* FAC ¶ 12. The rationale behind these cases—*i.e.*, that the distribution of publications in the plaintiff's home District "damage[s their] . . . reputation in the venue"—is categorically not applicable here since President Trump resides in the Southern District of Florida, where his Mar-a-Lago estate is located (or Washington D.C., where the White House is located), not the Middle District of Florida. *Fentriss v. Gateway Bank FSB*, 2016 WL 4097066, at *3 (M.D. Fla. Aug. 2, 2016); *see id.* (finding venue proper in this District because plaintiff "suffered the injuries from the defendants' conduct at [his] residence" here).[5]

This conclusion is particularly warranted here because there is no evidence that Defendants specifically targeted this District. *See, e.g.*, *Seminole Transp. Specialists, Inc. v. PDM Bridge, LLC*, 2009 WL 3822773, at *2 (M.D. Fla. Nov. 16, 2009). When courts

---

[5] *See also Immanuel v. Cable News Network, Inc.*, 2022 WL 1748252, at *1, *6 (E.D. Tex. May 31, 2022) (holding that venue was improper where challenged "statements were nationally broadcast on CNN's cable network and published online" and plaintiff, who lived and worked in a different district, failed to "connect the facts and allegations behind her claim" to the relevant district).

have found venue based on distribution of a work in this District, the cases involved private individuals or small businesses operating "exclusively within this District," whose reputations did not stretch beyond this District. *See, e.g., Tobinick v. Novella*, 2015 WL 328236, \*3 (S.D. Fla. Jan. 23, 2015) (venue proper where plaintiff was Middle District resident and alleged defamatory publication concerned his business, which existed "exclusively within this District"). Here, the opposite is true: President Trump is a national figure with a global reputation who regularly litigates across the country and does not even reside in the District.[6]

Finally, President Trump claims that venue is proper because a non-party to this action—media and technology company TMTG—is headquartered in Sarasota. FAC ¶ 19. But a plaintiff's activities unrelated to the publications at issue are irrelevant. *See, e.g.*, *Waste Pro USA, Inc. v. Adams Sanitation Holding Co., LLC*, 2022 WL 19842681, at \*2 (M.D. Fla. July 18, 2022) (citing *Jenkins*, 321 F.3d at 1371–72). And President Trump's investment in TMTG has nothing to do with the Statements (which do not mention TMTG); his investment in TMTG is thus not an event that "directly give[s] rise to the claim." *Jenkins*, 321 F.3d at 1371. Indeed, the court in *Nune*s rejected a nearly identical argument that the plaintiff's role as CEO of TMTG, which required him to regularly work in Sarasota County, gave rise to proper venue in this District, emphasizing that those "ties to Florida do not matter." *Nunes*, 2023 WL 2468646, at

---

[6] *See e.g.*, *Trump v. Hyatt Corp.*, Case No. 93-cv-5242 (S.D.N.Y); *Trump v. James*, Case No. 21-cv-1352 (N.D.N.Y); *Trump v. CBS Broadcasting Inc.*, Case No. 24-cv-236 (N.D. Tex.); *Trump v. Selzer*, Case No. 24-cv- 449 (S.D. Iowa).

*5.[7] In sum, President Trump cannot establish venue in this District based on a substantial part of the events giving rise to his defamation claims occurring here.

### B. This District Is Not a Proper Venue Under 1391(b)(3)

President Trump's conclusory contention that venue is proper under Section 1391(b)(3) also fails. That provision may be invoked only where "there is no district in which an action may otherwise be brought." 28 U.S.C. § 1391(b)(3). "[F]or 28 U.S.C. § 1391(b)(3) to apply, '[t]here must be no federal district *anywhere in the United States* that satisfies either Section 1391(b)(1) or Section 1391(b)(2)." *Velez v. Cuomo*, 2020 WL 13802228, at *1 n.1 (M.D. Fla. Dec. 16, 2020) (citing 14D Charles Alan Wright et al., Federal Practice and Procedure § 3806.1 (4th ed. 2013)) (emphasis in original). This backstop was meant to address "rare cases," such as "when the claim arose overseas and where there is no district in the United States that will satisfy residential venue." *See* Wright & Miller, Federal Practice & Procedure § 3806.1.

