## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PRESIDENT DONALD J. TRUMP,
an individual,

              Plaintiff,

        v.

NEW YORK TIMES COMPANY, a New
York corporation, SUSANNE CRAIG, an
individual, RUSS BUETTNER, an
individual, PETER BAKER, an individual,
and PENGUIN RANDOM HOUSE LLC,
a Delaware company,

              Defendants.

Case No.
8:25-cv-02487-SDM-NHA

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A
CLAIM AND SUPPORTING MEMORANDUM OF LAW**

Defendants The New York Times Company ("The Times"), Susanne Craig, Russ Buettner, Peter Baker, and Penguin Random House LLC ("PRH") respectfully move to dismiss with prejudice Plaintiff President Donald J. Trump's amended complaint ("Complaint" or "FAC"), Doc. 9, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

This lawsuit challenges "political speech of the highest order"—a book and two news articles about matters of public concern involving President Trump, which were published shortly before the 2024 Election. *Trump v. CNN, Inc.*, 684 F. Supp. 3d 1269, 1275 (S.D. Fla. 2023), *aff'd*, 2025 WL 3213203 (11th Cir. Nov. 18, 2025) ("*CNN*"). As the Court made clear when it dismissed President Trump's original pleadings *sua sponte*, a complaint is neither "a megaphone for public relations" nor "a protected platform to rage against an adversary." ECF No. 5 at 4. The Complaint ignores these clear instructions. It focuses on scoring political points against President Trump's perceived enemies in the press instead of "precisely, directly" identifying facts to support a viable legal claim. *Id*. Its conclusory, implausible allegations fail to pierce the First Amendment's protections, which guarantee our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).[1] Because the

---

[1] The Eleventh Circuit recently affirmed the dismissal of a separate lawsuit President Trump filed

Complaint does not meet the multiple pleading requirements the First Amendment imposes on defamation claims, it should be dismissed with prejudice.

President Trump targets a book—*Lucky Loser: How Donald Trump Squandered His Father's Fortune and Created the Illusion of Success* (the "Book"), written by Pulitzer Prize-winning reporters Russ Buettner and Susanne Craig and published by PRH—because it challenges aspects of his personal biography relevant to his campaign. He also sues The New York Times for publishing one article by Buettner and Craig, adapted from the Book, about his role on *The Apprentice* (the "Adaptation Article"), and a second article by The Times's chief White House correspondent, Peter Baker, surveying widely reported allegations of wrongdoing that had peppered President Trump's career (the "Survey Article," and together, the "Articles"). President Trump collects 33 statements from these three works and conclusorily brands them "false, malicious, and defamatory," largely because they contradict his self-image as a "globally celebrated businessman" with "unique business acumen and real estate abilities." FAC ¶ 30.

None of the identified statements can provide the basis for a viable cause of action for defamation against any of the Defendants for multiple reasons. *First*, the First Amendment requires President Trump to set forth facts specific to each Defendant and each statement in suit that plausibly allege actual malice, *i.e.*, knowledge of falsity or probable falsity. *See, e.g.*, *Michel v. NYP Holdings, Inc.*, 816 F.3d

---

against other perceived adversaries, emphasizing that it was not clear error for the trial court to find "Trump filed a shotgun complaint 'to harass,'" that the complaint "recklessly forwards frivolous legal theories," or that "Trump's activity showed a 'pattern of misusing the courts.'" *Trump v. Clinton*, --- F. 4th ---, 2025 WL 3290254, at *10–11 (11th Cir. Nov. 26, 2025).

686, 702 (11th Cir. 2016) (citing *Sullivan*, 376 at 271–72). He fails to do so. Instead, he offers generic allegations about irrelevant matters, such as an often-repeated grievance that he has been treated unfairly by a variety of "anti-Trump" journalists, who purportedly fail to follow objective reporting standards. The Eleventh Circuit has *repeatedly* made clear that such allegations cannot establish actual malice as a matter of law. *See, e.g.*, *id.*; *Jacoby v CNN, Inc.,* 2021 WL 5858569, at *4–6 (11th Cir. Dec. 10, 2021); *Reed v. Chamblee*, 2025 WL 1874638, at *2–3 (11th Cir. July 8, 2025). None of his allegations plausibly establish that *these* journalist or publisher Defendants had "serious doubts" about the statements in suit but published them anyway. To the contrary, the Book and Articles establish, on their face, the absence of actual malice by reporting unchallenged factual grounding for each of the challenged statements.

*Second*, the Complaint fails to sufficiently allege the most basic element of a defamation claim: a false and defamatory statement of fact. It does not allege, as it must, how each statement in suit is false or what President Trump contends the truth to be, and it challenges statements that are not defamatory. And many of the challenged statements express the authors' subjective interpretations of undisputed facts, which are not capable of being proven false. These statements are "opinion" as a matter of law and are not actionable.

*Finally*, President Trump's failure to plead any special damages, as required for defamation *per quod*, dooms Counts II, IV and VI of the Complaint and requires dismissal of all Statements included in those Counts.

For all these reasons, the Court should dismiss the Complaint with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Parties

President Trump served as the 45th President of the United States and currently serves as the 47th President of the United States. FAC ¶ 3. As early as 1982, he was reportedly among "the wealthiest people in America." *Id.* ¶ 23. While his name is associated with real estate, much of his success is owed to licensing deals whereby he capitalized on the Trump brand. *Id.* ¶¶ 24–25. He has also appeared in numerous films and television programs, often playing "a fictional version of himself." *Id.* ¶¶ 27, 32, 57, 58. He has authored over a dozen books, including *Trump: The Art of the Deal*, published by PRH. *Id.* ¶ 26; *see* Decl. of Scott Moyers ("Moyers Decl.") ¶ 10.

Russ Buettner and Susanne Craig are investigative reporters at *The New York Times*. *See* Ex. 1 (*Lucky Loser*), at 2.[2] Years before publishing *Lucky Loser*, Buettner and Craig published several articles about President Trump's finances. For one of those articles, they received the Pulitzer Prize. *See id.* at 5.

Penguin Random House is a leading book publisher that "publishes, markets, distributes, and sells thousands of titles," across many genres, including books *about* Donald Trump, such as *Lucky Loser* or *Donald Trump v. The United States*, and books *by* Donald Trump, such as *The Art of the Deal*. FAC ¶¶ 10, 15, 26, 49.

The New York Times is a "global media organization," that publishes in print

---

[2] *Lucky Loser* and the Articles are incorporated by reference into the Complaint because they are "central to the plaintiff's claim," *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024), and must be considered on this motion, *see Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

and online "news reports, editorials, and other media content." FAC ¶¶ 4, 10.

Peter Baker is the chief White House correspondent for *The Times* who has covered the last five presidents. Ex. 3 at 29.

**B.    *Lucky Loser***

In September 2024, two months before the 2024 Presidential Election, PRH published *Lucky Loser*. FAC ¶ 1(b).[3] The Book, as Buettner and Craig explain in the introduction, "buil[t] upon [their] prior reporting," including "several lengthy investigative articles in the *Times*." Ex. 1 at 5. Most specifically, the Book expressly references the authors' Pulitzer Prize-winning 2018 article in *The Times* (the "2018 Article"), revealing that President Trump's early success was paved with millions of dollars from his wealthy father and fueled by various tax avoidance schemes.[4] *Id.* Ultimately, the Book was the product of "hundreds" of interviews with both named and confidential sources, analysis of "about one hundred thousand pages of audited financial statements, tax returns, bank records, general ledgers, and legal papers," and

---

[3] Defendants expressly reserve the argument that the statute of limitations bars President Trump's claims against the Adaptation Article and the Book as both were published or made available for sale before September 14, 2024, Moyer Decl. ¶ 8; Ex. 2, and the claims are barred under New York's one-year statute of limitations, *see* N.Y. C.P.L.R. § 215(3); *McKenzie v. Dow Jones & Co., Inc.*, 355 F. App'x 533, 535 (2d Cir. 2009). Defendants also expressly reserve the argument that New York law applies to this case. For purposes of this Motion, however, the Court need not resolve the issue because the Complaint fails under Florida law and New York law.

[4] The 2018 Article, which was the subject of President Trump's 2021 tortious interference suit against The Times, Buettner, and Craig, *see Trump v. Trump*, 79 Misc. 3d 866, 868 (N.Y. Sup. Ct. 2023), and which is cited extensively in the Book, *e.g.*, Ex. 1 at 30, 101, 111, 183, 300, 314, 326, 360, 379 and hyperlinked in the Survey Article, may be considered on this motion. *See Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1318–19 (S.D. Fla. 2018) (consideration of hyperlinked article was proper); *Biro v. Conde Nast*, 2014 WL 4851901, at *4 (dismissing defamation claim based in part on facts disclosed in hyperlinked articles), *aff'd in part*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F. App'x 67 (2d. Cir. 2015).

extensive review of earlier reporting on Trump's life and business dealings, much of which is credited in the hundreds of endnotes. *Id.* at 5, 457–500.

The Book began by discussing Fred Trump's rental empire and how "[t]he family fortune that launched Donald Trump was built on government programs." *Id.* at 6. It went on to discuss how Fred Trump's support was "one of the great enabling factors of Donald's life," how President Trump became a television celebrity as a result of both his "innate and unique charisma" and the work of Mark Burnett's team on *The Apprentice*, and how President Trump made "hundreds of millions of dollars in endorsement and licensing deals that required little of him," including by putting the Trump name on real estate while "the burdens of the work—the decision-making, overseeing construction, all the financial risk"—fell to others. *Id.* at 1, 6–8.

