IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>NEW YORK TIMES COMPANY, a New York corporation, SUSANNE CRAIG, an individual, RUSS BUETTNER, an individual, PETER BAKER, an individual, and PENGUIN RANDOM HOUSE LLC, a Delaware company,<br><br>Defendants. | Civil Docket<br><br>No. 8:25-cv-2487-SDM-NHA |

Transcript of Motion Hearing

Heard in Courtroom 15A
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Wednesday - July 22, 2026
9:04 a.m. - 11:36 a.m.

BEFORE THE HONORABLE STEVEN D. MERRYDAY

UNITED STATES DISTRICT JUDGE

REBECCA M. SABO, RMR, CRR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Room 1221
Tampa, Florida 33602
Rebecca_Sabo@flmd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFF:

**Alejandro Brito**
**Jalaine Garcia**
BRITO, PLLC
2121 Ponce de Leon Boulevard, Suite 650
Coral Gables, Florida 33134
(305) 614-4071
abrito@britopllc.com
jgarcia@britopllc.com

PRESENT ON BEHALF OF THE DEFENDANTS, THE NEW YORK TIMES, PETER BAKER, SUSANNE CRAIG, AND RUSS BUETTNER:

**Thomas G. Hentoff**
WILLIAMS & CONNOLLY
680 Maine Avenue S.W.
Washington, D.C. 20024
(202) 434-5804
thentoff@wc.com

**Linda R. Norbut**
THOMAS & LOCICERO, PL
601 South Boulevard
Tampa, Florida 33606
(813) 984-3060
lnorbut@tlolawfirm.com

PRESENT ON BEHALF OF THE DEFENDANTS, PENGUIN RANDOM HOUSE, SUSANNE CRAIG, AND RUSS BUETTNER:

**Elizabeth A. McNamara**
**Alexandra Perloff-Giles**
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 489-8230
lizmcnamara@dwt.com
alexandraperloffgiles@dwt.com

**William J. Schifino, Jr.**
GUNSTER YOAKLEY & STEWART PA
401 East Jackson Street, Suite 1500
Tampa, Florida 33602
(813) 739-6968
wschifino@gunster.com

# I N D E X

**ARGUMENT BY COUNSEL:** **PAGE**


| | |
|---|---|
| Argument by Ms. McNamara | 5 |
| Argument by Mr. Hentoff | 25 |
| Argument by Mr. Brito | 40 |
| Rebuttal Argument by Ms. McNamara | 83 |
| Rebuttal Argument by Mr. Hentoff | 87 |

PROCEEDINGS

(Open court.)

(Court called to order.)

THE COURT: Good morning. Please be seated, one and all. We are together this morning in Case 25-civil-2487.

Who speaks for the plaintiff this morning?

MR. BRITO: Good morning, Your Honor. Alejandro Brito and Jalaine Garcia on behalf of the plaintiff.

THE COURT: Good morning to you both.

MS. GARCIA: Good morning, Your Honor.

THE COURT: And who speaks for the defendants?

MS. MCNAMARA: Good morning, Your Honor. Elizabeth McNamara on behalf of Penguin Random House, Sue Craig, and Russ Buettner, the authors at Penguin Random House. I have with me, my colleague, Lexi Perloff-Giles, as well at Bill Schifino.

THE COURT: Good morning.

And who speaks for the other defendant?

MR. HENTOFF: Good morning, Your Honor. Thomas Hentoff, and I am here for The New York Times, reporter Peter Baker, and also reporters Susanne Craig and Russ Buettner as it relates to the Adaptation Article. And I am here with my co-counsel, Linda Norbut.

THE COURT: Well, good morning to you all. Obviously we are here this morning to entertain argument on the defendants' motion to dismiss, which I believe is Document 44

on the docket.

Who wants to be heard first?

Ms. McNamara, if you'll step to the lectern, I'll be happy to hear from you.

MS. MCNAMARA: Thank you.

Good morning, Your Honor. Thank you for holding this hearing.

This action was commenced by a sitting President challenging news reports published a few months before the 2024 election in order to inform that election. As recognized by another lawsuit brought by the plaintiff invoking the Supreme Court's instruction, this is speech at the heart of the Democratic debate, particularly when involving an election that is accorded the fullest and most urgent application of the First Amendment.

THE COURT: Isn't it also the case that that is a maximum moment of prospective injury if the publication is wrongful?

MS. MCNAMARA: Well, Your Honor, I think that -- I don't know that that would be the maximum moment, because he's not really challenging statements that go specifically to the election, he's challenging historical -- with regard to the book, primarily historical statements that go to his business acumen --

THE COURT: Well, your premise was that it was

immediately before the election and therefore the highest protected First Amendment speech. So my --

MS. MCNAMARA: That's true, Your Honor.

THE COURT: -- my response was just to inquire, isn't it implicit in that premise that it is also a moment of maximum prospective injury in the event that the publication is wrongful?

MS. MCNAMARA: That theoretically could be possible, but here, as a matter of fact and record, the President was elected, so clearly it did not impact his election.

THE COURT: You think --

MS. MCNAMARA: And it's not claimed to impact his election here.

THE COURT: No, that's not a claim that I know about.

MS. MCNAMARA: All right.

THE COURT: That lessened his margin -- there's no claim that it lessened his margin.

MS. MCNAMARA: Yes, yes. Exactly, exactly, Your Honor.

And on this motion, we have established several independent grounds to dismiss the action. But I would like to really begin to focus on the actual malice grounds, which the failure to adequately plead actual malice disposes of the entire action as a matter of law. And I think it's useful to begin by noting what the parties do not dispute. They do not

dispute that on this motion to dismiss, a plaintiff must plead plausible facts sufficient to give rise to a reasonable inference of actual malice. That was made clear in *Michel versus New York Post* out of the Eleventh Circuit in 2016.

Now, plaintiff acknowledges his burden, but he argues it is a low burden, citing to *Bell versus Pollock*, a case out of the Middle District, but he ignores that that case did not involve actual malice and instead involved a private figure, so it doesn't speak at all to the burden associated with actual malice.

THE COURT: Well, I understand the burden of pleading to be less than the burden of proof at trial.

MS. MCNAMARA: Correct, Your Honor.

And when the *Michel* court adopted this burden, it made clear that the plausibility standard was important in a public figure case, because, and I quote from *Michel*, "There are powerful interests in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." In short, there's no dispute that the plaintiff has to plead plausible facts that creates an inference that each defendant subjectively had doubts about each statement when it was published, and this complaint falls far short, we submit.

There's also no dispute that the plaintiff cannot rely on general or conclusory allegations of actual malice that

do no more than recite the standard or that makes sweeping contentions untethered to the facts. Here, most of the allegations fit into that category. He argues in paragraph 2 that the publications were made with actual malice; or in paragraph 45 that they were published realizing they were false or with reckless disregard, which does no more than state the standard; or in paragraphs 50 through 54, he argues that the defendants establish patterns or practices concerning reporting that deviates from typical journalistic patterns and practices. But of course this isn't an objective standard and he doesn't cite any specific facts that tether those allegations to the book or the articles at issue.

Now, he also doesn't dispute the wealth of facts that are evident on the face of the book and the Adaptation Article documenting the extensive news gathering that the defendants identified in support of each of the challenged statements. In other words, the authors showed their work, Your Honor. And plaintiff does not dispute, as expressly reported in the book, that they reviewed over a hundred thousand pages of audited financial statements, tax returns, bank records, general ledgers, legal documents. They conducted hundreds of interviews. And as to each of the statements at issue, they accompany that statement with sources that they're relying on, documents they're relying on, often accompanied by pages, if not chapters, of supporting documentation.

THE COURT: Let me ask you this. I can bring to mind the recitation to which you just alluded that -- I think the phrase was something close to extensive analysis of hundreds or thousands of pages of documents, interviews, and the like. With respect to, let's take for example, the allegation of criminal tax fraud -- let me step back and just make one premise. I think -- I don't think there's a whole lot of disagreement between the parties as to what the standard is, how it applies in particular circumstances of course is under brisk debate, but the generalities that apply here are not truly in much debate. In the Eleventh Circuit's opinion in *Reed* -- Patrick Reed, the golfer case -- the opinion says at one point a defendant's failure to investigate -- and they're quoting Michael or *Michel*. Do you know how to pronounce his last name?

MS. MCNAMARA: I believe it's Michel.

THE COURT: Michel. That would be my guess. I think everybody calls him "Pras."

MS. MCNAMARA: I think that's Jean Basquiat Michel.

THE COURT: "Pras."

MS. MCNAMARA: Yes, yes.

THE COURT: Anyway --

MS. MCNAMARA: You know better than I, Your Honor.

THE COURT: We could know equally little, but you could not know less.

They say, "However, a defendant's failure to investigate, standing on its own" -- that's a phrase that we see repeatedly with respect to a lot of these components -- "standing on its own does not indicate the presence of actual malice." So let's take that as established, that a mere failure to investigate. The immediate following sentence says, "Instead, a plaintiff must show the defendant deliberately avoided investigating the veracity of the statement in order to evade learning the truth." So this difference between a failure to investigate and a deliberate avoidance of investigation based on --

MS. MCNAMARA: That's based on *Harte-Hanks*, Your Honor.

THE COURT: Well, he cites *Michel* for the first sentence --

MS. MCNAMARA: Okay.

THE COURT: -- and he cites the same for the second, but it's available several places. So how is it you think -- what does a sufficient allegation look like with respect to a failure to investigate?

MS. MCNAMARA: Well, I brought up *Harte-Hanks* because that's where that standard out of the Supreme Court came. And what that --

THE COURT: Is that the *Connaughton* case?

MS. MCNAMARA: Yes, *Connaughton*. I always call it

Harte-Hanks.

THE COURT: That's easier to say, so let's go with Harte-Hanks.

MS. MCNAMARA: It is. That's exactly right, Your Honor. I have trouble saying Connaughton, so I say Harte-Hanks.

And I think the facts of *Harte-Hanks* are instructive in precisely answering the question you're raising.

THE COURT: I do too. I've certainly studied it a bit.

MS. MCNAMARA: Okay. Well, there, as you no doubt saw, the reporters there interviewed a number of sources. They did not interview -- they chose not to interview the key sources and, most importantly, they had in their possession audiotapes that they chose not to listen to. And if they had listened to those audiotapes, they would have known the statement was false. That is a perfect example of the clear avoidance of evidence. You have to show that the defendant was aware of information and they deliberately chose not to investigate it and not to review something in their possession.

Here, the plaintiff has not identified a single fact that was in the parties' possession that they chose not to interview, they haven't identified a single witness that had relevant information that the parties did not either interview or chose not to interview. They admit that the plaintiff

was -- interviews of the plaintiff were sought on multiple occasions, and he chose not to respond, not to engage. They admit that is a must now.

Now, the one person they identified, oh, they didn't interview Mark Burnett, the creator of *The Apprentice*, but of course they tried to interview Mark Burnett, and, more importantly, they used -- just as they did with the President, they used multiple quotes from the President that are favorable that reflects his perception of events relevant to whatever is being written, and they use, probably most effectively, the quotes of Mr. Burnett, both from his own books that are cited in footnotes as well as speeches of Mr. Burnett, all of which say precisely what they tried to allege was omitted from the book or the article.

Most specifically, they -- Mr. Burnett is quoted as talking about what incredible charisma the President had, that he made the decision to have him, that he needed him for *The Apprentice*, and that he knew that someone of his stature would not just take the normal rate for working on *The Apprentice*; the deal had to be 50-50. The complaint alleges, oh, these thing were omitted, but then at the same time cites to pages of the book where precisely that language is used and is communicated to readers.

