UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PRESIDENT DONALD J. TRUMP

v. CASE NO. 8:25-cv-2487-SDM-NHA

NEW YORK TIMES COMPANY,
a New York corporation, *et al.*
___________________________________/

**ORDER**

The defendants move (Docs. 44, 103, and 107) to dismiss the plaintiff's second amended complaint (the complaint, Doc. 99). The plaintiff responds (Docs. 81 and 104).

No party disagrees that *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), is the source of the law that governs the pleading standard a plaintiff must overcome to state a claim for defamation against a public official, such as the plaintiff. *Times v. Sullivan* states that the First Amendment "prohibits a public official's recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 84 S. Ct. at 726. Twenty-five years later, Justice Stevens in *Harte-Hanks Communications v. Connaughton*, 401 U.S. 657, 686 (1989), states, "The meaning of terms such as 'actual malice' — and, more particularly 'reckless disregard' — however, is not readily captured in one infallible definition" but, rather, "only through the course of case-by-case

adjudication can we give content to these otherwise elusive constitutional standards." (The quotations in this order, all of which are familiar to the parties, are — in the current phrase — "cleaned up" for ease of reading.)

*Times v. Sullivan* has germinated in the courts and over the years decisional precedent in the Supreme Court and elsewhere — about which judges, lawyers, and others have composed countless pages of commentary, some laudatory and some antagonistic — has lent a degree of content and texture to the "actual malice" requirement but more often by specifying what "actual malice" or "reckless disregard" is not, rather than what it is, and by specifying what facts are insufficient to allege actual malice rather than what facts are sufficient. For example, even in *Harte-Hanks*, Justice Stevens finds that "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard," but he immediately adds that "reckless disregard may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his report." Perhaps sensing the unsatisfying content of those observations and perhaps attempting to clarify, Justice Stevens later in *Harte-Hanks* states, "Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." 401 U.S. at 692. Against this indistinct background, the parties' debate exactly how *Times v. Sullivan* and intervening precedent apply to the pleadings in this action.

**The formidable edifice of "actual malice"**

In the motion to dismiss, the defendants begin, of course, with *Times v. Sullivan* and explore in detail the principles and applications that have descended from *Times v. Sullivan* and how they combine and resolve to secure the protections of the "actual malice" standard for a publisher and an author. The defendants note with citations to authority that the challenged statements — about a presidential candidate published immediately preceding a presidential election — are "political speech of the highest order" and that reporting on that topic and at that moment "occupies the highest rung on the hierarchy of First Amendment values." The defendants insist correctly that the standard of pleading required of a public-official plaintiff is "famously daunting," an "exacting standard," and the defendants proceed to delineate examples of the formidable standard "actual malice" erects.

For example, in the matter of "actual malice," the defendants correctly assert that "reckless disregard" for truth is a "purely subjective test" and the "beliefs or actions of a reasonable person are irrelevant." The law, especially the tort law, is intensely concerned elsewhere with reasonableness, but not in the defamation of a public official. In other words, "all that matters are the speakers' subjective beliefs about the truth of their own statements." To warrant a finding of actual malice, "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," that is, "sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity."

The defendants, again with citations to authority, note that, notwithstanding the ordinary meaning and usage of "actual malice," "allegations of ill-will, improper motive or personal animosity play no role in determining whether a defendant acted with actual malice," which "does not concern ill-will, improper motive, or personal animosity," a conclusion which appears correct, in law if not elsewhere in the English language or in the common understanding. In sum, "actual malice is not about whether the speaker had evil intent or a motive arising from ill-will."

The defendants, again with citations to authority, remind the reader that "a departure from journalistic standards does not constitute actual malice." In other words, no enforceable or other journalistic "standard of care" rises *pari passu* as the "order" of the journalistic speech heightens, as a loftier rung in the hierarchy of First Amendment values is achieved, and as coincidentally the potential for public and private injury from defaming a public official and misleading the electorate becomes more acute and consequential.

The defendants add that neither "reliance on unnamed sources" nor choosing "not to speak with any witnesses who could have refuted the allegedly defamatory statements" nor a "failure to investigate" nor even a "failure to review records that are public" will establish actual malice.

Another defensive principle featured by the defendants is that, although "actual malice" means publication "with knowledge that [the publication] was false or with reckless disregard of whether it was false or not," the "required awareness of falsity is absent when the publisher's claims are reasonably supported by numerous

prior reports," previously published in "reputable sources," or "supported by corroborating reports in other news media."

As well, the defendants feature not only the fact that a writer or publisher has a "right to report information they believe to be true," even if the report is untrue, but also that "reliance on a potentially biased source does not by itself establish actual malice." A book publisher, the defendants recall, is "entitled as a matter of law to rely on an author's reputation and experience" and on the author's "reportorial abilities," and a public-official plaintiff must show "independent actual malice," that is, the publisher's actual malice apart from and independent of the author, to establish actual malice.