This is not that "rare case." President Trump could have easily sued Defendants in a proper venue in the Southern District of New York, where—as discussed above— a substantial part of the events related to the defamation claims in this action occurred. *See McDowell v. Ham*, 2011 WL 2560342, at *2 (N.D. Fla. 2011) (Section 1983 action

---

[7] The Complaint alleges that the publications "led directly to a precipitous decline in the stock price of TMTG, significantly injuring the President given his ownership stake." FAC ¶ 73. This allegation is insufficient for three reasons. *First*, President Trump cannot sue and recover individually for harm to TMTG, as shareholders do not have standing to sue for injuries suffered by a corporation. *See e.g., Kloha v. Duda*, 246 F. Supp. 2d 1237, 1242–43 (M.D. Fla. 2003). *Second*, a shareholder "must, instead of pleading diminution in stock value, plead 'realized loss,' *i.e., the shareholder sold the stock at a loss.*" *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1343 n.4 (M.D. Fla. 2003) (emphasis added). Here, there is no such allegation. *Third*, there is no legal support for the theory that owning stock in an entity that is headquartered within a judicial district gives rise to proper venue for an unrelated defamation suit.

related to plaintiff's arrest could have been brought in the Middle District of Alabama, where all of the events related to the detention took place).[8] Since there can be no dispute that Defendants are citizens of New York (or subject to New York's jurisdiction), and nearly all the relevant events occurred in New York, President Trump cannot establish venue in the Middle District of Florida via Section 1391(b)(3).

## II. Alternatively, This Case Should Be Transferred to the Southern District of New York Under 28 U.S.C. § 1404(a)

Even if venue were proper, this case should still be transferred to the Southern District of New York under 28 U.S.C. § 1404(a). That statute codifies "the doctrine of forum non conveniens for the subset of cases in which the transferee forum is within the federal court system," *Atl. Marine Constr.*, 571 U.S. at 60, and sets forth "relaxed standards for transfer," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981). It gives district courts discretion to "transfer any civil action to any other district . . . where it might have been brought" for "the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a).

In deciding whether to transfer, courts ask "(1) whether the action might have been brought in the proposed transferee court and (2) whether various factors are satisfied so as to determine that a transfer to a more convenient forum is justified." *Gencor Indus., Inc. v. Fort Myer Constr. Corp.*, 2012 WL 601190, at *5 (M.D. Fla. Feb.

---

[8] *See also Simon & Schuster*, 2023 WL 5000572, at *4 n.3 (copyright action could have been filed in the District of Columbia or the Southern District of New York, where the creation of the work at issue largely occurred); *AFC Franchising, LLC v. Prac. Velocity, LLC*, 2016 WL 6024438, at *2 (N.D. Ala. Oct. 14, 2016) ("Venue is at least proper in Illinois because that is where the writing occurred.").

23, 2012). An action "might have been" brought in another court if "the transferee court [has] personal and subject matter jurisdiction and offer[s] a proper venue." *Delorenzo v. HP Enter. Servs., LLC*, 79 F. Supp. 3d 1277, 1280 (M.D. Fla. 2015).

This action could have been brought in the Southern District of New York. That District has subject matter and personal jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) and New York's long arm statute, CPLR § 302. *First*, the Southern District of New York has the same diversity jurisdiction as this District. *Second*, the Southern District of New York has personal jurisdiction over all Defendants. PRH, The Times, and Craig reside there. FAC ¶¶ 4–6, 8; Craig Decl. ¶ 2. Buettner and Baker reside in New Jersey and Washington D.C., respectively, but they are subject to New York's personal jurisdiction in this case because they worked for a New York employer (The Times) and worked on the Articles with New York-based editors. Buettner Decl. ¶¶ 4, 11; Baker Decl. ¶¶ 2, 7. *See Donner v. DER SPIEGEL Gmbh & Co. KG*, 747 F. Supp. 3d 681, 692 (S.D.N.Y. 2024) (noting personal jurisdiction proper when "actual writing or editing of the article" underlying action occurred in New York), *aff'd*, 2025 WL 2985764 (2d. Cir. Oct. 23, 2025).

In addition, as set forth above, venue is proper in the Southern District of New York since a substantial part of the events related to this defamation action occurred there. *See* 28 U.S.C. § 1391; *see also, e.g.*, *Simon & Schuster*, 2023 WL 5000572, at *5 (emphasizing that "Trump could have properly filed his claims" in "the United States District Court for the Southern District of New York where two Defendants reside and many relevant decisions regarding The Trump Tapes were made").

 As to the second prong, courts consider the following factors:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005); *see also Flynn v. Weissman*, 2024 WL 3580850, at *1 (M.D. Fla. Mar. 20, 2024). Here, the majority of factors, including the most important, witness convenience, favor transfer. The remaining factors are neutral. No factors support keeping the case in this District.