The Book explained that President Trump "through a spokesman Jason Miller, did not respond to requests for comment." *Id.* at 457.

## C.    The Adaptation Article

On September 14, 2024, Buettner and Craig published an article in *The Times*, which was adapted from the chapters of the Book about *The Apprentice* and based on the same underlying reporting. *See* Ex. 2.

The Adaptation Article described Mark Burnett's experience as a groundbreaking reality television producer; the format of the show (including its innovative use of corporate sponsorship deals); the work of the producers to present a particular image of President Trump; the "virtue" of President "Trump's

unpredictability" in the reality television setting; the show's ratings success; and the ways in which the show transformed President Trump's finances and public perception. *Id.* at 9–10; *see* FAC ¶ 21. The account was "based on dozens of interviews over several years, confidential internal records from the show, and the decades of Trump family financial and tax records" that Buettner and Craig had previously obtained for the Book. Ex. 2 at 2. The Adaptation Article quoted several producers who worked on the show and sponsors who partnered with the show. *Id*. at 2, 5–6, 8, 10, 13–14. It also compared President Trump's claim to have "mastered the art of the deal" in the show's opening with his management of the real estate empire his father left to him and his siblings. *Id.* at 7–8. It noted that President Trump "did not respond to invitations to be interviewed either for the book or this article," *id.* at 3, and that "Mr. Burnett did not respond to invitations to be interviewed," *id.* at 4.

### D.   The Survey Article

On October 20, 2024, *The Times* published an article by Baker, titled "For Trump, a Lifetime of Scandals Heads Toward a Moment of Judgment." FAC ¶ 1(c); Ex. 3. Written before the 2024 election, the Survey Article highlighted for readers an unprecedented moment in political history: "No major party presidential candidate, much less president, in American history has been accused of wrongdoing so many times." Ex. 3 at 1. Relying on prior news coverage and public records, the Survey Article identified dozens of examples of such accusations over the course of President Trump's public life. *Id.* At the same time, the Survey Article described how President Trump "moved from one furor to the next" largely unscathed in the eyes of his

supporters, even turning his mug shot into a "marketing tool." *Id.* at 3–4.

### E.    Procedural History

The Complaint asserts defamation *per se* and *per quod* claims against Buettner, Craig, and PRH relating to the Book, against Buettner, Craig, and The Times relating to the Adaptation Article, and against Baker and The Times relating to the Survey Article. The challenged statements ("Statements") can be grouped as follows:

(1) The "**Apprentice Statements**," which relate to the crafting of President Trump's image on *The Apprentice* and the value he derived from the show, *see* FAC ¶¶ 20(b), (n), (o), (q), (u); 21(a), (b), (d), (e), (f), (i);

(2) The "**Inheritance Statements**," which relate to President Trump's receipt of money from his father, *see id.* ¶¶ 20(a), (c), (f), (g), (k), (l), (m), (q), (s), (t); 21(c), (g), (i);

(3) The "**Business Statements**," which relate to President Trump's approach to business, appetite for risk, and business failures, *see id.* ¶¶ 20(c), (e), (h), (i), (j), (m), (p), (r), (s), (t), (v); 21(h);

(4) The **"Penchant Statement**," which relates to President Trump's hiring of people with a "penchant for violence," *see id.* ¶ 20(d); and

(5) The "**Survey Statements**," which relate to statements in Baker's article surveying previously reported allegations against President Trump involving his upbringing and New York real estate dealings, *see id.* ¶¶ 22(a), (b), (c).

The Complaint seeks damages of "not less than" $15 billion. *Id.* at p. 39.

## ARGUMENT

This lawsuit challenges reporting about a candidate for the highest office in the land, published in the throes of the election. Such reporting "occupies the highest rung on the hierarchy of First Amendment values." *CNN*, 684 Supp. 3d at 1274 (quoting *Darlow v. Babineck*, 2022 WL 15345444, at *2 (11th Cir. Oct. 27, 2022)).

Under both New York and Florida law, the elements of a defamation claim are the same: "(1) publication; (2) falsity; (3) . . . knowledge or reckless disregard as to the falsity on a matter concerning a public official [or public figure] . . . ; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018); *accord, e.g.*, *Kesner v. Dow Jones & Co.*, 2023 WL 4072929, at \*1 (2d Cir. June 20, 2023). With respect to "falsity," "[t]he alleged defamatory statement must be sufficiently factual to be susceptible of being proved true or false" and must be alleged to be "actually false." *CNN*, 2025 WL 3213203, at \*1 (quoting *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1251 (11th Cir. 2021)).

President Trump's claims fail for several independent reasons. First, the Complaint fails to plausibly allege that the publications were made with actual malice. Second, the Complaint fails to sufficiently plead that any statement at issue is false, while many of the challenged statements reflect the authors' subjective conclusions, based on unchallenged facts fully elaborated in the Book or Articles, that are not "susceptible of being proved true or false," *id.*, and many others are simply not defamatory. Finally, President Trump fails to plead the special damages required to support a claim for defamation *per quod*.

## I.    THE COMPLAINT FAILS TO PLEAD ACTUAL MALICE

"As a compromise to the First Amendment's protections of free speech and press, the Supreme Court has held that 'public officials' and 'public figures' must prove that a defendant's allegedly defamatory statement was made with 'actual malice.'" *Klayman v. City Pages*, 2015 WL 1546173, at \*12 (M.D. Fla. Apr. 3, 2015), *aff'd*, 650 F.

App'x 744 (11th Cir. 2016). There is no dispute President Trump is a public figure. His claims all fail because he cannot plead actual malice as to any challenged Statement.

"The standard for actual malice . . . is a rather daunting one for public-figure plaintiffs." *Id.* at \*13; *see also Donald J. Trump for President, Inc. v. WP Co.*, 2023 WL 1765193, at \*4 (D.D.C. Feb. 23, 2023) (standard is "famously daunting"). That is by design because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive, groundless litigation." *Michel,* 816 F.3d at 702 (citing *Sullivan*, 376 U.S. at 271–72). To establish actual malice, Trump must "allege facts sufficient to give rise to a reasonable inference that at the time of publication, the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *Sullivan*, 376 U.S. at 280); *accord, e.g.*, *Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at \*2 (2d Cir. Oct. 21, 2021). As used here, "reckless disregard" is purely a "subjective test," requiring that the defendant actually, subjectively believed a statement was very likely to be false and published it anyway. *Turner*, 879 F.3d at 1273; *see Brimelow*, 2021 WL 4901969, at \*2. "The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant." *Michel*, 816 F.3d at 702–03.

"Allegations of actual malice in a defamation context must satisfy the *Twombly/Iqbal* plausibility standard," and courts routinely dismiss defamation suits at the pleading stage for failure to allege facts capable of satisfying this exacting standard. *Reed*, 2025 WL 1874638, at \*2; *see Jacoby,* 2021 WL 5858569, at \*6; *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015) (noting "significant" "hurdles to plausibly pleading

actual malice . . . given the First Amendment interests at stake").[5]

"[P]urely conclusory" allegations "that the defendants were 'reckless'" or acted with actual malice "are insufficient to support a cause of action." *Michel*, 816 F.3d at 704. It is not enough to plead, as the Complaint does here, "that the Defendants 'knowingly and recklessly' ignored or deliberately avoided" certain information. *Turner*, 879 F.3d at 1273; that they acted out of "[i]ll-will, improper motive or personal animosity," *Moore v. Cecil*, 109 F.4th 1352, 1366 (11th Cir. 2024) (per curiam); or that they failed to abide by newsroom standards, *Michel*, 816 F.3d at 703.

The First Amendment requires a plaintiff to "br[ing] home" the state of mind required for actual malice "to the persons in the [] organization having responsibility for the publication" at issue. *Sullivan*, 376 U.S. at 287. A plaintiff must plead facts "as to each Defendant[']s knowledge or mental state" sufficient to show actual malice for each Statement the particular defendant published. *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018). Ultimately, "[a]ll that matters are the speakers' subjective beliefs about the truth of their own statements." *Dershowitz v. Cable News Network, Inc.*, 153 F.4th 1189, 1193 (11th Cir. 2025).

## A.    The Complaint's Generalized Allegations of Actual Malice Fail

Plaintiff's sweeping, kitchen sink allegations do not come close to plausibly pleading actual malice against any Defendant.

*First*, many allegations in the Complaint are conclusory and thus "insufficient"

---

[5] *See also, e.g.*, *Michel*, 816 F.3d at 702; *Turner*, 879 F.3d at 1273–74; *Trump for President*, 2023 WL 1765193, at *4.

as a matter of law. *Reed*, 2025 WL 1874638, at \*3. For example, President Trump's allegation that "Defendants individually and collectively published numerous false, malicious, and defamatory statements while realizing that these statements were false or, at a minimum, with reckless disregard for the truth" merely restates the legal standard and carries no weight. FAC ¶ 45; *see also, e.g.*, *id.* ¶¶ 54, 72, 76. Relatedly, most of the actual malice allegations recite generic grievances about the press that have nothing to do with the publications in suit, let alone the Statements at issue. *See* FAC ¶¶ 45, 47–54, 62–64*.* This failure to plead "sufficient facts showing that Defendants 'entertained serious doubts' as to the truth *of the articles*" (or the Book) requires dismissal. *Jacoby*, 537 F. Supp. 3d 1303, 1312 (M.D. Fla. 2021) (emphasis added), *aff'd*, 2021 WL 5858569; *see Michel*, 816 F.3d at 703 (similar); *Patterson v. McClatchy Co.*, 2018 WL 11649575, at \*3 (M.D. Fla. Oct. 16, 2018) (similar)

*Second*, President Trump's generic allegations of "ill-will, improper motive or personal animosity," FAC ¶¶ 47, 49, 51, 55, play "no role in determining whether a defendant acted with actual malice." *Reed*, 2025 WL 1874638, at \*6. "[A]ctual malice" does not concern "[i]ll-will, improper motive or personal animosity." *Moore*, 109 F.4th at 1366; *see CNN*, 684 F. Supp. 3d at 1275 (similar) (citing *Donald J. Trump for President, Inc. v. CNN Broad. Inc.*, 500 F. Supp. 3d 1349, 1357 n.4 (N.D. Ga. 2020)).