THE COURT: Let me ask this just slightly differently. With respect to the allegation of a criminal tax

fraud, if you have in front of you -- if one has in front of one thousands of pages of income tax returns, financial records and the like, and one is not an LLM in taxation with a specialty in estate and gift tax, does one not know that one both has the means before one to determine whether the scheme was criminal and doesn't one know that you can't make that determination yourself but it can readily be made by a qualified person?

MS. MCNAMARA: Well, a couple of responses to that, Your Honor. First, the standard here is that the reporters had to have subjectively known that that -- the statements were false or that they had serious doubts. And, here, the plaintiff argues, oh, the inheritance statements, they knew that they were never investigated or -- or, rather, that it was never investigated or convicted of fraud and they didn't rely on expert advice, which you are suggesting is, don't you need expert advice.

THE COURT: Well, I'm not suggesting anything. I was just asking you, in the singular circumstance of accusing someone of a tax felony, you have the documents and the records available to you presumably to determine whether you can or cannot know of the existence of a tax felony, and you know that you can't but you know exactly who to ask to determine whether the estate plan, the gift plan, the deductions and the other arrangements are criminal, do you have any obligation to

inquire before you say that they are a tax fraud?

MS. MCNAMARA: Okay. And my response is, again, that the book exposes this precisely. The book -- it is alleged that they didn't have -- they didn't ask -- first of all, they went to the plaintiff, who refused to cooperate regarding these very points, but, second of all, the book reveals on pages 451 and -52 that the authors actually consulted several tax experts. They relied on including a prominent New York estate and tax lawyer for the very conclusions.

But the other critical point with regard to the tax fraud, Your Honor, these all emanate from the 2018 Pulitzer Prize-winning article that was published by the same authors in The New York Times in which the precisely same allegations were alleged concerning what suspected tax fraud -- or what appeared to be tax fraud in the inheritance from his father.

The plaintiff was well aware of that article. The plaintiff actually sued over the article. And we have cited in our papers the decision -- the *Trump versus Trump* decision in which the plaintiff sued the -- his niece as well as The New York Times and the authors at issue in this case. And notably, Your Honor, in that lawsuit he did not challenge the accuracy of any of the statements in that article that is evident on the face of that decision. Instead, he has sued for tortious interference with contract, and that claim against The New York Times and the reporters was thrown out. And even he was

awarded fees, which, surprisingly for this plaintiff, he actually paid to The New York Times several hundred thousand dollars. So he -- in 2018, he brought a suit over these precise same statements. He did not challenge the accuracy.

Now we have six years passing, he never challenges the accuracy of this information and these conclusions drawn by the reporters in the intervening six years, and they republish it in their book, going to him again seeking comment. On that record, Your Honor, we submit that there is simply no basis to suggest that either of these reporters or Penguin Random House would have any doubt whatsoever about the accuracy of this information, and the plaintiff's complaint does not allege any. So hopefully that answers your question, Your Honor.

Now, turning to the handful -- other than that, the handful of the arguments that the plaintiff tries to make to suggest that there's actual malice here, as he puts -- the plaintiff puts considerable weight on the argument that the book's authors relied on the convicted felon Charles Littlejohn who leaked plaintiff's tax returns, but we -- and argues that Penguin Random House knew this because Littlejohn is thanked in the book. But this argument, like the other argument concerning the tax returns -- the estate tax returns, falls apart on inspection.

First, Mr. Littlejohn was not a source of some dubious, incredible story. He was convicted because he

provided their actual tax returns. So these were the real documents, and that's why the man was convicted and sits in jail today. Thus, the facts and conclusions that were reported both by The New York Times originally in 2020 with regard to these tax returns and the book are based on actual, real documents which provides no support that they had any reason to doubt the accuracy of relying on this information. And, indeed, the Eleventh Circuit has made clear over and over that reliance on biased source, even criminal sources, is not evidence of actual malice. In the words of the Eleventh Circuit, there is no duty to find only pure, unimpeachable sources of information.

THE COURT: We're in a courtroom, and just to your left in that box often sit convicted criminals who come into criminal cases and testify against the prevailing defendant, so they are not -- the jury is entitled to know that they're a convicted felon, but that doesn't necessarily impeach their -- or defeat their testimony.

MS. MCNAMARA: Of course, Your Honor. I was going to use that precise analogy. But -- or use the facts of *Berisha*. And *Berisha*, out of the Eleventh Circuit, there the reporter relied on a person who had admitted to fraud, which to me is highly more relevant to their credibility than giving precise, actual tax returns to someone, and that was not sufficient under the Eleventh Circuit.

And then, also, with regard to -- you know, despite elevating Mr. Littlejohn's role in their argument to being the primary source for, it seems to be, all the challenged statements, clearly Mr. Littlejohn's actual tax returns that he provided had nothing to do with the challenged statements of *The Apprentice* statements or the statements challenging President Trump's approach to business, or his business failures, or the statements relating to plaintiff's hiring of people with a penchant for violence. And even with regard to the inheritance statements, as I've already established, the book makes expressly clear that those inheritance statements came from that 2018 article that the President sued over and never challenged the accuracy of. That is clear on the face of the book, and the plaintiff does not and cannot challenge that fact. Thus, for all those reasons, any reliance on Mr. Littlejohn does not move the needle on establishing actual malice.

And also with regard to the inheritance statements and the fact that it's important that the -- the fact that they argue that he was never investigated or convicted, but the book never says he was investigated or convicted, and to the contrary --

THE COURT: The "he" here is Trump? Is that the "he"?

MS. MCNAMARA: Yes, that President Trump was never

convicted. The book never says that. And to the contrary, the book makes clear, and, again, the plaintiff does not challenge that Fred Trump negotiated resolutions to tax audits and investigations into his windfall profits; that's on page 118. And that the other maneuvers, like the taxable gifts masquerading as loans, were unnoticed by the IRS. So there's nothing on the book that suggests --

THE COURT: How does one know whether the IRS fails to notice something?

MS. MCNAMARA: Well, there was no evidence -- there seemingly was no evidence. The President for years contended that his taxes were under audit, now he's immune, but -- or I guess I can't say that. But he -- there's no evidence, there was nothing on the record that the reporters could point to that the IRS had actually investigated or charged or done anything with regard to his taxes, so that's --

THE COURT: Well, that would be true of almost everyone in the United States, would it not?

MS. MCNAMARA: Well, that's true, and that's the point why there's a faulty logic --

THE COURT: So how would you know -- how would anyone be able to say that these things were corrupt yet unnoticed?

MS. MCNAMARA: Well, because you base that on what objective evidence you have in the record. And, again, you give people opportunities to respond. The President would have

had an opportunity to respond --

THE COURT: No, we're talking about the IRS, what the IRS --

MS. MCNAMARA: Yes. But the President would know if the IRS had investigated, if there had been a formal audit. He claimed there were audits, but there was never an indication of any charge or, most certainly, wasn't convicted of tax fraud. That would have been in the public record and would have been known.

Now, turning to the arguments with regard to *The Apprentice* statements, and we would submit that, if possible, these -- for actual malice, these are even more unfounded. Essentially the plaintiff's complaint alleges that the defendants refused or failed to interview Mark Burnett, the creator of *The Apprentice*, or other senior sources involved in the production of *The Apprentice*. And the complaint goes on to identify a series of facts that would undermine the depiction of the events in the book. But of course, as I've already alluded to, each of those facts actually were contained in the book and there was nothing omitted whatsoever that would have given the President's side concerning his achievements with regard to *The Apprentice*.

The book makes clear that they repeatedly -- or the article makes clear that they repeatedly tried to interview Mr. Burnett, and the book makes crystal clear that they

interviewed numerous senior producers involved in *The Apprentice*, including even the president of *NBC News*, Jeff Zucker. All you have to do is read pages 352 to 381 and see the countless sources that support each of the contentions on that, and, as I've noted, all the omissions were included. The book makes clear he was on the Forbes 400 List; that's on page 186, 226, 241, 250. The book makes crystal clear about the success of his book on *The Art of the Deal*, which incidentally was published by Penguin Random House. That's on page 237 and 262. And the book makes clear that he was on multiple prior TV and movie appearances, whether it's *60 Minutes* or the lives of the rich and famous.

But as I've noted, the best evidence that belies the whole argument regarding Burnett is Burnett's own quotes in the book, and you just have to look at page 345 to -46 cited in the first amended complaint to see that Mr. Burnett and his, you know, support and recognition of the President's charisma is well documented.

Now, plaintiff's opposition all but abandons any arguments or claims regarding the business statements and the penchant statement. On the business statements, plaintiff cannot rebut that the book in fact documents plaintiff's rise to fame over literally hundreds of pages with meticulous unchallenged facts as well as the plaintiff's well-established slide, the multiple bankruptcies, the drop from the Forbes 400

before *The Apprentice*.

Instead, in opposition, the plaintiff feebly argues that this -- all of this documentation of his prior success and awards and everything else was downplayed in the book. But that has nothing to do with alleging facts that show that any defendants subjectively doubted what was being reported.

THE COURT: Ms. McNamara, before we go on any further, just let me ask you what your understanding is. What is your understanding of the plaintiff's alleged defamation -- the plaintiff's allegation of defamation against the defendant with respect to this core of issues that we've summarized as *The Apprentice* statements? What do you understand the plaintiff's allegation of defamation to be?

MS. MCNAMARA: I think that what he really -- if giving the fairest reading to the complaint, and I'm not -- and I don't even know that it rises to the level of being defamatory as a matter of law, but I think the plaintiff's contention is that he's chafing at the notion that the book suggests that he was somehow reinvented by *The Apprentice*, when in fact it was his own personal charisma and his own kind of adoption of the "you're fired" phrase, which is credited and identified in the book, that it is his achievement that made *The Apprentice* the success that it is. And the book suggests that it was the creative work of the producers of *The Apprentice* on how they edited and how they did the intro for

*The Apprentice*. I mean, none of this rises to something that, you know, is so difficult for his reputation that it rises to defamation. But to answer your question, I think that's what the challenge is.

THE COURT: All right.

MS. MCNAMARA: And then with regard to the penchant statement, the plaintiff acknowledges and does not dispute that the anecdotes that support the challenged statement are -- he doesn't challenge those, but instead, in opposition, he only argues that this is a sweeping psychological characterization. But, again, that has nothing to do with knowledge of falsity and it also just underscores that it's an opinion and not a statement of fact. So, again, none of these -- these come close to the plausible evidence that any of the business or penchant statement amount to actual malice.

So in the end, Your Honor, I think it's helpful, the Eleventh Circuit has provided useful goalposts, and this kind of gets to a question you were posing before with regard to *Harte-Hanks,* that they have provided goalposts that show what allegations of actual malice will be sufficient to withstand a motion to dismiss and what allegations are not sufficient. And in order to understand those goalposts, I think it's useful to compare the facts of *Michel*, again, *versus New York Post*, and *Project Veritas versus CNN*.

In *Michel*, the Eleventh Circuit affirmed an upfront

motion to dismiss when, as here, the publications documented, the reporters showed their work, what they had done, that they had reached out to the event insiders, they had reviewed the applicable website and the relevant records, and the supposedly omitted facts were in fact included in the work. All of this is the same as what happened here. And there the Eleventh Circuit made clear that the alleged bias alleged by the plaintiff or the use of unidentified sources was not sufficient to establish actual malice.

Now, compare that with *Project Veritas versus CNN* where the Eleventh Circuit reversed the granting of a motion to dismiss. On a record that established that one of the CNN reporters had four days before the challenged report on air had tweeted out the actual correct reason why Project Veritas was kicked off of Twitter, which had to do with revealing privacy information and doxxing, and instead, on the air, stated that they were removed from Twitter for promoting misinformation.