The defendants assert, again supported with citations to authority, that the plaintiff must allege facts, not mere conclusions, "specific to each Defendant and each statement in suit that plausibly allege actual malice, *i.e.*, knowledge of falsity or probable falsity" and, to that end, that the plaintiff must allege specific facts plausibly showing that an author or a publisher had "a specific reason to doubt the truth of their reporting"; and that the plaintiff must allege "how each statement in suit is false or what [the plaintiff] contends the truth to be . . . ." The defendants note with citations that evidence of "extensive research" and "considerable corroboration" tends to weaken an inference of actual malice as to any statement and, similarly, that an inference of actual malice is weakened, "undercut" as the defendants write, by evidence of the solicitation of comment from the plaintiff and from others who might

provide probative information, especially from an independent vantage or from a vantage contrary to the vantage of other sources, the author, or the publisher.

The defendants further note with citations to authority that "subjective interpretations of undisputed facts, which are not capable of being proven false" are "opinions," which "as a matter of law . . . are not actionable." Similarly, the defendants state, quoting precedent, "Where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has, and rebuts actual malice."

Also, the defendants, supported by authority, explain that for a statement to support a defamation claim the statement "must be more than negative"; must "subject the plaintiff to 'hatred, distrust, ridicule, contempt or disgrace'"; and must amount to more than a "mild insult."

**Pleading a plausible and reasonable inference of actual malice**

The plaintiff begins the defense of the complaint by repair to the familiar pleading standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), summarized succinctly but precisely in *Iqbal*:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in Twombly, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

The plaintiff, citing authority, states that "a public-figure plaintiff need only allege facts sufficient to give rise to a reasonable inference of actual malice — not direct proof." Of course, the plaintiff necessarily agrees that, based on *Times v. Sullivan*, the reasonable and plausible inference that the facts alleged in the complaint must create is that the author or the publisher uttered defamatory statements "with knowledge they [they were] false or with reckless disregard of whether [they were] false or not." The plaintiff says reckless disregard is revealed by "the circumstances surrounding the publication," by allegations of "purposeful avoidance of the truth," by facts showing "the statement was inherently implausible or that there were obvious reasons to doubt the veracity of the informant," by facts showing "adherence to a pre-conceived narrative," and by facts showing "reliance on anonymous or unreliable sources without further investigation."

In sum, the parties agree both that the standard of *Times v. Sullivan* controls and that the standard of *Iqbal* and *Twombly* controls. The parties have examined at length perhaps every angle on every application of these important standards to this action.

**The allegations of the complaint**

The complaint (Doc. 99) alleges as defamatory and actionable a series of statements appearing in paragraphs 39, 43, 47, 51, 59, 63, 67, 71, 88, 92, 96, 100, 104, 112, 116, 120, 125, 129, 133, 137, 141, 145, 149, 153, 157, 162, and 166. Even if untrue, even if published with ill-will or evil intent, and even if insulting, insufficiently investigated, or the like and even if otherwise emotionally and financially injurious to the plaintiff, under the strictures of *Times v. Sullivan* and under other applicable law — whether right or wrong, whether wise or unwise, and whether for better or for worse — and for one or more of the many and varied reasons amply and ably explained by the defendants in the motion to dismiss and the supplement and encapsulated above, none of these statements is actionable.

However, as alleged in the complaint, the book, *Lucky Loser*, includes these statements: (1) "Donald Trump had received the equivalent of more than $400 million from his father, much of it through fraudulent tax evasion schemes" (Doc. 99 at ¶32); (2) "In the language of the tax code, Fred had given his son taxable gifts masquerading as loans, a likely tax fraud that went unnoticed" (Doc. 99 at ¶59); (3) "A plan was soon devised to funnel some of Fred's cash to Donald and his three siblings. They would accomplish that goal by adding a sham layer to Fred's business, one designed to evade the gift and estate taxes" (Doc. 99 at ¶75); (4) "So the Trumps began submitting the padded bills to request rent increases from state officials. Part of the cost of Donld Trump's off-the-books inheritance would be passed along to this father's middle-income tenants" (Doc. 99 at 81); (5) "Between the trust funds, the

invoice-padding operation, and other devices created to siphon off his father's wealth outside the gift and estate tax system, Donald was already collecting almost $2 million a year from his father companies. His own business failures meant he kept that money tax-free" (Doc. 99 at 84); and (6) "Donald Trump had faced these moments before, periods when it seemed his failures could not be saved only by aggressive tax maneuvers or not paying his debts" (Doc. 99 at 108). As described in the complaint, the second article includes the statement (7) "Federal, state and local authorities looked into his ties with the Mafia, found violations of money laundering rules and penalized him for skirting stock trade rules" (Doc. 99 at 170).