*First*, the "most important consideration," the convenience of the witnesses weighs heavily in favor of transfer. *Brennan v. Roman Catholic Diocese of Syracuse N.Y., Inc.*, 2009 WL 10671159, at *3–4 (M.D. Fla. Sept. 4, 2009) (Merryday, J.) (granting transfer where key witnesses were in New York). Key on-the-record sources for the Book and Articles are located in New York. For example, key sources for the Apprentice Statements include New York residents former President of NBC Entertainment Jeff Zucker and advertising executive Alan Blum. Craig Decl. ¶ 14. New York-based individuals served as sources and expert advisors for the Inheritance Statements, including Mary Trump (who provided the underlying estate documents), trust and estate lawyer Jim Ledley, accountant Joel Rosenfeld, and Michael Bailkin, who served as counsel for the New York City Mayor's Office of Lower Manhattan Development. Craig Decl. ¶¶ 8, 12. Likewise, Craig and Buettner relied on sources from the New York area for the Business Statements, including Peter Goldmark, who

21

served as the executive director of the New York and New Jersey Port Authority, former Trump Organization executives Barbara Res and Abraham Wallach, and environmental consultant Tim Miller. Craig Decl. ¶ 13. Baker did no original reporting for the Survey Article. Baker Decl. ¶ 6. But the challenged statements also concern Mary Trump and other people associated with New York-area investigations. *Id.* ¶ 9.[9]

Should this defamation action proceed to trial, these sources and other New York witnesses will likely be key witnesses in the case. By contrast, there are no nonparty witnesses—let alone key witnesses—in this District, which weighs heavily in favor of transfer. *See, e.g., Simon & Schuster*, 2023 WL 5000572, at *6 (finding this factor weighed in favor of transfer where witnesses were located in Washington D.C. or New York); *Fairstein v. Netflix*, 2020 WL 5701767, at *7 (M.D. Fla. Sept. 24, 2020) (granting transfer to Southern District of New York where "the list of potential witnesses skews in favor of New York").[10]

*Second*, the location of the relevant documents and the relative ease of access to sources of proof weighs in favor of transfer. The relevant evidence is almost exclusively located in New York or Washington D.C., where the Book and Articles were largely researched, written, edited, and published. Craig Decl. ¶ 11; Buettner Decl. ¶ 11; Baker Decl. ¶¶ 6, 7, 10. None of the relevant documents is located in Florida. *Id.* "On

---

[9] Although certain other potential witnesses are in California and Washington D.C., this is not a bar to transferring to the Southern District of New York, which is more accessible to D.C. witnesses, and equally accessible to California witnesses. *See e.g., Delorenzo*, 79 F. Supp. 3d at 1282–83 (Merryday, J.) (granting motion to transfer to D.C. where witnesses were in the D.C. area or Rhode Island).

[10] While President Trump may theoretically seek to call witnesses from TMTG, for the reasons discussed *supra*, his damages allegations related to its stock price are irrelevant.

balance, this factor favors transfer." *Laing v. BP Exploration & Production Inc.*, 2014 WL 4059870, at *2 (M.D. Fla. Aug. 14, 2014) (Merryday, J.).

*Third*, the convenience of the parties weighs in favor of transfer. PRH, The Times, and Craig reside in New York, Buettner in neighboring New Jersey, and Baker in Washington D.C. And employees of PRH and The Times who edited and published the Book and Articles are located in New York and the surrounding area, and in Washington, D.C. Craig Decl. ¶¶ 15, 16, 18; PRH Decl. ¶¶ 6, 7; Baker Decl. ¶¶ 7, 10. If this matter proceeds to trial, their testimony will be required to decide actual malice. For all of those witnesses, New York is more convenient. Additionally, President Trump maintains property in New York and is comfortable litigating there.[11] Further, as President, he spends a considerable amount of time in Washington D.C.— a short distance from New York.

*Fourth*, as discussed, the locus of the operative facts was the Southern District of New York. No relevant conduct occurred in or was aimed at this District. *See supra* Argument, Section I.A; *see also, e.g. Flynn*, 2024 WL 3580850, at *2 (holding transfer was appropriate where there were "no facts to support the allegation that [Defendants] directed their conduct at Florida, or that a substantial part of events giving rise to [Plaintiff's] claim occurred in the Middle District of Florida"); *Motorola Mobility, Inc. v. Microsoft Corp.*, 804 F. Supp. 2d 1271, 1275, 1278 (S.D. Fla. 2011).

---

[11] *See e.g., Trump v. Trump, et al.*, Index No. 453299/2021 (Sup. Ct. N.Y. Cty); *Trump v. Simon & Schuster, Inc., et al.*, 23-cv-6883 (S.D.N.Y); *Trump, et al. v. Deutsche Bank AG, et al.*, 19-cv-3826 (S.D.N.Y.); *Carroll v. Trump*, 22-cv-10016 (S.D.N.Y.).

*Fifth*, the key witnesses who reside in New York and its vicinity are within the subpoena power of the Southern District of New York for live trial testimony, but far "outside the reach" of any Court in this District. *Laing*, 2014 WL 4059870, at *2. Because no key witnesses "reside[] within the territorial subpoena power of the Middle District of Florida," this factor weighs in favor of transfer. *SMA Portfolio Owner, LLC v. CPX Tampa Gateway OPAG, LLC*, 2014 WL 4791997, at *6 (M.D. Fla. Sept. 22, 2014); *see Fairstein*, 2020 WL 5701767, at *9 (holding "this factor weighs in favor of transfer for the same reasons discussed with respect to the convenience-of-witness factor").

*Sixth*, the relative means of the parties are at best neutral. Three Defendants are individual journalists. President Trump is a self-described billionaire. FAC ¶ 74. If he can litigate his claims in this District, 900 miles from Washington D.C. and 200 miles from Mar-a-Lago, he can easily litigate in the Southern District of New York, where he famously keeps a residence at Trump Tower. *See A1 Procurement v. Thermcor*, 2015 WL 13659312, at *5 (S.D. Fla. Jan. 15, 2015) (relative means is neutral where plaintiff will travel regardless of forum). Indeed, he sued three of the Defendants here in New York state court only a few years ago. *See* Factual Background, Section II, *supra*.

*Seventh*, familiarity with governing law is neutral. While Defendants expect to seek application of New York law at a later juncture, they appreciate that this Court can apply New York defamation law, and a New York court can apply Florida law.[12]

---

[12] *See e.g.*, *La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) (applying Florida defamation law); *Gubarev v. Buzzfeed*, 340 F. Supp. 3d 1304, 1313 (S.D. Fla. 2018) (applying New York defamation law).

*Eighth*, "[w]here it appears that the plaintiff was forum shopping and that the selected forum has little or no connection with the parties or the subject matter, plaintiff's choice of forum is entitled to no weight whatsoever, and transfer of venue is appropriate." *Simon & Schuster*, 2023 WL 5000572, at \*7 n.4. This is especially true given that President Trump has sued "in a district other than his home district," the Southern District of Florida. *North Am. Underwriters, Inc. v. Am. Nat'l Ins. Co.*, 2008 WL 11336262, \*2 (M.D. Fla. May 12, 2008) (Merryday, J.) ("[A] plaintiff's choice of forum warrants little consideration if the plaintiff has sued in a district other than his home district.").

*Finally*, since "this case's locus of operative facts is New York and most of the material witnesses reside in New York, . . . trial efficiency and the interests of justice would be better served by transferring venue." *Fairstein*, 2020 WL 5701767, at \*10.

Because the factors overwhelmingly support transfer, including the most important first factor, the case should be transferred to the Southern District of New York. *Id.* (granting transfer); *Simon & Schuster*, 2023 WL 5000572, at \*8 (same).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss with prejudice the Complaint for improper venue or, in the alternative, transfer to the Southern District of New York.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Defendants certify that, on December 14, 2025, they conferred by email with counsel for Plaintiff, who intends to oppose the motion.

Dated: December 15, 2025

Respectfully submitted,

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero, Esq.
Florida Bar No. 603030
Linda Norbut, Esq.
Florida Bar No. 1011401
**THOMAS & LOCICERO**
601 S. Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

Thomas G. Hentoff, Esq.* (lead counsel)
Nicholas G. Gamse, Esq.*
Kimberly Broecker, Esq.*
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5804
thentoff@wc.com
ngamse@wc.com
kbroecker@wc.com

*Admitted *pro hac vice*

***Attorneys for Defendants New York Times Company, Peter Baker, Susanne Craig, and Russ Buettner***

*/s/ William J. Schifino, Jr.*
William J. Schifino, Jr., Esq.
Florida Bar No. 564338
Justin P. Bennett, Esq.
Florida Bar No. 112833
Gregory L. Pierson, Esq.
Florida Bar No. 123905
**GUNSTER, YOAKLEY & STEWART, P.A.**
401 E. Jackson Street, Suite 1500
Tampa, Florida 33602
Telephone: (813) 228-9080
Facsimile: (813) 228-6739
wschifino@gunster.com
jbennett@gunster.com
gpierson@gunster.com

George S. LeMieux, Esq.
Florida Bar No. 16403
Eric C. Edison, Esq.
Florida Bar No. 10379
**GUNSTER, YOAKLEY & STEWART, P.A.**
450 East Las Olas Blvd., Suite 1400
Fort Lauderdale, Florida 33301
Telephone: (954) 462-2000
Facsimile: (954) 523-1722
glemieux@gunster.com
eedison@gunster.com

Elizabeth A. McNamara, Esq.* (lead counsel)

John M. Browning, Esq.*
Alexandra Perloff-Giles, Esq.*
Alexandra M. Settelmayer, Esq.*
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 489-8230
lizmcnamara@dwt.com
jackbrowning@dwt.com
alexandraperloffgiles@dwt.com
alexandrasettelmayer@dwt.com

*Admitted *pro hac vice*

***Attorneys for Defendants Penguin Random House LLC, Susanne Craig, and Russ Buettner***