*Third,* the Complaint alleges (without any plausible basis) that Defendants engaged in "patterns and practices" that "[went] against widely accepted journalistic standards," but fails to identify a single instance of any Defendant violating journalistic

standards with respect to the Book or Articles. FAC ¶¶ 50, 52. Even if it did, "a departure from journalistic standards" does not constitute actual malice. *Michel*, 816 F.3d at 703; *see Klayman*, 650 F. App'x at 750–51; *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020).

*Finally,* President Trump's allegations that Defendants used "exclusively anonymous sources," FAC ¶¶ 46, 51–52, fail. The Book and Articles are replete with named sources and thus, on their face, belie the allegation. And even if true, "reliance on unnamed sources" is insufficient to establish actual malice. *Michel*, 816 F.3d at 704; *accord Cabello-Rondon v. Dow Jones & Co.*, 720 F. App'x 87, 89 (2d Cir. 2018). Similarly unavailing are the allegations that Defendants ignored "potentially positive and exculpatory sources" and "statements by witnesses or insiders that tend to support President Trump." FAC ¶ 52. The Complaint fails to plausibly allege that Defendants subjectively knew of any specific source who would have contradicted the reporting, and thus falls far short of showing that Defendants "*deliberately* avoided investigating the veracity of [the Statements] in order to evade learning the truth." *Reed*, 2025 WL 1874638, at *3 (emphasis added). Courts routinely dismiss allegations like the ones made here as insufficient. *E.g.*, *id.* (allegation that defendants chose "not to speak with any witnesses who could have refuted the allegedly defamatory statements" was insufficient); *Michel*, 816 F.3d at 703 ("[A] failure to investigate, standing on its own, does not indicate the presence of actual malice.").

In short, the Complaint's generalized allegations against all Defendants are "insufficient to show that [they] knew" the challenged Statements were false. *Id.* at

704. The Complaint's few actual malice allegations specific to the works at issue also fail, as shown in Sections B, C, and D.

### B.    The Complaint Fails To Plead That Any Statements in the Book Were Published with Actual Malice

To state a claim for defamation based on the Book, President Trump must, at a minimum, allege facts capable of demonstrating that Buettner, Craig, or PRH "entertained serious doubts" about the truth of the Statements in the Book. *Turner*, 879 F.3d at 1273. Instead of making specific allegations of fact targeted to each Statement, President Trump cherry-picks 22 Statements from the Book, asserts they are false (without explanation), and complains that Buettner and Craig were biased journalists with a "pattern and practice" of avoiding evidence contrary to "their anti-Trump thesis." FAC ¶ 55. "[G]eneral and conclusory allegations" that journalists "intentionally avoid[ed] learning the truth" are "rebutted by the [publication] itself" at the pleading stage if the publication describes the "real outreach" and "due diligence" on which the it is based. *Michel*, 816 F.3d at 704. In other words, absent any facts to suggest Buettner and Craig had a specific reason to doubt the truth of their reporting, President Trump cannot demonstrate actual malice when the Book shows that the authors conducted "extensive research" and relied upon "considerable corroboration" for the Statements. *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001).

The text of the Book itself conclusively rebuts President Trump's claims of actual malice by making clear that each Statement was supported by a wealth of reporting that President Trump does not challenge. *See Michel*, 816 F.3d at 704. As the

title suggests, *Lucky Loser* advances the thesis that President Trump "received his fortune from those sources mostly outside of his ability to run a business" and that the "secret of his life, one that emerges in hundreds of moments big and small, is that the less he has been involved in decision-making, the better his chances of financial success." FAC ¶ 20(c). The immense weight and scope of the source materials Buettner and Craig relied upon is clearly laid out in hundreds of endnotes spread over nearly 50 pages at the end of the Book. Ex. 1 at 457-500. Further, the notes document the authors' extensive research, including their review of financial documents related to the Trump Organization and President Trump's inheritance, financial records relating to his earnings from *The Apprentice*, and President Trump's own statements in court records and countless other publications. *See id.* at 5, 457–500.

In the face of the Book's documented sourcing for each Statement, President Trump does not plead "any facts demonstrating that [the PRH] Defendants held serious doubts about the truth of these sources." *Jacoby,* 2021 WL 5858569, at *5. The general allegation that Defendants had a "pattern" of giving President Trump a short time to respond to requests for comment is not brought home to the Book. FAC ¶ 53. Not only does the Complaint fail to allege he was not provided an opportunity to comment on the Book or given sufficient time to do so, it does not challenge the Book's report that he "did not respond to requests for comment." Ex. 1 at 457. Buettner and Craig's efforts to obtain comment, as reported in the Book and unchallenged in the Complaint, tend to *disprove* actual malice. *See, e.g.*, *Church of Scientology*, 238 F.3d at 175. The Book's frequent quotations of statements President Trump made elsewhere

to provide his perspective similarly belies President Trump's conclusory claims of actual malice. *See generally* Ex. 1 at 457–500; Ex. 2.

President Trump's remaining allegations of actual malice relating to the Book boil down to the assertion that Buettner and Craig "turn[ed] a deliberate blind eye" toward evidence that would have disproven the Book's subjective conclusion that luck was the source of his success, but this contention fails on multiple levels. *See* FAC ¶¶ 55–61. First, President Trump's allegations attacking the fairness of that subjective conclusion do not support a finding that Buettner or Craig "published a false statement of fact," because, "if anything, these allegations attack the *reliability* of the Defendants' *opinions*" and thus "fall outside the scope of a defamation suit." *Turner*, 879 F.3d at 1274. Second, despite having more than forty pages for his Complaint, President Trump does not plead *any* facts showing Buettner or Craig doubted any of the Statements or *any* facts that undermine the wealth of sourcing corroborating them. *See Michel*, 816 F.3d at 704 (no actual malice when article makes clear reporters spoke to or reached out to multiple entities and complaint fails to "explain why none of that qualifies as 'real outreach' or due diligence").

### a. The Complaint Fails to Plausibly Allege Buettner and Craig Published the Apprentice Statements with Actual Malice

The Complaint's sole specific factual allegation of actual malice with respect to the Apprentice Statements—that Buettner and Craig failed to obtain an interview with Burnett—is unavailing. FAC ¶ 55. Seeking to obtain comment from sources, even if the efforts prove unsuccessful, belies actual malice. *See, e.g.*, *Cabello-Rondon v. Dow Jones*

& *Co., Inc*, 2017 WL 3531551, at \*10 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87; *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018). And here, Buettner and Craig tried to interview Burnett but he did not respond to their requests. *See* Ex. 2 at 4. Importantly, the Book also makes clear that they actually *did* interview many *Apprentice* producers and staff members with firsthand knowledge of the show's development. Ex. 1 at 490–97. President Trump fails to identify what contradictory information Burnett would have provided to raise any doubts concerning the depiction provided by all these sources. Instead, the Complaint resorts to vague allegations that Buettner and Craig should have spoken to more or better sources, but those categorically fail to give rise to actual malice. *See Jacoby*, 2021 WL 5858569, at \*5.[6]

Where the work itself rebuts a generic allegation that the defendants failed to exercise due diligence, the plaintiff fails to allege actual malice. *Michel,* 816 F. 3d at 704. Here, the sourcing noted in the Book, which President Trump does not challenge, fully corroborates the reporting that Burnett and other producers "made Trump a star" on *The Apprentice* through their "skilled hands" and that the show provided him "the equivalent of a second inheritance." FAC ¶ 20(b), (q). The Book documents these conclusions with extensive on-the-record sourcing, including interviews and financial records. *See* Ex. 1 at 490–97 (citing interviews with *Apprentice* producers and staffers,

---

[6] President Trump alleges the authors failed to interview producers or directors of movies or television programs he appeared in "before *The Apprentice*." FAC ¶ 57. But he alleges no facts that suggest that such people had any information to contradict the Book's reporting on *The Apprentice*, *see id.* ¶ 58, and, again, the Book shows they *did* interview prior producers, *see* Ex. 1 at 227 & 285 (quoting interviews with *60 Minutes* and *Lifestyles of the Rich and Famous* producers).

including Alan Blum, Jonathon Braun, Dan Gill, Kevin Harris, and Bill Pruitt, and "[f]inancial records from Mark Burnett Productions"). The Book also reports Burnett's public statements about his work with President Trump, further corroborating Craig and Buettner's conclusions. *See id.* at 345–47. President Trump cannot plausibly plead actual malice given Buettner and Craig's reliance on this undisputed "outreach" and "due diligence" to support the Statements. *Michel*, 816 F.3d at 704.

President Trump's claim that Buettner and Craig "turn[ed] a deliberate blind eye towards" material that would show President Trump in a better light, FAC ¶ 55, also fails because "the examples given by [President Trump] are actually included in the [Book]." *Turner*, 879 F.3d at 1273. The Complaint alleges that the Book failed to recognize that Burnett cast President Trump in *The Apprentice* because he was "a globally celebrated businessman, and he possesses a unique charisma," which also led Burnett to "agree—extraordinarily—to split the shows profits 50/50." FAC ¶¶ 56, 59. But the Book says the same thing, reporting that Burnett sought President Trump out because he saw him as a "legendary billionaire" with "the charisma" to "dr[a]w eyeballs," and that Burnett split profits "[f]ifty-fifty" in recognition of President "Trump's stature" at that time. Ex. 1, 345–46. These statements touting President's "charisma" and "stature" undermine any notion of actual malice. *See Jacoby*, 2021 WL 5858569, at *5 ("[W]here the publisher included information contrary to the general conclusions reached in the article tend to undermine the claims of malice.").

All that remains are nondefamatory details (*e.g.*, reporting about his chipped office furniture) or subjective conclusions (*e.g.*, amount of credit he should get for the

show's success), but the Complaint fails to explain how they are false or how they caused Buettner or Craig to doubt a defamatory aspect of their factual reporting. Actual malice cannot be premised on "irrelevant" details or the validity of "opinions." *Turner*, 879 F.3d at 1274. President Trump fails to allege a single fact that supports the conclusion that the PRH Defendants had any doubt as to the accuracy of the Apprentice Statements.

### b. The Complaint Fails to Plausibly Allege Buettner and Craig Published the Inheritance Statements with Actual Malice

Not only does the Complaint make no specific allegations about Buettner and Craig's state of mind with respect to the Inheritance Statements, which alone is fatal, but the Book itself underscores the lack of actual malice. President Trump claims the Book undermined his perceived status as a self-made man by reporting that he "received the equivalent of more than $400 million from his father, much of it through fraudulent tax evasion schemes" and that he "erase[d] his father's accomplishments from the public consciousness in service of artificially inflating his own." *See* FAC ¶¶ 20(a), (g). As the Book makes clear, these Inheritance Statements track the reporting in the 2018 Article and are based on the same source material—including tax returns and other records provided by Mary Trump, interviews with accountants and sources, and court materials from disputes relating to the inheritance. The "required awareness of falsity is absent when the publisher's claims are reasonably supported by numerous prior reports." *Reed,* 2025 WL 1874638, at *3.

The Book documents in detail the extent of President Trump's inheritance and

his father's various tax evasion schemes. Ex. 1 at 5; *see* Ex. 4 (2018 Article) at 1, 5. The Book showed that Fred Trump "evade[d] the gift and estate taxes" by funneling money through a shell company, that "[p]art of the cost of Donald Trump's off-the-books inheritance would be passed along to his father's middle-income tenants," that President Trump was "collecting $2 million a year from his father's companies," and that "Donald Trump, the self-described world's greatest dealmaker, had sold the bulk of his father's empire for almost $250 million less than it was worth." Ex. 1 at 94, 300–01, 314, 360; *see* Ex. 4 at 5, 6, 28, 36. President Trump does not challenge any of these basic facts relating to how much he inherited or how his father avoided tax (as opposed to the conclusion that he owed his fortune to his inheritance). This foundation of unchallenged reporting demonstrates the "due diligence" that renders actual malice implausible. *See Michel*, 816 F.3d at 704.

Nevertheless, President Trump alleges that the Inheritance Statements were published with actual malice because the authors accused him of tax fraud based on "incomplete" tax records and should have performed a "responsible assessment" to "confirm[] that both President Trump and his father Fred Trump were in compliance with all applicable rules, laws, and regulations." FAC ¶ 61. But this is nothing more than an unfounded claim Craig and Buettner "fail[ed] to investigate," which is not actual malice. *Jacoby,* 2021 WL 5858569, at *5 (no actual malice based on alleged failure to review records that were public, unlike President Trump's closely guarded tax records); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("reckless conduct is not measured by whether a reasonably prudent man . . . would have investigated

before publishing"). The Complaint does not identify a single fact suggesting Buettner or Craig disregarded anything in the tax records they had that conclusively "prove[s] or disprove[s]" the legality of President Trump's inheritance. *Turner*, 879 F.3d at 1270.

The Complaint's allegations of reliance on "biased" or "discredited" sources like "convicted felon Charles Littlejohn" are similarly misguided. FAC ¶¶ 46, 52. *None* of the challenged Statements is even attributed to the tax returns Littlejohn provided.[7] Nor is there any suggestion that the information provided by Littlejohn or any other source was inaccurate.[8] The First Amendment safeguards that protect journalists' right to report information they believe to be true is not encumbered by a "duty to find only pure, unimpeachable sources of information." *Berisha*, 973 F.3d at 1313.

### c. The Complaint Fails to Plausibly Allege Buettner and Craig Published the Business Statements with Actual Malice

As with the Apprentice and Inheritance Statements, President Trump fails to plead any facts supporting the conclusion that Buettner and Craig doubted the veracity of the Business Statements, and the Book points to the opposite conclusion. The

---

[7] It would make no difference if they were. "Reliance on a potentially biased source does not by itself establish actual malice." *Trump Media & Tech. Grp. Corp. v. WP Co. LLC*, 2024 WL 5202865, at *4 (M.D. Fla. Dec. 23, 2024). Many of the Statements *do* relate to documents from Mary Trump about the fortune President Trump inherited from his father, including as a product of tax evasion schemes. *See* Ex. 1 at 4–5. President Trump *conceded the authenticity* of these documents when he brought tortious interference claims against The Times, Buettner, and Craig but did not challenge the accuracy of any information in their reporting or assert defamation claims. *See Trump v. Trump*, 79 Misc. 3d 866, 868 (N.Y. Sup. Ct. 2023) (President Trump "does not specifically dispute the truth of any statements made in the [Times'] 2018 article," "*Trump Engaged in Suspect Tax Schemes as He Reaped Riches*").

[8] The Book references Littlejohn's incarceration, stating he was "willing to risk his liberty." FAC ¶ 46 n.4; Ex. 1 at 451. "Where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has," and rebuts actual malice. *Michel*, 816 F.3d at 703.

Business Statements challenge the Book's central contention that President Trump was often "lucky" in business because he accumulated wealth "despite a litany of failures." *See* FAC ¶¶ 20(e), (h), (j), (p), (r) (t). To the extent the Business Statements are factual, they are again supported by a huge volume of unchallenged facts. The Book reports President Trump's well-known bankruptcies, including Trump Taj Mahal, Trump Plaza, and the Plaza Hotel. Ex. 1 at 289, 299, 302, 378. The Book describes how President Trump's failure to "heed[] the advice of others," FAC ¶ 20(h), or to engage in "deliberative planning," *id*. at ¶ 20(e), led to business disasters, including the debacles with Trump Shuttle, his upstart football league, and other failed investments, *e.g.*, Ex. 1 at 213–14, 272, 284, 299, 314. The Book recounts many instances where President Trump enjoyed "windfall[s]" that could be considered lucky breaks, including his inheritance, tax deductions from tremendous losses on certain investments, the earnings from projects to which he licensed his name, and money from product placement on *The Apprentice*. *Id.* at 410, 442, 444. Finally, the Book quotes President Trump's own words to corroborate the Business Statements, including his pronouncement that "when I do research on things, they never work out very well." *Id.* at 246–48. President Trump does not dispute these facts or the authors' reliance upon them, which rebuts actual malice. *See Michel*, 816 F.3d at 705.

### d. The Complaint Fails to Plausibly Allege the Penchant Statement Was Published with Actual Malice

President Trump similarly fails to plead actual malice with respect to the Penchant Statement. FAC ¶ 20(d). The Book documents that the Statement was based

on the undisputed facts that years after his classmate brutally beat another child, President Trump engaged him to work with the Trump Organization, together with other reporting reflecting President Trump's acceptance of and even attraction to violence. *See* Ex. 1 at 62–63, 68–69, 174–75.

### e. The Complaint Fails to Plausibly Allege PRH Published the Book with Actual Malice

President Trump's claims against PRH also fail for the independent reason that PRH was fully entitled to rely on Buettner and Craig's reporting in publishing the Book. President Trump does not dispute, as the Book's jacket copy makes clear, that Buettner and Craig are highly credentialed investigative reporters at *The New York Times*. Nor does he dispute that their prior "in-depth" reporting on his personal finances, revealing "the fortune Trump inherited from his father and the record of business failures hidden in twenty years of Trump's tax returns," was "awarded a Pulitzer Price and two George Polk awards." Ex. 1, flap copy; *see id.* at 5. Their work on the Book "buil[t] upon [this] prior reporting," with "hundreds of new interviews." Ex. 1 at 5. In the end, the final Book was meticulously documented, with hundreds of endnotes citing to sources. *Id.* at 457–500.

Book publishers are "entitled as a matter of law" to rely on an author's "reputation[] and experience." *McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 525 (1991) (recognizing plaintiff must show "independent actual malice" to hold publisher liable); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382–83 (1977) (granting

summary judgment for publisher where it "placed its reliance upon [the author's] reportorial abilities"); *Fodor v. Berglas*, 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995). PRH's reasonable reliance on Buettner and Craig's reporting and "sterling reputation for accuracy," *Masson v. New Yorker Mag., Inc.*, 960 F.2d 896, 902 (9th Cir. 1992), negates any claim of actual malice against PRH as a matter of law.

The only allegation of actual malice directed specifically against PRH is that it "published a book written by a Times reporter [Michael Schmidt], the very title of which wrongly and maliciously positions President Trump as an enemy of the United States . . . ." FAC ¶ 49. In addition to being an allegation of ill will that is legally insufficient to establish actual malice, the publication of that book says nothing about PRH's state of mind. Plaintiff acknowledges that PRH publishes "thousands of titles," including President Trump's *The Art of the Deal, id.* ¶¶ 15, 26, that reflect endlessly different and no doubt contradictory points of view. In this context, it would be absurd to infer that PRH had doubts about the accuracy of the Book because it published another book (out of "thousands" of other books not at issue here) with a title suggesting that a separate author believed President Trump to be threatening.

## C.   The Complaint Fails to Plausibly Allege that the Adaptation Article Was Published with Actual Malice

The few specific allegations directed to the Adaptation Article do not plausibly show that Buettner, Craig, or anyone else at The Times with "responsibility for the publication" entertained serious doubts about the truth of any statement at issue. *Sullivan*, 376 U.S. at 287. The Article is an adaptation of chapters from the Book that

contains variations of some of the Book's Apprentice Statements, Inheritance Statements, and Business Statements. The Article's Apprentice Statements relate to *The Apprentice* producers crafting a TV version of President Trump, compare that version of President Trump to his Trump Tower office, and describe the wealth that President Trump realized from the show. *See* FAC ¶¶ 21(a), (b), (d), (e), (f), (i). The Inheritance Statements relate to President Trump's inheritance from his father and sale of real estate despite his father's wishes. *See id.* ¶¶ 21(c), (g), (i). And the Business Statement relates to his sale of his father's real-estate empire for less than the value assigned to the properties by the buyers' banks. *See* ¶ 21(h). For the same reasons the Complaint fails to plead that Buettner and Craig published the Book Statements with actual malice, it falls short as to the Adaptation Article.

In particular, as to the Apprentice Statements, the Complaint faults Buettner and Craig for not "securing an interview with primary, senior sources involved in the production." FAC ¶ 55. But the Article and Book affirmatively establish this is untrue; they demonstrate that Buettner and Craig interviewed many other producers, *see supra* p. 17, and repeatedly sought to interview President Trump himself, who "did not respond to invitations to be interviewed either for the book or [the] article." Ex. 2 at 2. Those repeated invitations to comment not only belie the Complaint's allegations regarding sourcing, they also "undercut any inference of actual malice." *Lemelson*, 903 F.3d at 24. President Trump "is not entitled to" require that Buettner and Craig "credit his preferred sources of information or structure [their] articles in the manner that he desires," *Jacoby*, 2021 WL 5858569, at *5; *see Patterson*, 2018 WL 11649575, at *3

(similar), particularly given his own failure to avail himself of the multiple opportunities he was given to comment.

As to the Inheritance and Business Statements, no specific factual allegations support President Trump's conclusory assertion that the statements were made with actual malice. And, in both cases, the Article and the Book clearly establish that the reporters not only "engaged in due diligence," but had extensive support for their reporting. *Michel*, 816 F.3d at 704.

### D. The Complaint Fails to Plausibly Allege that the Survey Article Was Published with Actual Malice

The bare allegations as to the subjective state of mind of Baker and The Times when publishing the Survey Statements are also defective for multiple reasons.

*First*, the Complaint makes no allegations as to Baker or The Times's purported knowledge of falsity as to any of the Survey Statements. The only specific allegation that the Complaint makes about Baker's state of mind is that he allegedly "makes no secret of the fact that he considered President Trump's first administration to be a factory of falsehoods." FAC ¶ 48 (internal quotation omitted).[9] But actual malice is "not about whether the speaker had evil intent or a motive arising from ill will," *Coral Ridge Ministries*, 6 F.4th at 1253 n.8, and in any event the allegation itself does not plausibly allege any such intent on Baker's part.

---

[9] President Trump's criticisms relating to *The Times*'s coverage of "Russian interference to President Trump's victory in the 2016 Presidential Election," FAC ¶ 62, are both insufficient, because an alleged departure from reasonable journalistic standards does not establish actual malice, *Michel*, 816 F.3d at 703, and irrelevant, because none of the Survey Statements at issue concern Russia, and the articles President Trump cites were written by different journalists, *Sullivan*, 376 U.S. at 287.

*Second*, the Survey Article was an overview of prior news coverage. And "[t]he law is clear that individuals are entitled to rely on previously published reports from reputable sources." *Berisha*, 973 F.3d at 1313; *see also Moore*, 109 F.4th at 1367 (explaining publication "in a multitude of sources . . . tends to preclude a finding of actual malice"); *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1498 (11th Cir. 1988) (no actual malice where challenged segment "was thoroughly researched" and supported by "corroborat[ing]" reports in other news media); *Markle v. Markle*, 2024 WL 1075339, at *23 (M.D. Fla. Mar. 12, 2024) (dismissing defamation claim in part because statements were consistent with "widely reported" material).

Specifically, in compiling President Trump's "record of scandal stretching across" his lifetime, the Survey Article recounted and briefly summarized well-known public accusations and investigations, all of which, including those that are the subject of the three Survey Statements, had been widely reported on by a variety of outlets prior to publication. Notably, President Trump makes no allegation that Baker (or The Times) had knowledge of falsity or reckless disregard for the truth as to any of the statements, and the Statements themselves undermine any such inference.

The first Statement, describing a yearbook photograph with President Trump in a friend's dress jacket, FAC ¶ 22(a), expressly stated it was drawn from the Book. Trump does not allege Baker or The Times had any reason to doubt this report.

The second Statement recounted President Trump's niece's claim that he cheated to get into college by having a friend take the SAT for him, *id.* ¶ 22(b), and identified Ms. Trump's book as the source of the allegation. Ex. 3 at 6. The article then

added important context: "A spokeswoman for Mr. Trump has denied this, and the widow of a man with the name cited by Ms. Trump as the test-taking friend said that she was confident her husband did no such thing." *Id.* at 6. Not only that, but the online version of the article also linked directly to an article titled "Widow of Trump's friend pushes back against Mary Trump SAT allegation, calls it false," which detailed the repudiation of the SAT allegation and noted that the White House called the allegation completely false.[10] Thus, "[f]ar from intentionally avoiding the truth," Baker "included information contrary to [the Survey Statements' alleged] conclusions in the text of the article itself." *Michel*, 816 F.3d at 705. "[T]hat showing tends to *undermine* the claims of malice." *Id.* at 703 (emphasis added); *Jacoby*, 2021 WL 5858569, at *5 (actual malice undermined where articles included statements from plaintiff rebutting fraud allegations). Indeed, there would be no reason for Baker or The Times to include such clear denials of Ms. Trump's allegation if they were acting with actual malice.[11]

As to the third Statement that "Federal, state and local authorities looked into [1] his ties with the Mafia, [2] found violations of money laundering laws and [3] penalized him for skirting stock trade rules," FAC ¶ 22(c), each portion of the

---

[10] *See* John Santucci, *Widow of Trump's Friend Pushes Back Against Mary Trump SAT Allegation, Calls It False*, ABC News (July 9, 2020), https://abcnews.go.com/Politics/widow-trumps-friend-pushes-back-mary-trump-sat/story?id=71678433. When deciding a 12(b)(6) motion, a district court may consider materials incorporated by reference into the complaint, such as the Articles at issue here. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); *see also Turner*, 879 F.3d at 1264 (incorporating challenged report for account of "the many undisputed facts upon which the Defendants relied in making the challenged statements").

[11] The Survey Article included other specific denials or alternate characterizations of particular events that are not at issue here, further undermining any allegation of actual malice. *See* Ex. 3 at 13 ("He has consistently denied all charges. . . ."); *id.* at 16 ("Mr. Trump disputes this."); *id.* at 28 ("He has pleaded not guilty to all charges and blamed Democrats for coming after him for partisan reasons.").

statement linked to a separate authoritative source that squarely supported the assertion: (1) a Politico article by a Pulitzer Prize-winning journalist cataloguing extensive investigations into Plaintiff's alleged connections to the mob, (2) a government press release announcing Trump Taj Mahal's "civil money penalty of $477,000 for failing to file reports required by the Bank Secrecy Act," and (3) an article describing President Trump's agreement to "pay a $750,000 fine to settle a lawsuit charging that his acquisition of stock in the Holiday Corporation and the Bally Manufacturing Corporation violated Federal disclosure rules," *id.* ¶ 1(c). Those are exactly the kinds of "published reports from reputable sources" upon which publishers are entitled to rely. *Reed*, 2025 WL 1874638, at \*3. The Complaint pleads no facts to suggest that Baker or The Times seriously doubted these sources.

For these reasons, President Trump fails to plausibly allege that the Survey Article was published with actual malice, and his claim should be dismissed. *Id.*

## II. THE COMPLAINT FAILS TO IDENTIFY ANY ACTIONABLE STATEMENTS IN THE BOOK

A "false statement of fact" is the "*sine qua non* for recovery in a defamation action." *CNN*, 2025 WL 3213203, at \*1 (quoting *Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984)). The plaintiff bears the burden of establishing that the challenged statements are not just false, *see, e.g.*, *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986), but materially false, *see Masson*, 501 U.S. at 517. None of the challenged Statements is actionable because they are factual Statements as to which President Trump has not sufficiently pled falsity, because they are opinion,

or because they are not defamatory.

### A.   The Complaint Fails to Sufficiently Plead Falsity as to the Book

"[F]ederal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017). To meet that burden, President Trump must do more than "perfunctorily state that a statement is false; rather, [he] must identify *how* the defendant's statement was false," *Cabello-Rondon*, 2017 WL 3531551, at *6 (emphasis added); *see also Verragio, Ltd. v. AE Jewelers, Inc.*, 2017 WL 4125368, at *7 (S.D.N.Y. Aug. 23, 2017) (denying defamation counterclaim where defendants did not "articulat[e] how the statements" were false); *Utterback v. Morris*, 2025 WL 1455900, at *6 (11th Cir. 2025) (plaintiffs "must identify how the defendant's statement was false to survive a motion to dismiss"); *Lorador v. Vasquez*, 2015 WL 300433, at *2 (M.D. Fla. Jan. 22, 2015) (Merryday, J.) (dismissing defamation claim for failure "to allege the content of the false statement" or "the reason the statement is false"). "[C]onclusory language" like "the following are materially false statement[s] of fact" before a list of challenged statements, without an "expla[nation] [of] what is actually contradicted or false about the challenged statements," is insufficient. *1st Amendment Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at *15 (S.D.N.Y. Mar. 28, 2025).

The Complaint challenges 22 statements from the Book. FAC ¶¶ 20(a)–(v). Of those, 13—Statements 20(a), 20(b), 20(e), 20(f), 20(i), 20(j), 20(k), 20(l), 20(m), 20(n), 20(o), 20(p), and 20(t)—are at least in part statements of fact. But the Complaint does

not specifically say what President Trump believes to be false about them or what he claims the truth to be. A complaint that fails to "challeng[e] the accuracy of the statement" at issue, *Cabello-Rondon*, 2017 WL 3531551, at *7, or to provide any "factual support for its conclusion that these statements are, in fact, false," *Minsurg Int'l, Inc. v. Frontier Devices, Inc.*, 2011 WL 1326863, at *6 (M.D. Fla. Apr. 6, 2011), must be dismissed. *See CNN*, 2025 WL 3213203, at *1–2; *Turner*, 879 F.3d at 1267; *Advisors Excel, LLC v. Scranton*, 2014 WL 12543802, at *7 (S.D. Fla. Sept. 15, 2014).

The absence of specific allegations of falsity is confirmed by a review of the Statements at issue in the Book. As to the factual Apprentice Statements (Statements 20(b), (n) & (o)), President Trump does not dispute the skill of *The Apprentice* producers in portraying him on screen, *see* FAC ¶¶ 20(b), (t); the "musty and moldy carpet smell," "out of date" décor, and "chipped wood on seemingly every piece of furniture" on the 26th floor of Trump Tower," *id.* ¶¶ 20(n); the presence of newspaper and magazine articles in lieu of a "computer" or "contracts" on his desk, *id.* ¶¶ 20(o); or the size of his earnings from the show (more than $200 million for hosting *The Apprentice* and *Celebrity Apprentice* and an additional "$200 million from licensing and endorsement deals").[12] Indeed, his allegations that "President Trump and Burnett created *The Apprentice*" and that "*The Apprentice* instantly became a top-rated television show," "generat[ing] hundreds of millions of dollars in revenue," FAC ¶¶ 30, 31, 34, are

---

[12] Instead of identifying what Burnett would have said to contradict the Book's reporting, remarkably, the Complaint points only to Burnett's public acknowledgment that he split *Apprentice* profits 50/50 with President Trump—remarks that are *quoted in the Book*, undermining any claim that the Book was misrepresenting the facts. *See* FAC ¶ 56 (citing "Book at 345-347").

entirely consistent with the Book's assertions that the show was a lucrative success in which he played a starring role. *E.g.*, Ex. 1 at 388–89, 392.

As to the factual Inheritance Statements (20(a), (f), (k), (l), (m) & (t)), President Trump does not explain how or why statements that he received "almost $2 million a year from his father's companies" and ultimately "the equivalent of more than $400 million from his father" or that he "sold the bulk of his father's empire for almost $250 million less than it was worth" are false. FAC ¶¶ 20(a), 20(k), 20(l), 20(m), 20(p). Though President Trump appears to challenge the $975 million valuation of his father's empire, FAC ¶ 20(p), he does not dispute the Book's explanation that banks, which typically lend no more than 75 to 80 percent of the value of commercial properties, lent $731 million. Ex. 1 at 360. And President Trump alleges that he was listed among the wealthiest people in America "as early as 1982," *see* FAC ¶ 23—a fact that *supports* rather than disproves the Book's claims about the size of his inheritance and reliance on his father.

With respect to the Book's references to "tax evasion schemes" or "taxable gifts masquerading as loans," FAC ¶¶ 20(a), (f), President Trump alleges that neither he nor his father "was investigated for, charged with, or convicted of tax fraud," *id.* ¶ 61. But the Book acknowledges this, noting, for example, that Fred Trump negotiated resolutions to IRS tax audits and investigations by the FHA and New York State into his windfall profits, Ex. 1 at 118, and that various maneuvers like Fred Trump giving his son loans that were never repaid, *id.* at 174, were "unnoticed" by the IRS or prosecutors, *id.* at 166, 174. Moreover, while President Trump challenges the

Statement about All County Building Supply and Maintenance, whose sole purpose was "to evade the gift and estate taxes," FAC ¶ 20(k), he does not challenge any of the underlying details concerning the "sham" transactions involving that entity that support the Statement. Ex. 1 at 301–02. In short, in the context of the Book, none of the factual Inheritance Statements is plausibly alleged to be false.

With regard to the factual Business Statements (20(e), (i), (j), (m), (p) & (t)), President Trump again fails to establish falsity. He does not dispute that he engaged in "aggressive tax maneuvers or not paying his debts." FAC ¶ 20(s). He does not contend that he actually did turn to "business consultants" or others for "advice," or that he "r[an] the numbers" carefully and paid close attention to "financial details." *Id.* ¶¶ 20(h), (i), (j). Though he challenges Statements about the look and feel of his Trump Tower offices, he does not allege that he had an IBM computer on his desk or that the offices smelled like lavender. And, again, many of the challenged Statements are echoed by unchallenged statements elsewhere in the Book. For example, President Trump acknowledged that, in purchasing the Plaza Hotel, he paid a price he could "never justify . . . no matter how successful the Plaza becomes." Ex. 1 at 271. Likewise, when he purchased the New Jersey Generals of the United States Football League, he said he was "not doing this as an economic venture" and "did not respect" the League's subsequent engagement of McKinsey "to explore the potential risks and rewards of moving to the fall." *Id.* at 205, 212. The Book is replete with unchallenged examples documenting President Trump's failure to engage in due diligence. *Id.* at 252, 332; *see infra* note 13. Similarly, the Statement that he liked to "create[e] the

illusion" that he was the developer, FAC ¶ 20(r), is supported by uncontested accounts of the many licensing deals he entered into, for which he received money for the use of his "brand" "regardless of the outcome." *Id.* ¶ 24; Ex. 1 at 398, 410.

Finally, with respect to the Penchant Statement, President Trump does not deny he "wax[ed] sentimentally" about "the days when, in his perception, society accepted resolving disputes with physical violence." FAC ¶ 20(d). Nor could he, given his record of inviting violent characters to work with him. *See* Ex. 1 at 63, 68–69, 174–75.

In short, President Trump fails to adequately "challeng[e] the accuracy" of any factual Statement in suit, *Cabello-Rondon*, 2017 WL 3531551, at *7, by "explain[ing] what is actually contradicted or false…." *1st Amendment Praetorian*, 2025 WL 949575, at *15. His failure to adequately allege falsity compels dismissal of these Statements.

## B. Fourteen of the Challenged Statements in the Book Contain Non-Actionable Opinions

As to 14 of the challenged Statements (FAC ¶¶ 20(b), (c), (d), (e), (f), (g), (h), 20(i), (j), (k), (l), (m), (q), (u)), President Trump fails to plead falsity for another reason: they express opinions or conclusions not capable of being proven true or false. Notably, President Trump appears to recognize this vulnerability in his claim when he alleges that Defendants "couch statements . . . in language that allows them to claim they are making mere opinion statements." FAC ¶ 54.

The First Amendment protects statements of pure opinion from liability for defamation. *See Turner*, 879 F.3d at 1262; *Keller v. Miami Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985). As the Eleventh Circuit recently reaffirmed in connection

with another meritless lawsuit brought by President Trump, whether a statement "is one of fact or opinion" is a question of law that may be decided on a motion to dismiss. *CNN*, 2025 WL 3213203, at *2; *accord Turner*, 879 F.3d at 1262–63.

"[A] defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication . . . ." *Turner*, 879 F.3d at 1262 (quoting *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 57 (Fla. 1st DCA 1981)); *accord Steinhilber v. Alphonse*, 68 N.Y. 2d 283, 289 (1986). "In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984).

"Where the speaker or writer presents the facts at the same time he or she offers independent commentary, a finding of pure opinion will usually result." *Zambrano v. Devanesan*, 484 So.2d 603, 606 (Fla. 4th DCA 1986); *accord, e.g.*, *Foley v. CBS Broad., Inc.*, 28 Misc.3d 1227(A), at *4 (N.Y. Sup. Ct. 2006) ("[A] proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture."). For example, in *Turner*, the Eleventh Circuit held that the statement the plaintiff "participated in 'homophobic taunting' of Player A" was based on undisputed facts like the plaintiff "gave Player A, and him alone, a male blow-up doll." 879 F.3d at 1264. The challenged statement, which represented "the Defendants' subjective assessment of Turner's conduct," was "not readily capable of being proven true or false," and therefore "not actionable in a defamation suit." *Id.*

Many of the Apprentice Statements (FAC ¶¶ 20(b), (q), (u)) reflect "subjective assessment[s]" based on clearly disclosed facts from the Book that (as discussed above) President Trump never alleged to be false. These include the Statements about "skilled hands creat[ing] a version of Donald Trump" "that might have been nonexistent but was highly marketable," *see id.* ¶¶ 20(b); "other people . . . do[ing] all the work" to make money off product placement in *The Apprentice*, *id.* ¶ 20(q); and "Burnett's *The Apprentice* fortif[ying] Trump's fact-free bubble, while also making it national and bankable," *id.* ¶ 20(u). Each of these assessments is based on uncontested facts about decisions made by Burnett and the *Apprentice* producers, discussed at length in the Book (and Adaptation Article)—for example, filming Trump from a helicopter to make him "seem like the King of New York," hiring a set designer to create a suitably impressive boardroom rather than using President Trump's offices on the 26th Floor of Trump Tower, and "selectively choos[ing] snippets" from the tapes when "Mr. Trump's choice threatened to reflect badly on him and the show." Ex. 2 at 10; *see* Ex. 1 at 354–56, 362.

Many of the Inheritance Statements (FAC ¶¶ 20(f), (g), (k), (l), (m)) similarly contain non-actionable opinion based on disclosed facts. For example, the remark that President Trump "benefited the most from his father's wealth" even as he sought "to erase his father's accomplishments" and "inflat[e] his own," FAC ¶ 20(g), is supported by undisputed facts such as that he rebranded "the Fred Trump Organization" as "The Trump Organization," said his father gave him only "a very small loan in 1975," and declined to correct reporters who stated "[y]our assets are considered to be over a

billion dollars" at a time when he "had no more legal claim to his father's assets than his siblings." Ex. 1 at 2, 110, 185. The suggestion that Fred Trump's "gifts masquerading as loans" were an "off-the-books inheritance" and "likely tax fraud," FAC ¶¶ 20(f), (l), (m), reflects Buettner and Craig's subjective conclusion based on the undisputed facts that Fred Trump "cosign[ed] bank loans" for the Grand Hyatt project, paid for "lawyers and consultants and architects," and gave Donald Trump "millions of dollars in supposed loans," totaling "at least $15 million" that Donald Trump "would never repay." Ex. 1 at 166. As the Book explains, but Plaintiff does not dispute, Fred Trump, whose gift "would have been subject to a federal gift tax of 55 percent," "wrote off the $15 million he had given his son as a total loss on his tax returns," thus "reduc[ing] his tax bill by about $5 million." *Id.* at 297.

Many of the Business Statements (FAC ¶¶ 20(c), (e), (h), (i), (j), (m), (q)), too, are, at least in part, opinion based on disclosed facts. The suggestion that "the less [Trump] has been involved in decision-making, the better his chances of financial success," FAC ¶ 20(c), is based on the Book's numerous undisputed accounts of projects other people managed, from which President Trump profited. These include Starrett City, which Fred Trump developed but which offered President Trump a helpful tax shelter, Ex. 1 at 114; Trump World Tower, owned 90 percent by South Korean conglomerate Daewoo, *id.* at 321; his minority interest in two commercial towers controlled and operated by Vornado Realty Trust, *id.* at 428; and The Apprentice, which brought in millions, "almost all of it thanks to the work of Burnett's team lining up sponsors," *id.* at 379. The characterizations of President Trump's

business dealings as a "litany of failure[s]" and of his overall success as an "illusion," *see* FAC ¶¶ 20(m), (s), (t), (v), are also predicated on undisputed facts such as his tax records showing millions of dollars of losses, *e.g.*, Ex. 1 at 241–42, 262, 272, 298, 314, 329, 344, 419–20, 422, and his multiple bankruptcies, *e.g.*, *id.* at 289, 299, 302, 378. The characterization of All County Building Supply and Maintenance as a "sham layer," FAC ¶ 20(k), is an opinion based on the detailed facts about how that entity was used to purchase and re-sell goods to Fred Trump's company. And the assessment that President Trump engaged in little in the way of "deliberative planning," risk analysis, or financial modeling, and did not heed the advice of "business consultants" or others, FAC ¶¶ 20(e), (h), (i), (j), is based on undisputed quotes from President Trump himself, anecdotes shared by others, and numerous examples of projects President Trump undertook seemingly without regard to profitability.[13]

Finally, the Penchant Statement, *see* FAC ¶ 20(d), is opinion based on disclosed facts. It comes after an undisputed on-the-record account of Michael Scadron, a classmate of President Trump's at New York Military Academy, "deck[ing]" another classmate with a "two-foot-long wooden stick with a metal chain attached to one end," prompting Scadron's expulsion, followed by the undisputed assertion that President

---

[13] Examples include President Trump purchasing properties like the Plaza Hotel, the Taj Mahal, Seven Springs, the Briar Hill golf course, and the Eastern Airlines shuttle notwithstanding concerns about the financial viability of each, *see* Ex. 1 at 252, 271, 299, 324, 332–33; acknowledging he did not conduct any "great studies" of the Bally Manufacturing company before deciding to "park [his] money" there, *id.* at 246–48; saying "Never mind that crap" when Harrah's tried to share market research, *id.* at 216; calling a McKinsey report "bullshit," *id.* at 212; and endorsing a company he admitted he "kn[e]w nothing about," *id.* at 402.

Trump worked with him a decade later. Ex. 1 at 63, 68–69. It is also supported by other anecdotes, such as President Trump's instruction to track down a security guard who had "knocked" two hecklers "around and shoved them toward an exit" at the U.S. Open, and to offer the man a job as "director of security." *Id.* at 174–75.

President Trump may well characterize his business track record differently than Buettner and Craig, or attribute the success of *The Apprentice* principally to himself rather than the show's producers. But "one person's 'subjective assessment' is not rendered false by another person's 'different conclusion.'" *CNN*, 2025 WL 3213203, at *2 (citation omitted); *see Turner*, 879 F.3d at 1264 ("[T]hat another reader might come to a different conclusion upon review of the facts . . . does not make the Defendants' assessment . . . anything other than opinion."). Because "readers will understand they are getting the author's interpretation of the facts presented," *Adelson v. Harris*, 973 F. Supp. 2d 467, 490 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017), the opinion Statements "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Buettner and Craig's "commentary or opinion," based on "accurate facts set forth" in the Book (or Adaptation Article), is "not the stuff of libel." *Turner*, 879 F.3d at 1265.

## C.    Virtually None of the Challenged Statements in the Book Are Defamatory

For a statement to be actionable, it must be more than negative. Defamation law prohibits only false statements that subject the plaintiff to "hatred, distrust, ridicule, contempt or disgrace." *Rubin v. U.S. News & World Rep., Inc.*, 271 F.3d 1305, 1306 (11th Cir. 2001). At least parts of Statements 20(a), (b), (c), (d), (e), (g), (h), (i),

(j), (n), (o), (p), (q), (s), (t), (u), and (v) are not actionable also for the independent reason that they are not defamatory. The observations that President Trump's desk was once bare and his company's office furnishings needed refreshing, *id.* ¶¶ 20(n), (o), do not subject him to the type of disgrace or ridicule that could sustain a defamation claim. *See, e.g.*, *Va. Citizens Defense League v. Couric*, 910 F.3d 780, 786 (4th Cir. 2018) (not defamatory to show activist group members being stumped on policy questions). The same is true for statements that the *Apprentice* editors crafted an image of him as "measured, thoughtful, and endlessly wealthy." FAC ¶ 20(b). A plaintiff is not subject to disgrace or ridicule by a statement that he was not measured, not thoughtful, and not endlessly wealthy, which is at most a mild insult. *See Couric*, 910 F.3d at 786.

Statements that President Trump was "luck[y]" and that "good things happened to" him, including being "discovered by a revolutionary television producer" and receiving "the equivalent of a second inheritance" from *The Apprentice*, *e.g.*, FAC ¶¶ 20(q), (s), (t), also are not defamatory. Being described as lucky and wealthy is hardly obloquy, as President Trump himself recognized when he said "Sometimes you're better off lucky than good." Ex. 1 at 423. Likewise, reporting that he "received his fortune" from outside sources, including, at one point, almost $2 million a year from his father's companies and ultimately "more than $400 million from this father"; operated without "real estate or financial staff" and did not "heed[] the advice" of consultants; and sold his father's empire for less than the banks' valuation, FAC ¶¶ 20(b), (e), (f), (h), (m), (p), does not subject him to ridicule or disgrace. These Statements should be dismissed for this independent reason.

### III.    THE COMPLAINT FAILS TO IDENTIFY ANY ACTIONABLE STATEMENTS IN THE TWO NEW YORK TIMES ARTICLES

The Complaint also otherwise fails to state a claim as to the two *Times* articles.

#### A.    The Nine Challenged Statements in the Adaptation Article Are Not Actionable

The Complaint fails to state a claim as to all nine challenged statements in the Adaptation Article because none rises to the level of being defamatory. *See Rubin*, 271 F.3d at 1307. The allegations of falsity likewise are deficient as to all nine statements. *See Utterback*, 2025 WL 1455900, at \*6. And four of the statements are subjective assessments that are protected opinion because they are incapable of being proved true or false. *See Turner*, 879 F.3d at 1264–65.

**Nondefamatory Statements:** For the reasons discussed directly above as to the Book, *supra* Section II.C, none of the nine challenged statements in the Adaptation Article subject President Trump to a reaction that could sustain a defamation claim. *Rubin*, 271 F.3d at 1306. He was not exposed to "disgrace," *id.*, by reporting that 20 years ago he had a bare desk and his company's back offices had a musty carpet and chipped furniture, FAC ¶¶ 21(a), (b); that he had the good fortune of starring in *The Apprentice* and then earning enormous endorsement fees from it, *id.* ¶¶ 21(d), (i); or that he was not seen as measured, thoughtful, or endlessly wealthy, *id.* ¶¶ 21(e), (f). *See Markle*, 2024 WL 1075339, at \*14 (no defamation claim over "minutiae").

Likewise, reporting that President Trump secretly set in motion a plan to tap his father's fortune again and to sell dozens of buildings from his own trust fund despite his late father's wishes, FAC ¶¶ 21(c), (g), or that the banks making loans to his buyers

valued the buildings for more than $200 million more than the sale price, *id.* ¶ 21(h), does not subject President Trump to disgrace. This is particularly so where the Statement said that President Trump's sale of his own assets betrayed his late father's "wishes," without any suggestion that it violated a contractual obligation or broke a law. *See, e.g.*, *Bobulinksi v. Tarlov*, 758 F. Supp. 3d 166, 174 (S.D.N.Y. Nov. 26, 2024).

**Falsity Allegations:** The Complaint fails sufficiently to allege that any of the nine statements in the Apprentice Article is materially false for the reasons discussed as to the Book. *See supra* Sections II.A.

**Subjective Statements:** Four of the statements are subjective assessments that are not actionable because they are "not readily capable of being proven true or false." *Turner*, 879 F.3d at 1264. Calling landing *The Apprentice* "mostly luck" or thereafter earning $200 million in licensing and endorsement deals a "lucky windfall," FAC ¶¶ 21(d), (i), is a classic statement of opinion because the degree to which luck is a cause of any outcome is inherently unknowable, and thus unprovable. The same is true for saying that President Trump played a "re-crafted version of himself" that, unlike him, was "measured, thoughtful, and endlessly wealthy." *Id.* ¶¶ 21(e), (f). All three descriptions are subjective assessments that cannot be proved true or false. *See, e.g.*, *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) (describing price markup as "hefty" is "too subjective" to be "proved false").

**B.    The Three Challenged Statements in the Survey Article Are Not Actionable**

The Complaint fails to identify a false and defamatory statement in the Survey

Article.

To begin, the Complaint does not and cannot "identify how" the first and third challenged statements, FAC ¶¶ 22(a), (c), are false. *Utterback*, 2025 WL 1455900, at *6. The first Statement reported that as a high school student President Trump learned how to cut corners because, "according to a new book, Lucky Loser," he "knowingly borrowed a friend's dress jacket with a dozen medals attached to wear for his yearbook photo." Ex. 3 at 6. President Trump does not articulate what about that report, if anything, is false. Nor does he articulate what, if anything, is false about the third statement, that "[f]ederal, state and local authorities looked into his ties with the Mafia, found violations of money laundering rules and penalized him for skirting stock rules." *Id.* at 8. As shown by the online version of the article, Exhibit 3, the statement was supported by hyperlinks to articles demonstrating the truth of the statements. There can be no dispute that authorities did in fact look into all these things (and secured penalties against him in two cases), and President Trump does not offer even a word of explanation to doubt the extensive public record.

Next, the part of the third Statement noting that the Financial Crimes Enforcement Network levied a civil penalty against President Trump's casino company and that he was penalized for skirting stock trade rules, FAC ¶ 22(c), is also protected from liability by the fair report privilege, which covers accurate statements, like these, about official proceedings and documents. *See, e.g.*, *Vesselov v. Harrison*, 2024 WL 4449685, at *2–3 (11th Cir. Oct. 9, 2024).

Finally, the second Statement, discussing the allegation in President Trump's

43

niece's book that he cheated on a college entrance exam by having a friend take the test for him, FAC ¶ 22(b), is not defamatory because it is a balanced account of the allegation and denials that does not endorse the allegation. Importantly, the Complaint omits the article's very next sentence: "A spokeswoman for Mr. Trump has denied this, and the widow of a man with the name cited by Ms. Trump as the test-taking friend said that she was confident her husband did no such thing." Ex. 3 at 7. In light of that context, which included a third party's statement that the event did not happen, "[a] reasonable reader would therefore interpret the article as presenting two sides of this controversy" rather than endorsing one side. *Croce v. N.Y. Times Co.*, 930 F.3d 787, 795 (6th Cir. 2019); *see Fairfax v. CBS Broad., Inc.*, 534 F. Supp. 3d 581, 593-95 (E.D. Va. 2020) (report lacked defamatory meaning where broadcaster did not adopt the allegations of sexual assault as true and included rebuttals), *aff'd on other grounds*, 2 F.4th 286 (4th Cir. 2021); *Brian v Richardson*, 87 N.Y.2d 46, 53–54 (1995) (similar).

## IV.   THE COMPLAINT FAILS TO PLEAD SPECIAL DAMAGES

Finally, President Trump's claims must also be dismissed for failure to plead special damages with respect to all Statements identified in Counts II, IV and VI.

To state a claim for defamation *per quod*, a plaintiff must allege special damages—*i.e.*, "actual, out of pocket losses which must be proven by specific evidence as to the time, cause and amount." *Flynn v. CNN, Inc.*, 2023 WL 5985196, at *5 (M.D. Fla. Mar. 17, 2023); *accord, e.g.*, *Open Sea Distrib. Corp. v. Artemis Distrib., LLC*, 692 F. Supp. 3d 1151, 1202 (M.D. Fla. Sept. 19, 2023) (defamation *per quod* plaintiff "must specially plead and prove special damages proximately resulting from the

defamation"). "In all cases that are libel *per quod*, failure to plead special damages is a fatal defect." *Idema v. Wagner*, 120 F. Supp. 2d 361, 368 (S.D.N.Y. 2000); *accord, e.g.*, *Anderson v. Smith*, 2020 WL 10058207, at \*4 (M.D. Fla. Mar. 24, 2020).

Here, President Trump fails to plead special damages. While President Trump cites "a precipitous decline in the stock price of TMTG," FAC ¶ 73, none of the Statements relates to TMTG and, even if they did, under Florida law, a shareholder generally "cannot sue in the shareholder's name for injuries to a corporation." *Braun v. Buyers Choice Mortg. Corp. ex rel. McAloon*, 851 So. 2d 199, 203 (Fla. 4th DCA 2003); *accord Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1136 (11th Cir. 2020). Next, President Trump resorts to generalized allegations about harm to "the profitability of his businesses," his "personal brand," his "professional and occupational interests," and "his reputation as a businessman in the eyes of the American public and around the world." FAC ¶¶ 73–75. But to plead libel *per quod*, "[i]t is not enough to claim damages in a conclusory manner." *Anderson*, 2020 WL 10058207, at \*3. Indeed, even "'[r]ound figures' or a general allegation of a dollar amount"—such as Plaintiff's demand for $15 billion—"do not suffice" to establish special damages. *Idema*, 120 F. Supp. 2d at 368. The failure to specifically allege an amount and basis for special damages compels dismissal of the *per quod* claims.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Complaint with prejudice for failure to state a claim.

## LOCAL RULE 3.01(g) CERTIFICATION

Defendants certify that, on December 14, 2025, they conferred by email with counsel for Plaintiff, who intends to oppose the motion.

Dated: December 15, 2025

Respectfully submitted,

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero, Esq.
Florida Bar No. 603030
Linda Norbut, Esq.
Florida Bar No. 1011401
**THOMAS & LOCICERO**
601 S. Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

Thomas G. Hentoff, Esq.* (lead counsel)
Nicholas G. Gamse, Esq.*
Kimberly Broecker, Esq.*
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5804
thentoff@wc.com
ngamse@wc.com
kbroecker@wc.com

*Admitted *pro hac vice*

***Attorneys for Defendants New York Times Company, Peter Baker, Susanne Craig, and Russ Buettner***

*/s/ William J. Schifino, Jr.*
William J. Schifino, Jr., Esq.
Florida Bar No. 564338
Justin P. Bennett, Esq.
Florida Bar No. 112833
Gregory L. Pierson, Esq.
Florida Bar No. 123905
**GUNSTER, YOAKLEY & STEWART, P.A.**
401 E. Jackson Street, Suite 1500
Tampa, Florida 33602
Telephone: (813) 228-9080
Facsimile: (813) 228-6739
wschifino@gunster.com
jbennett@gunster.com
gpierson@gunster.com

George S. LeMieux, Esq.
Florida Bar No. 16403
Eric C. Edison, Esq.
Florida Bar No. 10379
**GUNSTER, YOAKLEY & STEWART, P.A.**
450 East Las Olas Blvd., Suite 1400
Fort Lauderdale, Florida 33301
Telephone: (954) 462-2000
Facsimile: (954) 523-1722
glemieux@gunster.com
eedison@gunster.com

Elizabeth A. McNamara, Esq.* (lead counsel)

John M. Browning, Esq.*
Alexandra Perloff-Giles, Esq.*
Alexandra M. Settelmayer, Esq.*
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 489-8230
lizmcnamara@dwt.com
jackbrowning@dwt.com
alexandraperloffgiles@dwt.com
alexandrasettelmayer@dwt.com

*Admitted *pro hac vice*

***Attorneys for Defendants Penguin Random House LLC, Susanne Craig, and Russ Buettner***