In other words, there, unlike here, the plaintiff presented actual facts alleged in the complaint that presented plausible evidence that the defendant either knew the statement was false or had serious doubts. Here, despite two attempts, the plaintiff does not allege a single fact that the defendants published any of the challenged statements with serious doubts, or in fact any doubt, as to the accuracy of the statements.

So we would submit that, like *Michel* and like *Turner*

and a number of other Eleventh Circuit decisions affirming motions -- dismissals on motions to dismiss, the book itself documents the extensive reporting, the reliance on multiple witnesses, the accurate and real records that they used, the experts that they consulted, and the book includes this very information that plaintiff argues undermines the conclusions.

Plaintiff cites no case to this Court that denied a motion to dismiss on comparable facts. And this is true also with regard to specifically Penguin Random House. They must separately allege that Penguin Random House had serious doubts and that it had no reason -- or should not have relied on these Pulitzer Prize winning, extremely experienced reporters.

They only cite to the Littlejohn, which is of course, as I've already established, doesn't move the needle. And they cite to the fact that Penguin Random House had published a book -- another book that was critical of the President, but they also acknowledge that Penguin Random House publishes thousands of books, that many books that are very pro the President, including his own works, as well as books that maybe are not so much.

So for all these reasons, Your Honor, the first amended complaint should be dismissed, we submit, with prejudice for failure to allege facts that create a plausible inference of actual malice.

Now, I can address some of the other arguments about

failure to allege a statement of fact or opinion are not defamatory. But it might be -- since we're on actual malice, if I want to turn it over to Mr. Hentoff to be able to do that, unless Your Honor wants me to address those other issues now.

THE COURT: No, that's fine. If Mr. Hentoff would like to be heard, we'll let him speak now.

MR. HENTOFF: Thank you.

MS. MCNAMARA: Thank you very much, Your Honor.

MR. HENTOFF: Good morning.

THE COURT: Good morning.

MR. HENTOFF: May it please the Court, also, we have one other person here on behalf of The New York Times, New York Times counsel Alexandria Settelmayer is here as well.

THE COURT: Welcome.

MR. HENTOFF: So I will also focus on the insufficiency of the complaint's actual malice allegations as to the Adaptation Article and then as to something we haven't talked about at all yet, which is the Survey Article that Peter Baker wrote. And as an Adaptation Article that ran in The New York Times, Ms. Craig and Mr. Buettner have been sued, and we are also representing them in that capacity. And The New York Times's position is a little different from Penguin Random House, because The New York Times is an employer of Ms. Craig and Mr. Buettner, therefore state of mind gets imputed under the doctrine of *respondeat superior.* So, whereas Ms. McNamara

was talking independently about Penguin Random House's state of mind, my argument is really just about what Ms. Craig and Mr. Buettner knew, and that applies also to The New York Times, and the same goes for Mr. Baker. So I will not -- you know, there is a lot of overlap between the allegations against -- against the book and against the Adaptation Article, and I will do my best to not repeat or belabor anything that Ms. McNamara has already said.

One thing I do want to add -- you know, Ms. McNamara -- Your Honor asked Ms. McNamara about what's an example of a purposeful avoidance claim that would get past the Iqbal/Twombly requirement in the Eleventh Circuit. And I was thinking of the same example, because purposeful availment is not some separate requirement from the requirement to sufficiently allege actual malice, it's a part of it.

So as we know, the shorthand for actual malice is knowledge of falsity or reckless disregard. But as the Supreme Court in *Michel* say specifically -- and actually the test is like all sorts of terms of art. Actual malice is a term of art. Reckless disregard is a term of art. It actually means subjectively harboring serious doubts about falsity and publishing it anyway, and so therefore purposeful avoidance of the truth is a species of that. It still has to be subjective -- serious subjective doubts. And the purposeful avoidance test is -- in essence, it's been described as the

defendant's on the verge of finding out that it's false and intentionally stops.

A lot of plaintiffs, when they cannot sufficiently allege allegations of knowledge of falsity or serious substantial -- you know, serious subjective doubts as to falsity attempt to make allegations which they call purposeful avoidance. But in a number of Eleventh Circuit cases, including *Michel*, the Court is very clear about how difficult it is to allege purposeful avoidance. That doesn't mean that --

THE COURT: But we know that *Connaughton* satisfies the test, right?

MR. HENTOFF: Yes, that's a very unique set of circumstances in that case.

THE COURT: Well, and as I discussed with Ms. McNamara, there were two things the court pointed to there, the failure to interview Ms. Stevens, and the failure to listen to tapes.

MR. HENTOFF: Yes. And --

THE COURT: There's no statement in there that it -- or maybe there is -- I'll ask it in the form of a question. Is there a finding in there that the publication was with actual knowledge of the truth or falsity or that they entertained reasonable doubts about the facts?

MR. HENTOFF: In that specific scenario, that is a

way to establish subjective doubts. However, the facts -- there are more facts in *Harte-Hanks*, because this wasn't simply a failure to do something.

THE COURT: There are a lot of facts in *Harte-Hanks*. That's quite the little local misadventure, isn't it?

MR. HENTOFF: It is. And among other things, the reporters learned from other people that there were reasons to doubt this person and that the tape would show it. And then the defendants made a decision to not listen, and that makes it a pretty unique case and not remotely what's been alleged here.

THE COURT: Isn't what the court talked about as distinguishing there were other factors that suggested malice, such as the competition with another newspaper, the opposition to the candidacy and that it was favorable toward another candidate? So that combined with the failure to check an obvious and available source, they seem to have found that that was sufficient in that circumstance. And they list some other factors. I think there were four other things that they list in that opinion.

MR. HENTOFF: Yes. And there are -- there are a number of allegations that can provide a minimal iota of support for actual malice, but there has to be sufficient allegations taken together for a reasonable inference that the defendant knew what they were saying was false or subjectively doubted it, and it's not easy to do via the *Harte-Hanks* route.

So I think it might be efficient for me to go to the plaintiff's opposition brief which marshals the evidence from the complaint. And I'd like to respond to some of the things in the opposition brief with a focus on the Adaptation Article and then the Survey Article as well. I think I'll just take them together and go through the --

THE COURT: Before we go on, I mentioned that these other factors in *Connaughton* or *Harte-Hanks*, including the competition that is mentioned, the desire to beat the Cincinnati newspaper to the story, or maybe it was the other way around, I don't remember, and the institutional favorability toward one candidate and opposition to the other candidate -- I mean, they're obviously looking to contextual circumstances there. Do you have any guidance as to when and under what circumstances and to what extent it is proper for the district court to look to contextual circumstances like that?

MR. HENTOFF: I think it's always proper for any court evaluating the sufficiency of the allegations of the complaint to look at context. However, there's a lot of guidance from the courts, including a number of Eleventh Circuit cases, about what allegations are sufficient to support a reasonable inference.

Speaking of a lot of facts, the *Michel* case goes on at some length about a number of different types of allegations

that the plaintiff made there that were insufficient to carry the burden. And so I think -- I guess what I would say is the Eleventh Circuit has an unusually rich vein of Eleventh Circuit cases on this very issue and I think they provide a lot of guidance on the issues that are presented today.

THE COURT: Well, you cite three of them. I think -- and we've discussed all three of them already in the first two or three pages of your response -- of your motion, excuse me, *Michel*, *Reed*, and whatever the other one is. I know there were three of them.

MR. HENTOFF: There's more --

THE COURT: That certainly is a formable headwind for the plaintiff in this circumstance.

MR. HENTOFF: And there are more, which we do cite also in the brief.

So I'm looking -- if I can proceed.

THE COURT: Absolutely. Of course.

MR. HENTOFF: So I'm looking at page 21 to 24 of their brief, and I'm not going to read four pages, but this is where the first of two places where the opposition brief says it's going to marshal the sufficient allegations of actual malice.

The first is the argument about the reliance on Charles Littlejohn. I'm going to skip that and rely on what Ms. McNamara said.

The second is the alleged failure to interview Mark Burnett, who might have said something different from the -- on-the-record producers who made various comments about the -- about President Trump and *The Apprentice*. So there, I think, that really is -- that's defeated by *Harte-Hanks* and its progeny. It's not good enough to say someone should have tried harder to get an interview when it was undisputed that they did try to get an interview.

For example, there's not a factual allegation that the reporters pretended to try to interview Mark Burnett. That's not an allegation in this complaint. So not getting the interview -- even putting aside the speculation that Mark Burnett would have -- might have said something different from the people who were talking about what they saw, that's an insufficient allegation under *Harte-Hanks* and its progeny.

So the third of the four points on these two pages is the allegation that The New York Times maintains documented internal practices that result in coverage deliberately departing from accepted journalistic standards, writing about plaintiff in an antagonist and negative manner. And I would say that captures a suite of insufficient allegations that are well -- you know, well established to be insufficient allegations.

First of all, it's well established that a conclusory allegation that the defendant lied about the plaintiff or had

subjective doubts is insufficient. So it's also insufficient simply to say there's a policy of lying, there's a policy of having subjective doubts. That doesn't change the conclusory and general nature of the allegation.

Next, citing the complaint, the opposition says The New York Times itself has acknowledged moving, quote, closer than it has ever been to being oppositional in its Times coverage as an allegation that's marshalled here as sufficient allegation of actual malice. That's a citation to the complaint, and the complaint links to a New York Times media reporter writing in a column in 2016. And I'll just say that one can read that column for one's self.

This is not an accurate quotation of what that media reporter said. He was not talking about his employer, The New York Times, and that it had become oppositional to, at that point, Mr. Trump. He was not President yet. Rather, it's sort of a think piece where he talks about a hypothetical reporter and how might this reporter report on the 2016 Republican candidate. So this too does not -- is not a sufficient allegation of actual malice.

Next, the opposition cites *Curtis Publishing v. Butts* --

THE COURT: Well, since you mentioned it, is it something that echoes the *Harte-Hanks* reference to the opposition to the candidate? Is it that sort of factor? It is

not itself either sufficient or direct evidence of the necessary state of mind but it is relevant to context to -- in that sense -- in the sense of *Harte-Hanks*?

MR. HENTOFF: Yes, I agree, Your Honor, and in the sense of every actual malice case, not simply *Harte-Hanks*, context is very important. But as we know, ill will, bias, bad intent are insufficient to establish actual malice. And, again, as the *Michel* court says, what we're looking for is, are there sufficient allegations for a reasonable inference of this high standard of actual malice.

THE COURT: Well, I agree that there are many quotations from a lot of the cases saying that any number of factors is insufficient on its own, but the "on its own" is often not the case. It's not on its own, as it was not on its own in *Harte-Hanks* and in other cases. So I guess the unanswered and perhaps unanswerable question is, how many things that are not sufficient on their own, if combined, are sufficient to create a plausible inference sufficient for a motion to dismiss -- the denial of the motion to dismiss?

MR. HENTOFF: I think that, Your Honor, that is the question. And we have other Eleventh Circuit cases, like the *Turner* case, that do address a number of different allegations and then look at them in that context.

And I keep stopping myself from saying this, so I'm just going to say it so I can move on. So within our firm,

Williams & Connolly, there's a famous story about Edward Bennett Williams arguing before the D.C. Circuit about whether some piece of information is sufficient -- in that case it was after trial, so it was sufficient to prove actual malice. And according to the story, he practiced for a long time his spontaneous response if he got the question. And the question was, is this admissible evidence of actual malice? And he said, apparently, with a very effective flourish, it is subject to admission but to the cheapest seat in the house. And I only said that so I can move on. So --

THE COURT: Well, I'm glad you're more comfortable now.

MR. HENTOFF: So plaintiff's opposition also cites *Curtis Publishing v. Butts* for the proposition that an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers may support actual malice, and that's a plurality opinion from 1967. And I would just direct the Court again to *Harte-Hanks*, which has a discussion of that plurality opinion from about 20 years earlier, and the *Harte-Hanks* court says that's not a majority rule. The majority rule is that even an extreme departure from professional standards is not evidence of actual malice.

THE COURT: By itself.

MR. HENTOFF: Well, also by itself. But I would also say, in looking at all of the factual allegations of actual

malice in this complaint, they do not actually allege an extreme departure from journalistic sources.

You know, another interesting thing about *Michel*, and it's not the only case that does it, but it points out -- well, you can see a lot about what happened in the article by reading the article, and the plaintiff is not saying that these things didn't happen. So it's true -- I'm going to talk about the book just for a moment. It's true that there are only 22 statements from the book that are -- that are alleged. But as Ms. McNamara showed, there's so much more in the book that showed all the effort that these journalists did both in the book and then in the adaptation.

So the final point here in the opposition brief is that -- oh, it's an allegation about -- Ms. McNamara talked about that with regard to the book about the undisputed facts that President Trump and his father were not, you know, charged for tax schemes, tax evasion. My only point there is that is not part of the Adaptation Article. So to the extent that that argument has any weight, it does not apply to either the Adaptation Article or the Survey Article.

So there is one other place on pages -- hold on one second -- oh, on pages 21 and 22 of the opposition brief where the brief marshals five statements to support their allegations.

So the first is also the Charles Littlejohn point,

which I'm again going to skip.

Second, defendant refused to interview Mr. Burnett. I will say this now is an exaggeration from the complaint. The complaint does not say the defendants refused to interview Mark Burnett, the complaint says they didn't sufficiently pursue it. It said the complaint would control there.

The third point is these alleged anti-Trump policies of The New York Times, and those are set forth in the complaint. And I would say about that, as I've said, these are conclusory allegations of bad, ill will, or not taking President Trump at his word. In addition to it being conclusory, none of those alleged policies are actually alleged to have been implemented here to undermine the defendants' state of mind as to the nine statements that the plaintiff sues over with regard to the Adaptation Article or the three statements that they sue over with regard to the Survey Article.

The fourth I skip again, because this is about no evidence of criminal charges against President Trump or his father.

And the fifth is omission of the undisputed facts regarding President Trump's demonstrated business success and global brand recognition. I would say that fifth point does not undermine the specific statements in the Adaptation Article about what producers on *The Apprentice* observed or about the

reporting on a particular sale of properties from a trust.

President Trump has undoubtedly had great business success and global brand recognition, but they do not undermine the state of mind of the reporters when they addressed -- when they wrote the Adaptation Article and the Survey Article.

So I'd like to talk about the Survey Article. I have a couple of points to make about it. The first is, as we can see from Eleventh Circuit Rule 12(b)(6) cases that we cited in our brief that relying on prior published materials tends to cut against an allegation of actual malice. In addition, everything that's challenged in the Survey Article, and, indeed, everything in the Survey Article is an examination of prior controversies that have already generated a lot of publicity and a lot of coverage.

So Peter Baker was not coming new to anything. In fact, the entire premise of the article was, it's remarkable that we have a former President who's on the verge of becoming President again, who has survived dozens of scandals and accusations and investigations that would have derailed anyone else and they hardly seem to slow him down. There are literally dozens of controversies, scandals, accusations that are covered in that article. The plaintiff pulls out three of them but does not allege that Peter Baker subjectively believed them to be false.

So there really -- particularly there, it's difficult

to see why a news organization should not be allowed to write about the many controversies surrounding a presidential candidate before the election, and there's not an allegation that Mr. Baker got the prior public reporting wrong. It seems to be an allegation about the underlying facts that the plaintiff disagrees with.

So, I guess, unless the Court has any questions, I would just close with what I think the judge -- with what Your Honor started with, which is, if the statements are consequential before an election, isn't the harm also consequential. That's a paraphrase. And that's probably true. A lot of consequential things are said about President Trump, a lot of consequential things are said by him, probably a thousand of them have happened while we were sitting here. This is a very consequential person.

The balance between those two interests, I would submit, has been drawn by the Supreme Court in *Times v. Sullivan* and by the Eleventh Circuit, most notably, in the *Michel* case. Because there are two concepts from *Times v. Sullivan* that *Michel* picks up on, and that is breathing space for free speech and chilling effect. And *Michel* is a modern case in that when the Supreme Court decided -- this is before my time -- when the Supreme Court decided *Times v. Sullivan* in 1964, my understanding is a lot of times litigation was, we have a box of documents, will you take a look at them?

The active litigating is so much more expensive now than it was when *Times v. Sullivan* was decided. And the *Michel* court recognized that and said you can defeat the breathing space and have the chilling effect that *Times v. Sullivan* talks about if a case gets past a motion to dismiss and into expensive discovery. And I would submit that a grand Survey Article before an election about all of the things that President Trump had gone through to get there is something that is deserving of that breathing space and should not be chilled.

THE COURT: All right.

MR. HENTOFF: Thank you, Your Honor.

THE COURT: Thank you.

Before -- we've been in session a little bit more than an hour. Before I ask Mr. Brito to stand up for a second -- and begin a second hour, why don't we take just about a ten-minute recess and everyone can refresh themselves, and then we will come back and I'll recognize Mr. Brito for his argument.

So we'll be in recess for about ten minutes.

(Proceedings in recess from 10:06 a.m. until 10:17 a.m.)

THE COURT: All right. Please be seated, one and all.

Mr. Brito, you are recognized to approach the lectern and be heard on your response.

MR. BRITO: Thank you. And good morning, Your Honor.

THE COURT: Good morning.

MR. BRITO: May it please the Court, I am, once again, Alejandro Brito and Jalaine Garcia on behalf of the plaintiff, President Donald J. Trump.

Your Honor, the defense, as you heard from the very outset, wants this hearing to be about politics, and they also want it to be about the First Amendment in an abstract format. But in reality, Your Honor, this case is far more straightforward. It's really hinging -- this hearing in particular is hinging on one narrow question that we need this Court to answer, which is whether the amended complaint has sufficiently pled enough facts to make our defamation case plausible on its face, and I think we've sufficiently done that. And I want to go through that with the Court, because there is a deliberately low bar that needs to be employed for purposes of establishing whether or not plaintiff has met its burden today.

THE COURT: Before we go on, can I ask a couple of things?

MR. BRITO: Yes, Your Honor.

THE COURT: Earlier in the case, we had some prescribed stipulated discovery on venue, and there was a motion to stay discovery otherwise in response to that, and I denied that motion to stay discovery otherwise. Have you conducted -- have the parties conducted discovery?

MR. BRITO: No, Your Honor.

THE COURT: Am I correct that there's no restriction -- that that -- you are at liberty to do that?

MR. BRITO: I believe you're correct, Your Honor.

THE COURT: I have it at Docket 70, I think is an order, unless I'm missing something, I'm authorized -- or at least denied a stay of discovery.

The other thing, just -- and I'm not isolating this or picking on you, I just have this on my list that I wanted to get to, so I'm going to get to it early. On page 16 of your response, you say, at the top of the page, "Despite conceding that the tax planning and structuring exhibited by President Trump and his father was lawful," and you cite ECF 44, which is the defendants' motion at page 20, "defendants mischaracterize such activities as 'fraudulent tax evasion schemes' and 'likely tax fraud'," and then you cite to Document 9 on the docket.

I looked at page 20 of Document 44, and I honestly don't see that concession. And I was wondering if I'm misreading it, if you misread it, or if there's a typo there or what.

MR. BRITO: I'm trying to track where Your Honor is reading from.

If I may, Your Honor, my colleague was gracious enough to correct me with respect to the previous question relating to discovery. We had exchanged written discovery

requests between the parties, but that's the extent of the discovery.

THE COURT: Other than venue?

MR. BRITO: Correct. There has been an exchange of written discovery requests, but no depositions beyond the venue issue.

THE COURT: I didn't mean to ambush you here on this. Maybe I should have mentioned it earlier and given you a chance to respond. But if you would -- before the hearing is over, or even after it, if you want to just file something or send us an email, let us know whether -- I was wondering -- I don't see that concession and I was wondering if it is somewhere. I don't mean to hold you up. We can do this later.

MR. BRITO: I'll have my colleague maybe read more on that while we advance, if that's okay.

THE COURT: All right. The reference is, in your Document 81, to page 16, and that's at the top of the page, and the reference is to the defendants' Document 44, page 20, just for your staff's benefit -- or colleague. Again, I didn't mean to throw you off, I just wanted to get that out there.

MR. BRITO: That's not a problem, Your Honor. I'll have Ms. Garcia take a look at that and I can come back to that if that's okay with the Court.

THE COURT: Yes, sir.

MR. BRITO: Thank you, Your Honor.

And so, Your Honor, just to reiterate, I think at this point one thing that I'd like the anchor the Court to when we address the arguments that have been raised by the defendants is that at this stage the Court is not to resolve factual disputes. I know the Court is aware of that --

THE COURT: Yes.

MR. BRITO: -- and I don't want to obviously belabor an obvious fact. The reason I bring it up is because much of the arguments that were raised in the motion to dismiss and some of those that were argued before you this morning seek to have the Court do exactly that. And Your Honor asked a very pertinent question, how much can the Court contextualize the allegations, how much can the Court consider for purposes of combining the factors for purposes of engaging in the actual malice consideration.

And valid questions that courts have struggled to answer with any clear line -- and I know that the Court had mentioned that there were certain cases that the defendants had raised in their opposition -- I'm sorry, in their motion to dismiss -- pardon me -- that provided some headwind, and I think one case that's very recent and is within this courthouse which gives some scope and gives some clarity with respect to what the Court should be looking at during this stage of a motion to dismiss is the decision from Judge Barber, Your Honor, of last year in the *Trump Media & Technology Group*

case *versus The Washington Post* on a motion to dismiss, which was entered on June 6, 2025. And I don't want to get too far afield from it, but I did want to at least give the Court that citation, because I'm going to reference it back as I go through my presentation, because there's certain elements of it that I think are not only instructive to the issues but are responsive to some of Your Honor's questions that you posed to counsel relative to what I just articulated in terms of, where do we draw the line, how far can the Court go at this stage based upon simply the allegations of the complaint.

And I think the long and short answer is, there's much ado that's been made in other cases about trying to distinguish defamation claims from other claims at this stage, and I think that that's running a little bit far afield from what the Court has already acknowledged, which is, we're here on the allegations of the complaint, are they alleged sufficiently to simply meet the standards that the law employs.

And so, you know, every time that I would hear not only -- or read but also hear my colleagues talk about, well, the book says, or the reporting showings, or it's widely reported, that term -- or those terms, I would posit, Your Honor, that they're asking the Court to weigh evidence in doing so and asking the Court to resolve factual disputes in terms of, well, the allegations of the complaint state X, and the book shows or the reporting evidence is something else, and

I don't think that that's an appropriate argument for the defendant to be raising at this stage.

So for me, as the representative and the attorney for the plaintiff, the roadmap that I believe the Court should follow is simple. I think the Court -- what I intend to show the Court is that we have plausibly alleged the three elements that are being challenged by the defendants here, which is actual malice, falsity, and special damages. And the statements that have been alleged are neither a privilege and they're certainly not opinion based upon the allegations of the complaint.

I'd like to deal with the actual malice argument, because that was the thrust of Ms. McNamara's argument and certainly what's been filed. I want to at least establish some consistency with the arguments that I heard with respect to the standard, and I want to make sure that it's obviously clear to the Court I'm not here to prove actual malice, I'm here to simply follow the *Michel* standard, which a public figure plaintiff has to allege facts sufficient to give a reasonable inference of actual malice, not direct proof, plainly that's the case.

In the *Veritas versus CNN* decision, the Eleventh Circuit, in 2024, also could not have been any more clear in terms of what the standard is that my complaint is being held up to, which is that the plaintiff need only allege sufficient

facts to permit the inference that the defendant published with actual malice. And I think that the complaint does that even though the defense argues that what we have done in the amended complaint is to essentially allege the kitchen sink and to allege conclusory allegations.

I think those characterizations collapse the moment the Court looks at what was actually pled. And we have -- as Your Honor has I'm sure read, we've pled at least five concrete independent categories of conduct, and the law is clear that those are to be assessed together as opposed to be picked apart one at a time, which is what the defendant would ask this Court to do.

And one of things that stood out to me in this morning's presentation, Your Honor, was the falsity component, when, in reality, there was two methods by which actual malice can be viewed, either that the defendant knew that the statement was false or that it was published with reckless disregard for whether it was true. And I know that counsel spoke to that and mentioned it, but the bulk of the argument was really focused on whether or not the defendants knew the statements to be false. And the *St. Amant versus Thompson* matter from the U.S. Supreme Court in 1968 talks about actual malice and the reckless disregard standard as being the one that this Court can employ at this stage.

I'd like to start with what I think is one of the

strongest facts and allegations in the complaint with respect to this issue of actual malice, and that's the one element that has no real answer from the defendants at this point, which is the involvement of Charles Littlejohn. Mr. Littlejohn, in the book itself in its own acknowledgments thanks Mr. Littlejohn as, quote, an earnest and brilliant young man who came to us willing to risk his liberty. That's the defendants' own words in their own publication about this gentleman.

I appreciate the fact that not every convicted individual is subject to scrutiny, but I believe in light of the allegations and the actual reasons for Mr. Littlejohn's conviction -- and at this stage of the allegations in this complaint, this is one of several factors that I do think lends in favor of the denial of the arguments that are raised by the defendants, because the timeline of the events is important, and I think we raised this in our opposition to the motion to dismiss.

Mr. Littlejohn was charged with a felony on September 29, 2023. The book was published on September 17th, 2024, nearly a year later, crediting him with what I just read to you and lauding his praise. And so the defendants knew or, again, relying upon the established standard, should have known that they were relying on a source who had criminally and unlawfully disclosed President Trump's private tax records. I think that it's one of several factors that the Court should

consider, primarily under the *Harte-Hanks* decision, which has been discussed at some length. I'd like to just quote a certain part of it.

It says, quote, recklessness may be found where there are obvious reasons to doubt the veracity of the informant. And so, again, I appreciate that we don't single him out and that be the only factor in this case. There are multiple factors, and there's multiple factors, this being one of them, that the reliance upon the -- Mr. Littlejohn.

The book doesn't disclaim or articulate what Mr. Littlejohn was or was not relied upon for purposes of the statements. And that's going to be true of the arguments that have been raised with respect to reliance upon and communications and interviews with others who were involved either with NBC, with *The Apprentice*, any of that. There's no attribution or lack thereof from any of these sources for the challenged statements. We're talking about books and articles, Your Honor, that have multiple pieces of information.

As my colleague stated, President Trump is somebody who communicates frequently, and so there are a lot of things that have been said about him in these publications, but there's no direct tie between the individuals that the defendants claim to have spoken to and the defamatory statements. There's a missing link there that they can't serve to fill in through argument before this Court on a motion to

dismiss. And so that's a factor that weighs against their reliance upon any of these individuals, inclusive of Mr. Littlejohn, whether or not they choose to acknowledge it or not.

THE COURT: It struck me, at least one of the things that I believe Ms. McNamara said was, there is a distinction between reliance on Littlejohn, that is, a statement he might make, and use of documents that he provides. In other words, if you look to the content of documents that he provides and the documents that appear to have the badges of authenticity and genuineness, you are not relying on Littlejohn, you are relying on the material that he has provided you. In this case, if I understand correctly or remember correctly, at least some income tax returns of either the plaintiff or the plaintiff's businesses.

MR. BRITO: I think you captured Ms. McNamara's argument correctly and appropriately, Your Honor. But there's assumptions that are being made there with respect to whether or not the only information relied upon by these defendants was the actual records, or was it the records as represented or provided to them by Mr. Littlejohn in some form or fashion that rendered those documents incomplete or misleading, or they spoke to Mr. Littlejohn in addition to reviewing the information that was there. We are presuming, based upon Ms. McNamara's argument and nothing more, that the totality of

the records that President Trump had filed with the IRS were provided or that accurate versions or that complete versions.

None of that is something that I think any of us are prepared to be able to accept or agree in light of Mr. Littlejohn being somebody who, I think the law states, we all have obvious reasons to doubt his involvement in this process. And the fact that he is not only being thanked by the defendants, it stands to reason -- and, again, now I'm -- in answering Your Honor's questions and addressing counsel's argument, I feel as if I'm going a little bit too far afield from the parameters of a motion to dismiss in surmising the fact that Mr. Littlejohn was thanked in the book stands to -- it stands to reason that he provided simply more than documents for purposes of the reporting, but at this point in time we don't know.

And so that, again, weighs against the defendants' contention that they would like this Court to simply believe, well, the reporting only relied upon actual documents provided by Mr. Littlejohn that he stole from the IRS. We don't know that, and that's not what the complaint alleges action and so we can't make that inference at this stage.

In one of the arguments that they raised --

THE COURT: Before you go on from that point, and I don't want to make too fine a point of this -- I understand the statement that you've made -- is there an allegation of

reliance on some statement by Littlejohn apart from the contents of the purloined tax returns?

MR. BRITO: No, there isn't. I want to be very transparent with the Court, because we did not have the benefit of that information at the time of the filing of the amended complaint to know --

THE COURT: Which information?

MR. BRITO: Whether or not there was any reliance by the defendant upon any statements made by Mr. Littlejohn. We wouldn't know. We wouldn't be privy to that information at this stage. We believe that in discovery that information is certainly going to be reflected in the business records of the defendants. If we interview or depose Mr. Littlejohn, there could be a host of information that would be able to answer Your Honor's question. But I want to be transparent at this stage of the pleading, we can't make that good faith allegation, because we certainly don't know, other than what we read in the publications, which is thanking Mr. Littlejohn and the fact that there's these numerous allegations that are made about the tax fraud components that Your Honor has already raised in your inquiry of the defendants.

THE COURT: Well, is it a fair inference from the complaint that the -- some of -- at least some of the defendants relied on the contents of the documents that Littlejohn --

MR. BRITO: Absolutely.

THE COURT: -- provided?

MR. BRITO: Yes. Yes, I think that's a fair --

THE COURT: And there is no allegation in the complaint that they relied on any other statement -- any fact for which Littlejohn was the primary source of information.

MR. BRITO: Not only is that not laid out in the complaint but also in the publications themselves, I don't think it points to a direct attribution with respect to the defamatory statements that we are raising in this case that stem from the tax returns or the financial affairs of the President, correct.

The other element of actual malice is the issue of purposeful avoidance of the truth, and that really stems around the defendants' refusal to engage with Mark Burnett. And obviously, based upon the narrative that's laid out as it pertains to *The Apprentice*, Mr. Burnett is the central figure in that entire narrative, and he's the producer at the heart of the book's thesis that the show, quote, created a version of Donald Trump that might have been nonexistent, and, quote, was a second inheritance. We don't merely allege that --

THE COURT: Is that the defamatory component?

MR. BRITO: That's the sting -- to use the term of art that some of these cases employ, that is the sting of the defamatory statement is the fact that they're trying to create

either -- they're trying to have the reader conclude that the President's business reputation, professional reputation, his business success --

THE COURT: Did not preexist *The Apprentice*.

MR. BRITO: -- was essentially falsified, inflated, was a construct of imagination, all of those things, yes, Your Honor. And so --

THE COURT: Is there some distinction here between the public perception of the plaintiff's business reputation before *The Apprentice* and the actual state of affairs? Are you saying that the defense -- excuse me. Is there a distinction of importance here between what the defendants said was the actual state of the plaintiff's business and professional reputation and status and the public perception?

MR. BRITO: No. If I understand Your Honor's question, we don't do -- and I'm going to put it in my words, I'm going to dumb it down, because I won't be able to say it as articulate as you, Your Honor. Did we allege a look back, if you will, to the public's perception of President Trump before the publication of the book and weigh that against the public's perception post-publication? No. What we've alleged is a little different, it's a little bit more focused on the impact to the reader at the time of the publication, which is really what's necessary for purposes of the defamation claim, to try to defame, denigrate the President's business reputation. What

we did is --

THE COURT: As of the date of publication.

MR. BRITO: As of the date of publication. Our look back was the -- it's somewhat akin to what Your Honor is asking me in terms of what the public perception was prepublication, versus post-publication. We don't articulate it in the words that Your Honor asked, so I don't want to overstate it. But we certainly are taking the position that the publication, in stating that the President didn't have the business success that he enjoyed and that *The Apprentice* essentially created a scenario that the President never enjoyed prior to that, as it relates to professional reputation, business success, all of that -- all of those elements of his branding, his name, and his business reputation, what we allege is that existed -- and that's the reason for the falsity of these statements is that these statements that the defendants are making that those elements never existed and they were only created because *The Apprentice* sought out the President and created something that, quote, the President would not have had otherwise. That is essentially the look back that we're establishing in showing the dichotomy between what is true and what was being represented in the books.

Did we go back and say that the public's perception of the President was A, B, C, and D? I don't think we alleged it in that fashion, but I think you can reasonably infer from

the allegations that what we're saying is that, as of the time of publication, there was a standard, there was an understanding as it pertains to the President that this book sought to demean, diminish, and defame by claiming that it was a construct of fiction and that the President never really had this business success that he actually did have.

So that's a long-winded answer to your very short question, Your Honor, but I think that's the best way for me to approach it in terms of what the amended complaint alleges.

THE COURT: All right.

MR. BRITO: With respect to Mr. Burnett, we heard a failure to investigate. We don't allege merely that the defendants failed to investigate. I want to be precise here, because the defense tries to conflate some issues under *Harte*-Hanks. The court stated, quote, although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is a different category, closed quote. And that's exactly what we've pled in this case, Your Honor.

And specifically this 50-50 profit split deal that has been alleged in the complaint between Mr. Burnett and President Trump, that's a fact that the book itself reports. It plainly talks about the existence of that arrangement, which we refute this, quote, unquote, passive beneficiary thesis that the book thereafter tries to employ saying that the President

was this beneficiary of the good graces of Mr. Burnett.

You certainly -- and this could be reasonably inferred from the allegations, you don't give somebody half of the profits for contributing nothing or being just somebody that's along for the ride. And rather than reconcile that contradiction in the book, what the defendants do is they bury this issue with regard to Mr. Burnett and the purposeful avoidance in a footnote. And the fallback argument that they do employ is that they invited, quote, unquote, Mr. Burnett to speak to them, and he declined, and that we must plead exactly what Mr. Burnett would have said had he actually provided a response to their inquiry or given them an interview, and that misstates our burden as a matter of law, Your Honor.

Under *Veritas*, we only have to allege sufficient facts to permit the inference that if they had spoken to Mr. Burnett, if they had done what a reasonable journalist would have done, as well as take into consideration his prior statements, which they had access to, referred to, and made reference to in their publications would establish that what they were doing here was purposely avoiding the truth of the relationship, the truth that we get back to the harm to the professional reputation that Mr. Burnett in the book itself acknowledges the value that President Trump had and brought to this relationship.

The defendant tries to utilize that to say, although

we said some really terrible things -- my words, not theirs -- we said some really terrible things about the President on page 20, we said some other really nice thing on page 60. That doesn't serve as a basis to defeat what they said on page 20. And that's just simply -- to argue that is simply not well taken with regard to essentially speaking out of both sides of their mouth.

They know and they have the information from Mr. Burnett as to the genesis of the relationship, but yet at the same time they paint this picture that the President was a lucky -- you know, as they refer to him a lucky loser and a beneficiary of Mr. Burnett's good graces. And the reason why that's important is not hurt feelings. Why it's important is because of the fact that it damages the President's business reputation that he has had and has developed for a significant period of time. They're making direct defamatory statements that demean the President's business reputation in doing so.

And I think I mentioned this earlier, Your Honor, and I apologize if I repeat myself, there was an argument that was raised by counsel with respect to the number of other individuals within NBC that they spoke to. This does not address what we're arguing here today and what we've alleged in our amended complaint with respect to the purposeful avoidance of speaking to Mark Burnett given the fact that Mr. Burnett is the person who would be able to speak to the relationship, the

reasons behind the relationship, the structure, the value the President brought, the reasons why the President was selected to be part of this business venture. Speaking to other executives is not a replacement in terms of defeating the purposeful avoidance argument.

The third component, Your Honor, is the fact that --

THE COURT: I'm sorry. Say that again.

MR. BRITO: The argument that -- in sum or substance, the argument that was raised by the defendants that they believe obviates the need for the Court to consider, this purposeful avoidance of Mr. Burnett is that they spoke to other NBC representatives.

THE COURT: Yes.

MR. BRITO: And they make reference to it -- you know, they mentioned a litany of individuals, but there's two problems with that argument. The statements that we have alleged in the amended complaint that we claim are defamatory as it pertains to the relationship between the President and *The Apprentice*, there's no attribution from any of the individuals that they claim that they have interviewed with respect to those false and defamatory statements. There's nobody that they can pin that to, number one.

Number two, the person who would be able to either corroborate or completely refute the statements is Mr. Burnett. He's the one that was involved in the formation of the

relationship and can speak to the reasons why the President was selected, the value that the President was bringing to this business venture, all of the things that would have completely eviscerated the defamatory statements in the book they purposely chose not to either fully quote Mr. Burnett in his prior communications that were either documented or they had access to or make a reasonable journalistic effort to interview him at that time.

THE COURT: All right.

MR. BRITO: The next thing is, in the complaint, we allege the documented internal practices which depart from journalistic standards by these defendants. And The New York Times maintains that, you know -- or at least we've alleged, and we do so with specificity, that The New York Times has maintained internal practices about writing about the plaintiff in an antagonistic and negative manner. We believe that they've deliberately ignored potentially positive and exculpatory sources, they've published negative false claims about him based on anonymous sources without verification.

And as Mr. Hentoff was speaking to you about, The Times acknowledge that it was moving closer than it has ever been to being oppositional in its coverage of President Trump. I appreciate Mr. Hentoff's explanation, but that explanation is for another day. That is not an appropriate consideration for purposes of a motion to dismiss as it relates to --

THE COURT: You cited the article.

MR. BRITO: I did.

THE COURT: And you linked to the article.

MR. BRITO: I did.

THE COURT: Including the contents of the article.

MR. BRITO: Correct.

THE COURT: And the content of the article, do they say that The New York Times is assuming an oppositional position to the President?

MR. BRITO: It acknowledged -- the writer acknowledges that The Times was moving closer than it ever has been to being oppositional, closed quote, in its coverage of President Trump. That's in the article. The presentation by Mr. Hentoff was more akin to let me explain to you the context of that article and why it was being written and for what purpose. And, again, I think that that's --

THE COURT: It was a rumination about the quandary of a journalist who is -- there's a question mark at the end of this -- that was in a tradition of journalistic balance but is faced with someone that the journalist presumably conceives of as dangerous and whether that reporter should abandon a balance and assume a position of opposition?

MR. BRITO: I think that's the way that it was characterized. The reader can draw a conclusion as to whether or not that's the intent and the logical conclusion that can be

drawn from the article, or is this --

THE COURT: Whether it's a projection to some hypothetical reporter or the heart and soul of The New York Times speaking through one of its writers.

MR. BRITO: Or is it art imitating life.

THE COURT: Okay.

MR. BRITO: And there's conclusions that can be drawn from the methodology of the writer. And I appreciate that it's not a direct, clear-cut -- very few of these cases are direct, clear-cut evidence of such bias, especially from large periodicals such as the defendants in this case. But I think we can reasonably conclude with circumstantial evidence that we've been able to allege in the amended complaint that this shows some bias and it shows additional reasons why the defendants would employ the statements that they did.

Again, and I know Your Honor has brought this up, but just in the interest of candor with this Court, because this issue is a little bit mushy -- again, my words --

THE COURT: It's a technical term, "mushy" --

MR. BRITO: Very technical term.

THE COURT: -- right in there with the actual malice and mushiness.

MR. BRITO: A departure from journalistic standards standing alone doesn't establish actual malice. I get it. I agree with it, but that's not what we're alleging and that's

certainly not what I'm arguing to this Court.

THE COURT: And it does say "standing alone."

MR. BRITO: That's the reason why I said what I said, absolutely. I'm not relying upon that journalistic standard issue alone, but I think it's one of several factors that I've gone through with this Court that I believe weighs in favor of the denial of the motion to dismiss.

THE COURT: Okay.

MR. BRITO: The next point, Your Honor, is reliance on a preconceived narrative and a refusal to consult on contrary evidence which we've alleged and argued in opposition to the motion. And here, Your Honor, courts routinely have found malice to be plausibly alleged where a complaint identifies reliance on questionable sources, which I've addressed previously, a refusal to consult contradictory evidence and adhere to a preconceived narrative. And that's the *St. Amant* decision as well as the *Biro*, B-i-r-o, *versus Condé Nast* where that court stated, "Reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice."

In addition to that, Your Honor, in *McDougal versus Fox News*, a speaker may be found to have acted with actual malice where the plaintiff alleges that the speaker, quote, specifically reviewed a contrary publication previously. And that is exactly the case here, because the defendants own

reporting and publicly available information contradicted the narrative that they chose to publish relative to the President's business background as well as the information that I spoke to you about just a few minutes ago in relation to Mr. Burnett.

The next point is obviously the undisputed absence of any charge or conviction of the President as it pertains to the tax fraud, and I believe that this issue is dispositive on the tax statements. It's undisputed that neither President Trump or his father have ever been charged with or convicted of any tax fraud, yet the defendants published as fact that the defendant -- I'm sorry, that the plaintiff -- pardon me -- was the beneficiary of, quote, fraudulent tax evasion schemes and likely tax fraud.

Nowhere in the book do the authors explain the basis for branding the -- any lawful conduct that was engaged in by the President as criminal fraud. And when you combine a false criminal accusation, Your Honor, with a stolen record, a convicted felon source and the inference of a reckless disregard, it is not just plausible, it's compelling. Because Your Honor was asking me these questions because that's the logical conclusion that a reader would draw not only to the publications but to the allegations of the complaint. When you combine those three factors, I think it's a compelling conclusion to draw that the defendants were relying upon the

information from Mr. Littlejohn in making these false allegations.

THE COURT: I think Ms. McNamara responded to my question, at least in part, with a citation to the book, which was somewhat different than the citation in the papers, and the part to which she referred suggested that the authors had consulted tax experts with respect to the allegations of tax fraud. Does that affect -- does that recitation in the book affect the question of whether they were actively doubting the veracity of their own reporting?

MR. BRITO: Not necessarily for a couple of reasons. The primary one is -- I agree with the Court, I didn't read in their motion to dismiss that specific reference. And so I'd like to confirm whether or not the citation that Ms. McNamara was referring to directly ties into the defamatory statements or whether they consulted with tax professionals for other reasons that are unrelated to those. I need to make sure that there's a link that's not missing in that chain, number one.

Number two, the way that the story was written, irrespective of whether or not they engaged in a communication with somebody who said "it looks like it might be" is different than what was written. And what was written is more definitive in its nature in terms of making the accusation that I read to you with respect to the fact that the President was being listed as being the beneficiary of fraudulent tax evasion

schemes. And I don't think that there's sufficient of a dissemination of the information to the logical reader that the reason for that statement is because of the reliance on tax professionals or otherwise. They simply make an affirmative statement that I don't think is necessarily protected simply because they spoke to some either named or unnamed tax professional. As it --

THE COURT: Well, let's give Ms. McNamara the benefit of the doubt for the moment and the accuracy of her citation to the text. If tax professionals were consulted and unless they said, no, this is a lawful arrangement, does that affect the vitality of the notion that the authors entertained active doubts about the veracity of their reporting?

MR. BRITO: Depending on what the professional said, it could very well, yes. It could very well. But none of us know exactly what they relayed to the reporters other than what is in the book itself and in the articles itself, which I don't believe is sufficient to carry the day with respect to sufficiently addressing the actual malice component. But if the evidence were to demonstrate something akin to what Your Honor just said, it would certainly have an impact one way or another depending on the testimony of these tax professionals, what information they were supplied, what documents they reviewed, who they spoke to, all of that would factor into a later determination as to whether or not that

impacts the actual malice statement, yes.

With respect to the argument that was raised in the filing with respect to a per-defendant malice analysis, as it relates to Penguin Random House and Mr. Baker, we have not lumped everyone together despite contentions to the contrary. What we did is, as to Penguin Random House, we allege that it's blind reliance on Ms. Craig and Mr. Buettner's reporting, reporting it knew rested substantially on Mr. Littlejohn, and The Times documented anti-Trump practices is itself *prima facie* evidence of Penguin Random House's reckless disregard. Because a publisher that publishes on such a foundation without justification, independent verification adopts the malice that was baked into the source to begin with.

As it pertains to the Adaptation Article, the terminology that's used in the motion and in the response, the defense conceded it was adapted from the chapters of the book and rests on the same underlying reporting of the book. And so this concession, I believe, is fatal to any argument that, as it pertains to the Adaptation Article, that we did not sufficiently allege the malice component as it pertains to Penguin Random House and Mr. Baker. The malice that infects travels directly into the Adaptation Article.

As it pertains to Mr. Baker and the Survey Article, Mr. Baker was subject to the same documented anti-Trump practices that his employer, we've alleged, were parties to,

and we pled *prima facie* evidence of his particular bias, that the defense's answer to that was that the material that he was relying upon was, quote, widely reported, and that's not a pleading stage defense that can be raised to defeat -- or I'm sorry, to support a motion to dismiss. It merely creates a factual dispute for the Court about verification in terms of what was widely reported, what was relied upon, what was verified by Mr. Baker in the Survey Article, which, for obvious reasons, the Court is not pressed to resolve today.

Many of the cases that Your Honor discussed with counsel at the outset with respect to the issue of actual malice offered only conclusory allegations regarding malice in those cases, and -- such as *Michel*, *Reed v. Chamblee*, *Jacoby versus CNN*, a lot of that was the standing alone type or an insufficient number of standing alone type elements. I don't think that this case is akin to that and is close to that.

And one of the cases that I do believe that I mentioned earlier is the decision that was reached by Judge Barber in the *Trump Media & Technology Group* case. And in that case -- Your Honor's familiar with it -- that dealt with a statement that was reported by The Washington Post about the payment of a referral fee, and the statements that were made by The Washington Post were based on no internal documents that reflected the referral fee actually being paid. It dealt with a definitive statement by The Post that a referral fee had been

paid which would lend itself to the possibility of criminal violations by a company and by the individual who was supposed to have either paid and/or received the funds without a signed agreement, without any evidence to suggest that the payment had actually been made.

There was a draft document that reflected that the payment was being discussed or somebody was requesting a payment, despite the fact that the reporter in that particular instance did not have verification that the payment was actually made. The Washington Post made the statement of the payment -- of the fee, and Judge Barber considered the factors relative to actual malice and found that that was sufficient to establish that The Washington Post had a high degree of awareness that the fee had not been paid. And so I think that that case factually had far more limited allegations in that amended complaint that survived the motion to dismiss on the grounds of actual malice.

If I may, I'd like to move to the issue of falsity. And the second attack that's been raised by the defendant to the amended complaint is that we actually didn't plead -- or correctly plead falsity, that we must show how each statement is false on a statement-by-statement basis. We believe that the complaint does exactly that.

And, Your Honor, I'm also mindful of Your Honor's decision in *Louidor versus Vasquez* as it pertains to what the

Court's view is, I think at least in that case, of what the plaintiff should be providing for purposes of establishing the falsity of the allegations.

Your Honor, if I may, I've prepared some charts. I've provided them to my colleagues. If I may approach the bench.

THE COURT: You may.

MR. BRITO: Thank you.

THE COURT: Just hand them to the deputy clerk there, she'll hand them to me. Or the CSO.

MR. BRITO: And those charts, Your Honor, essentially try to meet the standard that we believe the Court's looking for for purposes of establishing not only what the allegation is, where it's found in the complaint, where it's found in any of the publications, be it the book or the articles. The information I have supplied the Court is not an augment to what we've already argued. It's extracted from the amended complaint or extracted from the opposition to the motion to dismiss. There's nothing new in there. It's simply for ease of reference so that if the Court wants to employ an allegation-by-allegation analysis, what it pertains to in terms of those five categories that have been laid out and the way that it's been broken down by the defendants and why it is that the statement is false. I provide that to the Court for its own reference. I don't want to belabor by going allegation by

allegation, but I think it's an easy tool for the Court to use if the Court so chooses.

THE COURT: All right. Thank you.

MR. BRITO: You're welcome, Your Honor.

The amended complaint, Your Honor, as established by the plain as well as what ended up equates each challenged statement --

(Cellphone ringing.)

THE COURT: Excuse me, Mr. Brito.

What is that noise?

UNIDENTIFIED SPEAKER: I apologize, Your Honor. It will not happen again.

THE COURT: Yes, sir, Mr. Brito.

MR. BRITO: Thank you, Your Honor.

The amended complaint quotes each challenged statement verbatim from the books -- or the articles. It pleads an affirmative factual narrative that contradicts the central thesis of the statement and it identifies the specific factual contradictions going to the gist of the statement or the sting of the statement.

As the charts that I've handed to the Court are going to make clear, as it relates to *The Apprentice* statement, the book says that the producers -- and we talked about this -- created a version of Donald Trump that might have been nonexistent, that the show was a, quote, second inheritance and

that it made him, quote, national and bankable in ways that Trump never did on his own.

Those three statements -- to circle back to Your Honor's question some time ago as to what's the real sting or the gist of the statements as it pertains to *The Apprentice* are found in those statements. Because, again, it seeks to convince and allow the reader to conclude that the business relationship and the business reputation -- pardon me -- that the President had was nonexistent, fictional, contrived, and in reality that he owed whatever success he had now from a business perspective to this *Apprentice* relationship.

And we plead the opposite of those facts, that Mr. Burnett sought out President Trump who was a globally celebrated businessman with unique charisma. Going back to the look back, if you will, that Your Honor asked me about some time ago, there are those allegations in the complaint that establishes what we believe existed as of the time of the defamatory statements. We further allege that the show became a top-rated program because of the President and that its value declined after he left in 2015.

On the issue of the inheritance statements, we're not quibbling over the dollar figures. That's not the purpose of the allegation. We challenge the defendants' characterization of those figures as, quote, fraudulent tax schemes, likely tax fraud, quote, sham layer designed to evade the gift and estate

taxes. Those are concrete factual claims of criminal conduct, and our contradicting fact is that neither the plaintiff nor his father, and we've alleged this, were ever investigated, charged, or convicted.

As it pertains to the business statements, Your Honor, the defense really has --

THE COURT: I believe that the defense points out, however, that the Trump Organization was. Is that right?

MR. BRITO: The Trump Organization was.

THE COURT: Did lose some litigation with respect to its accounting procedures and paid some penalties and the like.

MR. BRITO: There is an argument that's raised to that effect, but, again, you're dealing with a nonparty, and the attempt to now argue that there was a blending or a bleeding between the President, his father, and the Trump Organization I don't think is sufficient to withstand scrutiny with regard to whether or not a defamatory statement has been made about this particular plaintiff, the President. It's an organization and it's separate and distinct from the plaintiff in this case.

With respect to the business statements, as I mentioned, the book has a broad assertion that the -- again, the plaintiff lacks business skill, that his success is, quote, unquote, the loser, that there is no evidence that in the 50 years of labor that he added to his lucky fortunes, and all of

that is contradicted in the complaint through the facts that have been alleged. The same points that I just raised to the Court, his national recognition as a businessman, his best-selling business books, his standing as a pop culture icon at the time that the statements were made, all of these things and all of the shows that he had appeared on before *The Apprentice* serve to belie the statements made in the book.

And then finally, Your Honor, with regard to the penchant statement, and really what that deals with is fairly limited. Basically there was some sort of a psychological characterization that was made by these writers based on information that is not really made clear that the President is, quote, drawn to men who display a penchant for violence. And that's only supported by some anecdotal reference that's made which is actually contradicted by the reputation that we've pled in the complaint about the President's professionalism. And it's certainly something that would be antagonistic to the statements in the book about him having a -- being drawn to individuals who have a penchant for violence.

The next issue I'd like to raise to the Court, Your Honor, we didn't hear much about it today, but I know it's in the filings, so I just don't want to fail to ignore it -- or fail to address it, is the argument that the statements are protected opinion. And the controlling test in that

determination is in the *Milkovich versus Lorain Journal* and the question whether a statement is sufficiently factual to be susceptible to being proved true or false. *Milkovich* also holds, Your Honor, that even a statement of opinion is actionable if, quote, the facts upon which it is based are incorrect or incomplete.

And so this district, also in the *Pollock* case, said, quote, both pure opinions and mixed expressions of opinion are actionable if the facts underlying them are false or inaccurately represented. And if we apply that standard here as it pertains to the fraudulent tax evasion schemes, the likely tax fraud, those are verifiable factual claims of criminal conduct, clearly. Those are either provable or disprovable based upon investigatory records, IRS audits, prosecutorial records. That's fact, that's not an opinion. The claims that the producers had to reinvent a version of Donald Trump that did not actually exist, these are causal factual claims about what produced his success. Again, those are testable with objective evidence.

I just want -- I'm sorry. I thought I heard Your Honor -- I'll close with one point as it relates to context, because opinion is context driven, and we've talked about context quite a bit today.

Under *Hay versus Independent Newspapers*, the Court construes statements in their totality. And I think under

*Johnson v. Clark* where a statement is a, quote, mixed opinion and fact and reasonably capable of defamatory interpretation, that's a jury issue. And so when we're dealing with that, obviously the denial of a motion to dismiss is what's appropriate under that standard.

I think one point that I have here in my notes that I'd like to address, because I think it goes back to some of Your Honor's questions as it pertains to *The Apprentice* scenario. One of the three prongs that Florida courts recognize as to what constitutes a defamation per se is if a person has been charged or has committed an infamous crime or if it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace, or tends to injure one in his trade or profession.

And so when we deal with the tax fraud issue, that's clear, that goes to the first category. As it pertains, more importantly, to the ones that I think the Court had some concerns or some questions about as it pertains to *The Apprentice*, that deals with more the last two elements, in that those statements tend to subject the President to hatred, distrust, ridicule, contempt, or disgrace, or, probably more pertinently, tends to injure one in his trade or profession by virtue of the statements that are being made especially given the public identity that the President enjoys as a businessman and falsely portraying him as somebody who doesn't have those

business skills and that what he represents as a fabrication, that's the heart of trade libel per se.

I did not hear counsel argue the issue of special damages as it pertains to the defamation per quod claims.

THE COURT: Yes, sir.

MR. BRITO: If the Court wants me to address that or --

THE COURT: I think I have a fundamental understanding of that issue without your consuming your time on that.

MR. BRITO: Thank you, Your Honor. Then let me wrap up, Your Honor, because I think -- actually let me --

THE COURT: Let me ask you two things real quickly. Do you place any -- strike that. Reverting to the concept that I was discussing with Mr. Hentoff, for sure, about the contextual factors that led to the result in *Connaughton* and assembling a set of factors that evidence malice or the components of malice that include a reasonable doubt or actual knowledge of falsity of -- reasonable doubt about the truthfulness or knowledge of the falsity of the statement that is published, are these charts that you've given me, is this that array of factors? Or can you articulate them otherwise about what factors are you asking that the Court assemble or array in finding the necessary element of malice here, recognizing, of course as we all do and as the courts have

said, that this is a notoriously difficult standard?

MR. BRITO: There's a few questions within your one question, Your Honor. I'm going to try to break it down.

THE COURT: I didn't mean to load it up. I'm sorry.

MR. BRITO: No. And there's questions that I was, you know, creating in my own head in conjunction with where Your Honor was headed with this.

THE COURT: I'm asking what you're asking me to piece together --

MR. BRITO: A hundred percent.

THE COURT: -- to arrive at a conclusion that you've fairly pleaded a reasonable inference.

MR. BRITO: And that's where I wanted to start is by answering that question and then kind of spill into some of the other ones.

There's four components. Number one, reliance on a convicted felon and the arguments that I've raised relative to that. I don't want to reiterate them, I just want to give you the bullet points, if I may.

THE COURT: You may.

MR. BRITO: Number two is failure to interview or acknowledge previous statements from an individual who would contradict the statements that were made in the publication, i.e., Mr. Burnett and his previous statements that were inconsistent and contrary to what they were representing about

the President, that is an element of purposeful avoidance.

Number three, The New York Times's internal documented practices, which we believe departs from journalistic standards.

And, number four --

THE COURT: Excuse me. Go ahead.

MR. BRITO: Oh. And number four is a failure to verify certain statements that were being made, primarily those with respect the allegations of tax fraud and engaging in tax fraud. There's no statements in any of the publications that would support a direct reason why the authors felt comfortable enough to make such a direct statement as opposed to crafting it in a way that softened it, maybe stated it as a belief or could be, or any of those statements that might soften it up, even -- even softened up, I still think it would be inappropriate for them to have made those statements given the fact that they didn't have any way to verify the tax fraud issue other than what we believe to be Mr. Littlejohn.

But those are the primary four factors so that we're not dealing with a standing alone type of a case. I think we have four factors to consider. And the question that I think it begs is what is the Court's role in analyzing one of these or all four of these factors for purposes of a motion to dismiss. And I think really the analysis goes back to where I started, which is, this case and defamation cases in general

should not differ from any other type of dispute as it pertains to, has the plaintiff alleged enough of those factors in the complaint to survive.

It's not a question of whether or not there's enough evidence to support, because we've all used the term "evidence" today, and I know it's just parlance, but I think it's a distinction that needs to be emphasized. That at this point in time we really do believe that allowing the plaintiff to be able to inquire of the authors, of the individuals who provided information to the authors and explore discovery on these at least four factors that we've alleged thus far is what would get us to the point to where we are today, and then coming before the Court and saying, okay. Now that we have the evidence, are these four factors sufficiently established through evidence as opposed to did the complaint allege enough factors, did it only allege one factor and the case law says that that's not enough, to just do a bare bone allegation, or is there enough in this complaint and there's enough factors in this complaint, of which there are four, to survive a motion to dismiss.

THE COURT: I briefly raised the question of the timing of the publications, that is, immediately preceding the 2024 General Election. You don't attribute any -- do you attribute any significance to that timing in establishing these elements -- the necessary elements?

MR. BRITO: The timing cannot be ignored, plainly. It's been alleged that -- the obvious timing of the release of these publications. I don't think we spend much time in the amended complaint beyond that, maybe at the risk of overstating the obvious, but certainly we didn't want to convert this into a situation where it was political in nature. I started my presentation to the Court stating that the defendants are trying to, and I'm not doing that. I don't want to do that. But we'd be remiss if we didn't look at the dates of publication relative to important events of this country.

Your Honor, if we strip away the rhetoric, I think, that has been advanced with respect to the balance between the First Amendment and the right for a plaintiff to seek relief from this Court, what remains is a complaint that does the work that Rule 12(b)(6) demands. It names a convicted felon source, it supplies an undisputed timeline showing the defendants knew the source was compromised, it points to a refused interview with one person who could confirm or refute the central thesis of many of the statements, it documents institutional practices of oppositional coverage, and it pleads the undisputed fact that no charge or conviction for tax fraud ever existed. And so on those facts and inference of actual malice, it is not merely plausible under the existing law, it's the natural inference to be drawn.

We would posit every counterargument that the defense

raises, such as, the book explains it, or it is widely reported, or the source corroborates it, those are an invitation to the Court to weigh the evidence and resolve disputed issues of fact, and that invitation should be declined. And if a reasonable jury could conclude that the plaintiff was defamed, dismissal would be improper, and we recite to *Trump versus ABC*.

So we would ask, respectfully, that Your Honor deny the motion to dismiss in its entirety. And as we raised in our opposition to the motion to dismiss, if the Court finds any deficiency, which we submit it should not or will not, we ask in the alternative that the dismissal be without prejudice and with leave to amend.

I'm happy to answer any of the Court's questions should you have any.

THE COURT: In your motion to dismiss, as you were just saying, you say that if I'm inclined to grant the motion to dismiss, which should not happen, you say, would -- you'd like to amend to include additional facts to demonstrate why the challenged statements are not substantially true, along with the additional facts and innuendo by defendants to show why the challenged statements are defamatory and additional evidence of actual malice for each defendant. Do you have additional facts that you want to plead?

MR. BRITO: Standing here today, I do not simply in

light of one of the things that the Court mentioned about the pendency of discovery and the possibility that discovery may elicit some additional information. But, more importantly, I'm not relying so much on that as I am direction from the Court as to what the Court finds -- should it do so, finds to be insufficient in terms of the pleading allegations.

I'm certainly going to rely upon our belief that the amended complaint sufficiently alleges the claim. But if the Court disagrees and specifies why it disagrees, there may be an opportunity for me to address concerns that the Court may have. It may not. I may not be able to. It really depends on the direction the Court takes us. But standing here today, I'm not sitting on a second amended complaint that I'm holding onto.

THE COURT: Yet you've conducted no discovery and it's been available since no later than March 12th.

MR. BRITO: Other than the written discovery that's been submitted as well as the jurisdictional discovery, correct, Your Honor.

THE COURT: Venue discovery.

MR. BRITO: Venue discovery. Pardon me.

THE COURT: All right. Anything further?

MR. BRITO: I do not. Thank you for your time.

THE COURT: All right. Thank you, Mr. Brito.

Realizing that all things must pass, Ms. McNamara, do you have a reasonably brief rebuttal that you'd like to offer.

MS. MCNAMARA: Yes, Your Honor. I'll try to make it very reasonably brief, but there are some points I think warrant me responding to here.

I think the overarching theme of both Your Honor's questions as well as Mr. Brito's statements is that he recognizes that any one factor standing alone does not amount to actual malice under his pleading, but he's trying to frame building blocks to various components. But what he ignores and what the law requires is he has to allege facts to support each one of those building blocks.

So, for example, here he never alleges any facts that Sue Craig or Russ Buettner or Penguin Random House had any specific animus to the plaintiff. He doesn't point to anything in the record, in the book, or anything else that evidences such specific animus. He also notes there's been a failure of journalistic standards in some broad abstract fashion.

He notes, for example, that they don't give the President sufficient time to respond to queries. Yet, notably, he does not allege here that any facts that support that conclusion that the authors went to the President just the day before they were printing the book or that they went to him just hours before they were publishing the Adaptation Article, there is no such allegation in the complaint to support the conclusory contention, and for that reason it fails.

And they talk about that we ignored contrary

evidence. It doesn't appear that the plaintiff has actually read the entire book. The plaintiff, as well as the Court, is duty bound to look at these statements in context, and where they evidence, the very contrary facts they're alleging in the complaint, I've already established that the book, you know, pages and pages, sometimes hundreds of pages, document the rise of President Trump's career and his incredible successes. The book documents that, and none of that is challenged here.

And consider, for example, the Eleventh Circuit's decision in *Turner versus Wells*, where it is the responsibility of the court -- and, I'm sorry, that this involves an entire book, but it is the responsibility of the court to look at the entire work in context. In *Turner versus Wells*, the court scoured the entire report that was at issue concerning the football coach and found that the very facts that the plaintiff was alleging, oh, this is positive and there's positive things to say about the coach were included in the report. And when it's on the face of the document, that establishes that they have not set actual malice. And I heard the plaintiff's counsel say that not only that, you know, contending we didn't somehow report positive statements from Mr. Burnett, which I've already established the book is replete from positive statements of from Mr. Burnett, and he says we don't tether or identify the other *Apprentice* sources.

But just look for example on pages 352 and 353 of the

book and that entire chapter, it quotes source after source for the very statements challenged in this book. It identifies Bill Pruitt, the producer who had the reaction when he went into the Trump offices. It quotes Alan Blum, it quotes Jonathan Brown. It quotes person after person after person that were interviewed and that formed the foundation for the statements. The Court, under *Johnson versus City of Atlantic* out of the Eleventh Circuit, can and should consider the works that are necessarily a part of this -- of this action.

Now, the plaintiff on more than one occasion cited to the Trump -- the *TMTG* case *versus The Washington Post,* and that's a very good example of exactly -- much like in the *Project Veritas* where the court scoured the actual publication at issue on the amended complaint and found an inconsistency in the article that evidenced perhaps some doubt about the accuracy of what was being reported.

I direct your attention to the court's observation in *TMTG*, where it says, "But the article expressly stated that the note was not fully executed and described it as an offer of funds, unlike The Post's unqualified reference to the fee agreement. Further, no one disputes the loan was made and receipt of the proceeds were shown by wire transfer. The Post's careful treatment of the loan and its documentation cuts in favor of actual malice as to the finder's fee statement, not against it."

Yet, here, the plaintiff cites to absolutely no statements in this book that shows any such contrary evidence, any such questioning or doubt. It references, and you heard the plaintiff acknowledge, that Mr. Littlejohn -- there's nothing in this book that suggests that he was relied on for information, and there's nothing in this book that contradicts the accuracy of the various statements at -- or the tax returns that were relied on. And as I noted earlier, the President had an opportunity to challenge those statements. Those are not from Littlejohn, they're from 2018, they're from Mary Trump's documents about the estate. That's expressly clear in the book. I'm not talking about evidence that would be developed. That is what the book establishes, that is what the prior litigations with the President establishes.

And, lastly, Your Honor, regarding the tax professionals, again, the book makes that clear, and there's nothing in there and they have not pointed to any particular fact in the book that would support that there was any doubt about any of those statements, most certainly because all of them were published prior -- you know, six years before the book was published, and the plaintiff never saw fit to challenge any of them. How does that show subjective doubt?

So for all those reasons, Your Honor, I won't belabor them any further, because you've been extremely tolerant of the parties and I really appreciate it. Thank you very much.

THE COURT: Thank you.

Mr. Hentoff, did you want to add anything?

MR. HENTOFF: Very, very briefly, Your Honor.

THE COURT: All right, sir.

MR. HENTOFF: Your Honor, I'm just going to respond to a couple of points.

THE COURT: Yes, sir.

MR. HENTOFF: So I believe I heard counsel say that, when counsel was discussing these alleged New York Times policies, their evidence that would support an allegation of actual malice, one of them which is in the complaint, is supposedly a policy to always rely exclusively on confidential sources. And, you know, we say that allegation just doesn't match the two articles we see here, whereas the Survey Article is just a lot of things that have already been published.

And then I believe I heard counsel say with regard to the Adaptation Article, well, there's no attribution to people; maybe I misheard him. But if one reads the Adaptation Article, I immediately counted three on the record, *Apprentice* producers who said things that the article relied upon. So the allegation of a policy of exclusively relying on confidential sources is not plausible.

Counsel said we should not -- we should not weigh evidence, and I agree. It's not appropriate to weigh evidence on this motion. However, the Eleventh Circuit has

recognized -- it has recognized as a matter of public record and based its 12(b)(6) dismissal on that. Specifically I'm thinking of *Moore v. Cecil*, where the Court said -- and this is at 109 F.4th 1352 and 1377, and this is where reliance on previously published sources undercuts an allegation of actual malice. The Court said, "Indeed, it is undisputed that the allegations that Moore had preyed on young teenage girls were widely published in a multitude of sources at the time of the digital ad which tends to preclude a finding of actual malice." And, again, although the word "finding" is used, this was a 12(b)(6) affirmance. And, here, the Survey Article, it's a greatest hits. It's a -- it is a large discussion of very, very famous controversies in the online version of it with a lot of links to the sources.

And then finally with regard -- I think toward the end, counsel made two comments about Mark Burnett in support of the allegations of actual malice. One of them was -- it was purposeful avoidance to not interview Mark Burnett.

THE COURT: I'm sorry. It was a purposeful avoidance to what?

MR. HENTOFF: To not interview Mark Burnett. Okay? And the complaint doesn't even factually allege that. The complaint alleges that the reporter should have tried harder. And relatedly and finally, counsel characterized that as the refused interview. The complaint does not say that, therefore

it does not support that point.

And that's all I have, Your Honor.

THE COURT: All right. Thank you, Mr. Hentoff.

Mr. Brito, I'll give you a couple more minutes if you have anything you want to add.

MR. BRITO: I don't want to abuse your courtesy, Your Honor. I have nothing to say.

THE COURT: I'm a district judge, I'm abused all the time.

MR. BRITO: Not by me, Your Honor.

THE COURT: All right. I will -- I thank you all for your good briefing and the good spirit and ability that you've displayed here today in this argument. I will issue -- I'm going to need to talk to my lawyers back in chambers, and I want to look at the material that Mr. Brito gave me and these charts and reconsider the matter, and I will issue an order very soon.

So with that and with my thanks to you all, we are in adjournment.

(Whereupon, the Court adjourned at 11:36 a.m.)

--oo0oo--

REPORTER'S CERTIFICATE

I, REBECCA M. SABO, a Registered Merit Reporter and Certified Realtime Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of the transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Tampa, Florida, this 9th day of August, 2026.

/s/ Rebecca M. Sabo

Rebecca M. Sabo, RMR, CRR
Federal Official Court Reporter