In these seven instances, the allegations of the complaint quite plausibly and reasonably create an inference that the authors and the publishers knew that these statements, accusing the plaintiff of planning and perpetrating complex crimes and knowingly receiving the proceeds and other benefits of these crimes, were "based on incomplete, minimal information" and that the author and the publisher "realized that a responsible assessment of the Trump family's compliance with tax laws would have required forensic auditing, expert tax and legal advice, and other expensive investigatory tools." Further, the complaint alleges that the authors and the publishers knew that "neither President Trump nor Fred Trump was investigated for, charged with, or convicted of tax fraud . . . ." (Doc. 99 at ¶231) In other words, the facts alleged in the complaint create at least a plausible inference that the authors and the publishers knew that no reliable conclusion about violations of the tax laws, including especially the estate and gift tax laws, is possible without reliance on qualified

opinion formulated after the necessary factual and legal research and analysis, which they knowingly failed to obtain.

The defendants respond in part to the plaintiff's claims based on allegations of crime as follows:

> Craig and Buettner "analyz[ed] about one hundred thousand pages of audited financial statements, tax returns, bank records, general records, and legal papers." Their conclusions regarding tax fraud were informed by numerous experts. The 2018 Article quotes Lee-Ford Tritt, an "expert in gift and estate tax law," who said the Trumps' use of All County was "highly suspicious" and could constitute criminal tax fraud; Adam S. Kaufmann, "a former chief of investigations for the Manhattan district attorney's office," who said it "smells like a crime"; and Mitchell Gans, a tax law professor, who explained how gift tax returns can evade IRS scrutiny. Reliance on experts controverts actual malice—particularly when, as here, Plaintiff makes no effort to challenge such reliance. See, e.g., *Levan v. Cap. Cities/ABC, Inc.*, 190 F.3d 1230, 1241-44 (11th Cir. 1999) (reliance on "numerous objective experts" and "industry professionals" defeated actual malice); *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1498 (11th Cir. 1988) (no actual malice where challenged publication "was thoroughly researched through interviews with experts") (citation omitted).

In response to a question about the basis for the accusation of tax crimes, the defendants identified page 451 in the "Acknowledgements" section of the book, which states, "In coming to terms with the highly technical areas of tax law, we would have been lost in the weeds without the generous help of several experts. We hold a special place in our hearts for Jim Ledley, one of the most prominent estate and trust lawyers in New York, who was endlessly patient and exceptionally generous with his time. Jim made the arcane work fun."

Obviously, even a qualified expert's offering a superficial characterization such as a transaction is "suspicious" or "could" violate the law or attributing to a transaction the (unspecified and undefined) "smell" of crime or noting that a gift tax return can evade IRS scrutiny or generously giving his immensely valuable time to aid laypersons "lost in the weeds" is far from a formal legal opinion sufficient to remove serious doubt about the truthfulness and accuracy of a statement accusing a specific person of fraud or tax evasion or some related crime arising from a specific transaction, including a crime allegedly effected through "ties to the Mafia." The confident detection of tax and other crimes, including money laundering, of the kind that some of the challenged statements attribute to the plaintiff, that is, tax crimes including estate and gift tax crimes and the like, is a task that is intensely fact-dependent, and the law that governs is singularly complex and within the immediate competence of only a relatively small cohort of specialized practitioners. Anyone who publishes the claim that someone else has committed a crime of the complex nature described in some of the challenged statements and who has not received an explicit opinion from a qualified source after a thorough examination of pertinent facts necessarily proceeds with particularized reason to doubt the truth of their statements and with knowledge of a high degree of probable falsity of the statements; in other words, they know that they don't know, but they are undeterred. Knowing of the necessity for that opinion but failing to procure that opinion is a fine example of the purposeful avoidance of the truth, a knowing failure that remains actionable, even after *Times v. Sullivan*.

## CONCLUSION

For these reasons, including the reasons detailed by the defendants in the motion to dismiss and the supplement, the motion to dismiss Counts III and IV is **GRANTED**, but the motion to dismiss Counts I, II, V, and VI is **DENIED**. The twenty-seven challenged statements listed on page eight of this order (paragraphs 39, 43, 47, 51, 59, 63, 67, 71, 88, 92, 96, 100, 104, 112, 116, 120, 125, 129, 133, 137, 141, 145, 149, 153, 157, 162, and 166) are not actionable as, and will not proceed further in this action as claims of, defamation published with "actual malice." The plaintiff's request to again amend the complaint is **DENIED** because no reason appears, even after initial discovery, to conclude that an additional amendment is not futile. The defendants must answer within twenty-eight days. Nothing in this order constitutes a ruling as to the admissibility at trial of evidence of the content and circumstances of any of the twenty-seven challenged statements listed above but not actionable as defamation.

ORDERED in Tampa, Florida, on November 19, 2026.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE